UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| VICTOR OOLITIC | )    Case Nos. 09-05786 and 09-05787 |
| STONE COMPANY, *et al.*, | )    (Jointly Administered) |
| | ) |
| Debtors. | ) |
| | ) |

### MOTION OF DEBTORS FOR ORDERS: (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTORS AND ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO LIMESTONE ACQUISITION CORP. FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, AND (II) APPROVING (A) AUCTION AND OVERBID PROCEDURES IN CONNECTION WITH THE PROPOSED SALE TO OBTAIN HIGHER AND BETTER OFFERS, (B) AN EXPENSE REIMBURSEMENT, AND (C) THE <u>MANNER AND FORM OF NOTICE OF SALE</u>

Victor Oolitic Stone Company ("Victor Oolitic" or "Company") and Victor

Oolitic Holdings, Inc. ("Holdings"), the above-captioned debtors and debtors-in-

possession (collectively, the "Debtors"), by and through their undersigned counsel,

hereby move for orders:  (I) authorizing the sale of substantially all of the assets of the

Company and the assumption and assignment of certain executory contracts and

unexpired leases to Limestone Acquisition Corp. (the "Proposed Buyer") free and clear

of liens, claims, interests and encumbrances pursuant to the terms and conditions set forth

in that certain Asset Purchase and Sale Agreement between Company and the Proposed

Buyer dated as of September 16, 2009, a copy of which is attached hereto as <u>Exhibit A</u>

(the "Asset Purchase Agreement")[1], and (II) approving (A) auction and overbid

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement.

procedures in connection with the proposed sale to obtain higher and better offers, (B) an expense reimbursement, and (C) the manner and form of notice of sale.

After many months of intensive negotiations, the Debtors, their senior secured lenders and the equity holders have reached an agreement which, if approved by the Court, will result in the continuance of the business as a going concern and the preservation of important jobs. The essence of the agreement is the sale of substantially all of the assets of Victor Oolitic to a newly-formed entity, the owners of which include some of the current equity holders. The consideration to be paid by the Proposed Buyer is approximately $54 million, including cash to repay the Debtors' senior secured loans and assumption of certain post-petition liabilities. Importantly, immediately prior to the closing of the Sale, the Proposed Buyer will be capitalized with an infusion of $2,750,000, which will ensure liquidity to make needed capital expenditures and provide an equity cushion to ensure the future viability of the company. **The senior secured lenders have approved this proposed transaction in all respects.**

In further support of the Motion, the Debtors respectfully represent as follows:

### Jurisdiction

1.     This Court has jurisdiction to consider and determine this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 363 and 365 of the Bankruptcy Code.

## Background

### A.    Procedural Background

2.      On April 28, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors' respective cases are being jointly administered by this Court (collectively, the "Chapter 11 Cases").

3.      No committee or trustee has been appointed in the Chapter 11 Cases.

### B.    General Business Description

4.      Founded in 1897 in Bloomington, Indiana, Victor Oolitic is the leading provider of high quality Indiana limestone in North America.

5.      Limestone has been this nation's building stone for more than 150 years, securing an enduring position in American architecture.  Indiana limestone is well known among architects and builders for the consistency of its color and texture, uniformity, durability and ease of use, maintenance and fabrication.

6.      Victor Oolitic sells three primary limestone products: (i) raw material in the form of quarry blocks, (ii) raw material in the form of slabs, and (iii) finished accent pieces known as sill stock, which include keystones, quoins, copings, patio tiles, hearths, mantels and veneer.

7.      As of the Petition Date, Victor Oolitic employed approximately 85 full-time individuals.  For the fiscal year ending December 31, 2008, the Debtors generated revenues of approximately $18,000,000 and had adjusted EBITDA of approximately $10.1 million.

### C.    Capital Structure

8.    On August 25, 2005, Holdings was formed for the purpose of facilitating the acquisition by certain funds managed by the Audax Group, a Boston-based private equity company, of the majority of the stock of Victor Oolitic from the Edgeworth family. The stock of Holdings is currently owned by five Audax-managed funds, John Edgeworth, Harry Edgeworth and certain other minority stakeholders. Holdings owns 100% of the stock of Victor Oolitic and has no assets other than this stock.

9.    The 2005 acquisition was financed in part with senior and junior debt secured by the assets of Victor Oolitic. Specifically, Victor Oolitic entered into a Credit Agreement (the "First Lien Credit Agreement") with M&I Marshall & Ilsley Bank (as successor by merger to First Indiana Bank, N.A.) (the "Senior Agent"), Fifth Third Bank, The Huntington National Bank and Charter One Bank[2] (collectively, the "Senior Lenders"). Pursuant to the First Lien Credit Agreement, the Senior Lenders initially provided the Company with aggregate senior credit facilities of $60,000,000 (collectively, the "Senior Loans"), consisting of a $5,000,000 revolving loan commitment ("Revolving Loans"), a $40,000,000 term A loan (the "Term A Loan") and a $15,000,000 term B loan (the "Term B Loan"). The Senior Loans, along with certain hedging arrangements, are secured by substantially all of the assets of Victor Oolitic and are guaranteed by Holdings, which guaranty is secured by Holdings' pledge of its stock of Victor Oolitic (together with the assets of Victor Oolitic, the "Prepetition Collateral").

10.    Prior to the Petition Date, the Revolving Loans bore interest at the default interest rate of Prime plus 2%, the Term A Loan bore interest at the default rate of LIBOR plus 5% and the Term B Loan bore interest at the default rate of LIBOR plus

---

[2] Charter One has since been acquired by RBS Citizens Bank.

5.25%. From and after the Petition Date, the Credit Agreement provides that both the Term B Loan and the Revolving Loans bear interest at LIBOR plus 3.25% and the Term A Loan bears interest at LIBOR plus 3%. As of the Petition Date, the aggregate obligations owed by the Company to the Senior Lenders under the Credit Agreement were approximately $53 million (plus interest).

11.     In addition, Victor Oolitic borrowed $15,000,000 (the "Second Lien Loan") pursuant to a Second Lien Credit Agreement dated August 25, 2005 (the "Second Lien Agreement") with Freeport Financial LLC (the "Second Lien Agent") and Freeport Loan Fund LLC. A portion of the Second Lien Loan was subsequently assigned by Freeport Loan Fund LLC to Freeport Loan Trust 2006-1 (together with Freeport Loan Fund LLC, the "Second Lien Lenders", and both collectively with the Second Lien Agent, "Freeport"). The Second Lien Loan is secured by a second-priority lien on the Prepetition Collateral and is guaranteed by Holdings. On February 28, 2008, Freeport and the Company entered into an amendment to the Second Lien Agreement to increase the Second Lien Loan by $475,360.92. On the same date, certain Audax-managed funds purchased participations in 100% of this additional Second Lien Loan amount.

12.     The respective rights of the Senior Agent and the Second Lien Agent, and certain other parties, are governed by an intercreditor agreement dated August 25, 2005 (the "Intercreditor Agreement"). The Intercreditor Agreement provides, among other things, that Freeport will not take certain actions in the event of a bankruptcy of the Company. Specifically, section 4(c)(iv) of the Intercreditor Agreement expressly provides that, in any bankruptcy case of Holdings or the Company, the Second Lien Agent and the Second Lien Lenders shall not:

object to any sale of all or any portion of the Collateral consented to by the First Lien Agent, or file any pleadings, objections, motions or agreements with respect to the sale of all or any portion of the Collateral, without the prior express written consent of the First Lien Agent in each instance; provided, that the respective interests of the [Second Lien Lenders] attach to the proceeds thereof, subject to the provisions of this Agreement[.]

### D.    Events Leading to the Filing of These Chapter 11 Cases

13.    The acquisition of Victor Oolitic in August 2005 was made at or close to the peak of the Company's value.  At that time, the United States residential and commercial construction markets were experiencing extraordinary annual growth, and there were occasions where Victor Oolitic could not meet customer demand for limestone.  At the time of the acquisition, the Company anticipated that the growth in demand would continue.  Shortly after the acquisition, however, the market began to soften.

14.    By mid-2007, the residential housing industry was in substantial decline.  Then in 2008, commercial and industrial building began to level off.  Consequently, demand for limestone decreased.  In response to the demanding challenges of the marketplace, the Company began implementing very aggressive cost-saving measures, including payroll reductions in the form of employee layoffs and cutting overtime, as well as drastically cutting back on capital expenditures (reducing these expenditures by approximately two-thirds from 2007 to 2008), while ramping up sales and marketing efforts.  Notwithstanding these measures, EBITDA declined from $12.0 million in 2007 to $10.1 million in 2008.

15.    Although the Company managed to generate sufficient cash flow to fund operations despite the harsh economic climate and to make all interest payments due

under the First Lien Credit Agreement, the Company has been unable to fully service the substantial debt load inherited in the 2005 acquisition. The Company's financial situation led to a series of discussions, and forbearance arrangements, with the Senior Lenders.[3] On a parallel track, implemented in 2008, the Company hired an investment banker and embarked on a strategy to seek out potential purchasers and/or investors for a transaction that would lessen the debt load and preserve the going concern value of the business. Those efforts, however, failed to generate adequate offers that would repay even the Senior Lenders.

16.     The Company's last pre-petition forbearance agreement with the Senior Lenders expired on January 1, 2009.[4] On March 29, 2009, following non-payment of the senior amortization payments and with no forbearance in effect, the Senior Lenders accelerated the Senior Loans in their entirety and terminated the revolving loan commitments. On April 15, 2009, the Senior Lenders effected a set off against the Debtors' operating account, ultimately resulting in the filing of the bankruptcy petitions on April 28, 2009.

### E.     Post-Petition Events

17.     Concurrently with the commencement of the Chapter 11 Cases, the Debtors filed various "first day" motions with the Court (the "First Day Motions"). The First Day Motions sought relief aimed at, among other things, maintaining the going concern value of the enterprise, maintaining employee morale, minimizing disruption to the Debtors' business, and establishing procedures for the smooth and efficient

---

[3] Despite significant efforts, the Company was unable to negotiate a forbearance agreement with Freeport.

[4] During the forbearance periods, the Company remained current on interest payments to the Senior Lenders (including the additional 2% default interest) but did not have sufficient funds to pay obligations under the Second Lien Loan.

administration of the Chapter 11 Cases.

18.     The Court approved certain of the relief requested by the First Day Motions in various orders (the "First Day Orders") entered by the Court on May 5, 2009. Among the First Day Motions was the Debtors' *Motion for Interim and Final Orders Authorizing Use of Cash Collateral and Granting Adequate Protection in Connection Therewith* (the "Cash Collateral Motion"). By the Cash Collateral Motion, the Debtors requested authority to use cash collateral and provide adequate protection to the Senior Lenders and the Second Lien Lenders. The Senior Lenders initially opposed the Cash Collateral Motion, but this dispute was ultimately resolved consensually. On May 27, 2009, the Court entered a stipulated final order authorizing the use of cash collateral and granting adequate protection and other related relief (the "Final Cash Collateral Order"). The Final Cash Collateral Order provided, among other things, the following:

- Use of cash collateral through October 2009 pursuant to a budget attached to the Final Cash Collateral Order;

- Monthly adequate protection payments to the Senior Lenders in the amount of $165,000;

- A carve-out for the payment of allowed fees and unpaid expenses of the Debtors' professionals and allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) incurred prior to any order of the court: terminating the Debtors' use of cash collateral; granting relief from the automatic stay; converting the Chapter 11 Cases to cases under chapter 7; or dismissing the Chapter 11 Cases; and

- A requirement that the Debtors maintain their operating account with the Senior Agent and deposit all post-petition receipts therein.

## F.     Proposed Sale of the Company

19.     Over the last several months, the Senior Lenders, the Company and its shareholders engaged in intensive negotiations concerning the restructuring of the

Company's debt. The Asset Purchase Agreement is the culmination of those efforts. **The Senior Lenders have consented to the terms of the sale and the Proposed Buyer has agreed to pay the obligations under the First Lien Credit Agreement (other than default interest, which will be waived, and excepting the Senior Lenders' professional fees and expenses, which will be paid by Buyer in cash at the Closing) pursuant to a new credit agreement to be entered into between the Senior Lenders and the Proposed Buyer, the terms of which are described below.**

20.     The sale of the Company's assets on the terms set forth in the Asset Purchase Agreement (the "Sale") will ensure the continuation of the business as a going concern, ensure the preservation of important jobs, and increase the likelihood of returning the business to profitability by easing the debt burden.  Under the Asset Purchase Agreement, the Debtors have agreed to sell the Purchased Assets (as defined in Section 1.2 of the Asset Purchase Agreement), subject in all respects to the terms of the Asset Purchase Agreement, to higher and better offers to be sought through an auction process, and approval of this Court.  The proposed Sale contemplates (on the terms and subject to the conditions of the Asset Purchase Agreement): (i) a new equity infusion (exclusive of any assets purchased in the Sale) into the Proposed Buyer in the amount of $2,550,000 net of the Purchase Price; (ii) the Proposed Buyer's agreement to offer employment to all of the Company's employees on terms no less favorable than those they currently have; (iii) payment of the full amount of the senior bank debt (other than default interest) and assumption of administrative expenses in the Chapter 11 Cases that remain unpaid prior to the closing; and (iv) payment of $200,000 cash to the Company for the discharge of any real estate liens, with the balance being paid to Freeport as junior

secured creditor.

### G.    The Proposed Buyer

21.    The Proposed Buyer is a newly-formed entity that will be majority owned

by funds controlled by the Audax Group.  Marjorie Shymske (President, Chief Executive

Officer, and a director of the Company) and Terrence Reutell (Chief Financial Officer of

the Company) may also make small investments in the Proposed Buyer.

### H.    Summary of the Asset Purchase Agreement

22.    The following is a brief summary of the terms of the Asset Purchase

Agreement.  This summary is qualified in its entirety by reference to the text of the Asset

Purchase Agreement, and the Court and all parties in interest are advised to review the

Asset Purchase Agreement in its entirety:

    (a)    <u>Purchase Price</u>: The purchase price includes cash in the amount of $200,000.00 paid to the Company and payment to the Senior Lenders of all amounts outstanding under the First Lien Credit Agreement (other than default interest).

    (b)    <u>Purchased Assets</u>: The Purchased Assets include substantially all of the Company's assets as listed in Section 1.2 of the Asset Purchase Agreement, except for the Excluded Assets which are listed in Section 1.3 of the Asset Purchase Agreement.

    (c)    <u>Assumption of Liabilities</u>: On the Closing Date, the Proposed Buyer will assume and agree to discharge the following Liabilities of the Company: (i) all amounts outstanding under the Swap Agreement; (ii) all Liabilities pursuant to or arising under Assumed Contracts, including all Cure Costs related to Assumed Contractors; (iii) the following post-petition administrative claims of the Company that arose during or relate to the period after the Petition Date and before the Closing Date, in each case to the extent unpaid: real estate taxes; income taxes relating to income recognized in a period prior to (x) the Closing Date and (y) the consummation of the transactions contemplated by the Purchase Agreement (not to exceed $150,000); payables owing to all current vendors (which will be scheduled) and new vendors with which the Company does business prior to the Closing Date (subject to a $50,000 cap); and the allowed fees and expenses of the Company's

professionals in the Chapter 11 Cases whether allowed before or after the Closing Date; and (iv) all employment-related Liabilities including accrued payroll for salaries, wages, bonuses and commissions, vacation time and sick pay and related employment taxes and all "COBRA" obligations. Except for the assumption of the Assumed Liabilities that are listed in section 1.4 of the Asset Purchase Agreement, the Proposed Buyer is not assuming any other Liabilities of Company, the Business or any Affiliates of Company. Without limiting the foregoing, the Buyer is not assuming any Liabilities for Taxes resulting from or related to the consummation of the Sale, including any income Taxes related to any income or gains recognized as a result of the consummation of the Sale, notwithstanding that the Company will have no unencumbered funds to pay any such Taxes.

(d)  <u>Offers to Employees</u>. The sale of the Purchased Assets will ensure the continued employment of all of the Company's current employees, who will be offered employment with the Proposed Buyer on terms no less favorable than those they currently have with the Company.

(e)  <u>Closing</u>: The consummation of the sale of the Purchased Assets (the "Closing") shall take place within two business days following the satisfaction of the conditions to closing set forth in Sections 7, 8 and 9 of the Asset Purchase Agreement or at such other time and date as the parties hereafter agree in writing (the "Closing Date").

(f)  <u>Representations and Warranties</u>: The Asset Purchase Agreement contains very limited representations and warranties by the Company.

(g)  <u>Expense Reimbursement</u>: The Proposed Buyer will be entitled to an expense reimbursement fee of up to $200,000 (the "Expense Reimbursement") only in the event that: (i) the Asset Purchase Agreement has not been terminated, pursuant to §11.1(a) thereof, by mutual consent or by the Proposed Buyer based on the failure or impossibility of the closing conditions set forth in Section 7 or 8 of the Asset Purchase Agreement, (ii) the Proposed Buyer does not purchase the Purchased Assets, (iii) the Proposed Buyer is not otherwise in default, and (iv) the Bankruptcy Court enters an order approving an offer to purchase the Purchased Assets submitted by a person or entity other than the Proposed Buyer or enters an order confirming a plan of reorganization of the Company (other than a plan under which the Proposed Buyer acquires the Company's assets). If applicable, the Expense Reimbursement will be payable from the proceeds of the sale of the Purchased Assets notwithstanding any liens, claims, interests or encumbrances

thereon and will be paid within three (3) business days after the closing of the sale of the Purchased Assets or the effective date of a plan of reorganization of the Company (other than a plan under which the Proposed Buyer acquires Company's assets), as the case may be.

(h)    <u>Capitalization of Proposed Buyer</u>.  Immediately prior to the closing, the Proposed Buyer will be capitalized in cash with not less than $2,750,000 of equity and immediately after the Closing with not less than $2,550,000 in cash on hand, exclusive of any assets acquired in the Sale.

**I.    Summary of the Amended First Lien Credit Agreement**

23.    In connection with the sale to the Proposed Buyer, the Senior Agent, on behalf of the Senior Lenders, has agreed to accept payment of the outstanding obligations of the Company under the First Lien Credit Agreement by extending a single term loan to the Proposed Buyer (the "New Term Loan") pursuant to a new credit agreement (the "New First Lien Credit Agreement").  As part of the consideration provided by the Proposed Buyer in connection with the sale, the Proposed Buyer will execute the New Term Loan and all other loan documents under the New First Lien Credit Agreement. The following is a brief summary of the terms of the New First Lien Credit Agreement:

(a)    <u>Principal</u>: The New Term Loan shall be in the original principal amount of $53,530,069.74 (including, for avoidance of doubt, $276,596.75 of accrued pre-petition interest) plus accrued, post-petition interest through the Closing Date, at the contract non-default interest rate, less monthly adequate protection payments received through the Closing Date.

(b)    <u>Interest Rate</u>: The interest rate on the New Term Loan shall be LIBOR plus 5.0% per annum.

(c)    <u>Maturity</u>: The New Term Loan shall mature 3 years from the Closing Date.

(d)    <u>Principal Prepayments</u>.  Beginning in first quarter of fiscal year 2010, and quarterly thereafter, the principal of the New Term Loan shall be amortized in an amount equal to $125,000 per quarter in 2010, $175,000 per quarter in 2011, and $250,000 per quarter in

2012. The Proposed Buyer may make principal prepayments at any time without penalty.

(e) <u>Financial Covenants</u>: The Amended First Lien Credit Agreement will provide for an Interest Coverage Ratio of 1.0:1.0, tested quarterly.

(f) <u>Affirmative and Negative Covenants</u>: No cash dividends or distributions to the shareholders of the Proposed Buyer will be permitted; <u>provided however</u> that dividend payments to holders of participating preferred stock shall be payable monthly. The participating preferred stock will have a 6% current dividend and shall be convertible into 100% of the common stock of the Proposed Buyer. The New First Lien Credit Agreement will also contain a minimum working capital requirement of $250,000, to be measured monthly by cash on hand.

(g) <u>Events of Default</u>: The New First Lien Credit Agreement will contain customary events of default.

(h) <u>Senior Agent's Expenses</u>: The Proposed Buyer will reimburse the Senior Agent's expenses through the Closing Date and will reimburse its reasonable out-of-pocket expenses thereafter.

(i) <u>Excess Cash</u>. During the first three years after the Closing Date, the Amended First Lien Credit Agreement will permit excess cash (i.e. amounts in excess of $3 million in 2010, and $2 million thereafter) to be applied to principal and to the Proposed Buyer's monthly management fees to the Audax Group. The Audax Group will be entitled to a guaranteed monthly management fee (regardless of the amount of excess cash) of $10,000 per month. The maximum annual management fee following the Closing Date will be $250,000.

<strong><u>Relief Requested</u></strong>

24.     By this Motion, made pursuant to sections 363 and 365 of the Bankruptcy

Code and Rules 2002, 6004, 6006 and 9006 of the Federal Rules of Bankruptcy

Procedure, the Debtors seek entry of orders:

(a) approving (A) the terms and conditions of auction and overbid procedures in connection with the sale, (B) the Expense Reimbursement provisions contained in the Asset Purchase Agreement, and (C) the manner and form of notice of the auction and the sale; and

(b) approving, at the Sale Hearing, the sale of substantially all of the assets of the Company, as more specifically described in the Asset Purchase Agreement, to the Proposed Buyer, or such other buyer who the Debtors determine has made a higher and better offers for the assets, free and clear of all liens, claims, security interests and encumbrances, and authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith.

## The Expense Reimbursement Should Be Approved

25.    As noted above, pursuant to section 6.1(c) of the Asset Purchase Agreement, the Proposed Buyer shall be entitled to the Expense Reimbursement in the event that: (i) the Asset Purchase Agreement has not been terminated, pursuant to section 11.1(a) thereof, by mutual consent or by the Proposed Buyer based on the failure or impossibility of the closing conditions set forth in section 7 or 8 of the Asset Purchase Agreement, (ii) the Proposed Buyer does not purchase the Purchased Assets, (iii) the Proposed Buyer is not otherwise in default, and (iv) the Bankruptcy Court enters an order approving an offer to purchase the Purchased Assets submitted by a person or entity other than the Proposed Buyer or enters an order confirming a plan of reorganization of the Company (other than a plan under which the Proposed Buyer acquires the Company's assets).  Any such Expense Reimbursement will be paid to the Proposed Buyer from the proceeds of the sale.

26.    Bidding protections in the form of break-up fees and expense reimbursements serve a number of useful functions: (1) they attract bidders, (2) they help to insure that a bidder does not withdraw its bid, and (3) they help to establish a minimum bid standard for other bidders. See In re Integrated Resources, Inc., 147 B.R. 650, 661-62 (S.D.N.Y. 1992).  Indeed, courts routinely approve such protections. See In re Crowthers McCall Pattern, Inc., 114 B.R. 877, 879, 890 (Bankr. S.D.N.Y. 1990); In re 995 Fifth Ave. Associates L.P., 96 B.R. 24 (Bankr. S.D.N.Y. 1989); In re Whistler Corp. of

Massachusetts, No. 99-43575-HJB (Bankr. D. Mass. 1999); see also In re Financial News Network, Inc., 931 F.2d 217, 219 (2d Cir. 1991).

27.    Courts generally consider three questions in assessing the appropriateness of bid protections such as expense reimbursement provisions: whether (1) the relationship between the parties who negotiated the expense reimbursement provision is tainted by self-dealing or manipulation; (2) the expense reimbursement provision hampers, rather than encourages, bidding; and (3) the amount of the proposed expense reimbursement is reasonable relative to the proposed purchase price. See Integrated Resources, 147 B.R. at 657 (discussing break-up fees).

28.    In this case, the Expense Reimbursement (up to $200,000) is a small fraction of the total value of the Sale to the estate, which exceeds $54 million. Given the circumstances of these cases and the size of this transaction, the Expense Reimbursement is reasonable and necessary to consummating a sale transaction.

29.    In addition, the Expense Reimbursement meets the appropriateness standard set forth above. First, the Expense Reimbursement is the product of arm's length negotiations among the Senior Lenders, the Company, and the Proposed Buyer. Second, the Expense Reimbursement, as a necessary condition of the Proposed Buyer's offer, encourages meaningful bidding by (i) attracting and retaining the Proposed Buyer's offer, and (ii) establishing a standard against which the Debtors can evaluate counteroffers. Third, as noted above, the Expense Reimbursement is fair and reasonable relative to the amount to be paid to the Debtors if the Motion to sell the Purchased Assets is approved. Therefore, the Expense Reimbursement is in the best interest of the Debtors' estates and should be approved.

GSDOCS\1935971

## The Auction and Overbid Procedures Should Be Approved

30.     To ensure that the Company receives the highest and best offer for the Purchased Assets, the Debtors propose to hold an auction (the "Auction") pursuant to the auction and overbid procedures attached hereto as Exhibit B (the "Auction and Overbid Procedures").

31.     Under the Auction and Overbid Procedures, only Qualified Bids (as defined therein) will be considered by the Debtors.  To be a Qualified Bid, a bid must, inter alia, be on terms no less favorable in any material respect than the Proposed Buyer's offer and provide for a minimum overbid of $450,000 in excess of the Purchase Price to be paid by the Proposed Buyer pursuant to the Asset Purchase Agreement.[5]  The $450,000 minimum overbid consists of an initial overbid of $250,000, plus the Proposed Buyer's $200,000 Expense Reimbursement.

32.     Bankruptcy courts which have addressed the propriety of overbid provisions have generally approved the use of minimum overbid increments as limitations on subsequent nuisance bidders.  See In re Crowthers McCall Pattern. Inc. 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (approving a minimum initial overbid of $500,000 in a $45 million sale).  The overbid provision is reasonable, is consistent with the type of generally approved overbid provisions, and should be approved.  Indeed, the overbid provision is intended to provide the Debtors with enough additional funds to satisfy the Expense Reimbursement.  In addition, the Auction and Overbid Procedures require a further initial overbid of $250,000 and subsequent bidding to be in increments of

---

[5] The summary provided herein is not intended to restate or amend the Auction and Overbid Procedures. For the complete list of requirements in submitting Qualified Bids, the actual text of the Auction and Overbid Procedures should be consulted.

GSDOCS\1935971

$100,000. Such a procedure is designed to eliminate nuisance bidding, while at the same time not to be overly burdensome to serious bidders.

33.     The Auction and Overbid Procedures permit bidders to bid on the Purchased Assets, in a full and fair manner, and allow the Debtors to promptly review, analyze and compare all counterbids to determine which bid is the highest and best bid. The Debtors believe that the Auction and Overbid Procedures will foster bidding and ultimately maximize the return on the Purchased Assets. Accordingly, the Debtors respectfully submit that the Auction and Overbid Procedures should be approved.

34.     The Debtors propose that the Auction and Overbid Procedures contained in this Motion and as principally set forth on Exhibit B hereto should govern the sale of the Purchased Assets and respectfully request that the Court enter an order approving and incorporating those procedures. The Debtors reserve the right to modify such procedures as necessary or as they deem appropriate, in consultation with the Senior Agent, to maximize value for the Debtors' estates and creditors, so long as such modifications are not inconsistent with the Auction and Overbid Procedures.

35.     The Debtors believe the Auction and Overbid Procedures provide an appropriate framework for selling the Company's assets in a uniform fashion and will enable the Debtors to review, analyze, and compare all bids received to determine which bid is in the best interests of the Debtors and their estates and creditors.

36.     If Qualified Bids are received by the deadline set by the Court, which the Debtors request to be **October 16, 2009**, the Debtors propose that on **October 20, 2009 at 10:00 a.m. (Eastern Time),** they will commence the Auction at the offices of Ice Miller, One American Square, Suite 2900, Indianapolis, Indiana 46282. Any bidder who

submits a Qualified Bid (as defined in the Auction and Overbid Procedures) may participate in the Auction.

37.     Bidding will continue with respect to the Auction until the Debtors – in consultation with the Senior Agent -- determine that they have received the highest or otherwise best bid(s) for their assets. After the Debtors so determine, they will close the Auction. The Debtors, after consultation with the Senior Agent, will then determine and announce which bid has been determined to be the highest or otherwise best bid (the "Successful Bid"). In determining which bid is a Successful Bid, the Debtors will consider the net return after the payment of the Expense Reimbursement, provided, however, that economic considerations shall not the be the sole criteria upon which the Debtors may base their decision and the Debtors shall take into account all factors they believe to be relevant in the exercise of their business judgment.

38.     The Debtors submit that the short timeframe between the date of this Motion and the proposed date of the Auction is reasonable and appropriate under the circumstances. The Debtors retained an investment banker and aggresively marketed the Company pre-petition, generating several (albeit inadequate) expressions of interest. Having already conducted an extensive marketing process, the Debtors believe that the expedited sale process contemplated herein will maximize value for the estate and its creditors. Furthermore, both the Buyer and the Senior Lenders have requested a prompt sale process.

### Approval of Notice of Sale

39.     The Debtors propose to provide notice of the proposed sale of substantially all of the Company's assets by serving the Notice of Sale substantially in the

form attached hereto as Exhibit C, disclosing the time and place of the Auction, the deadline for submitting bids or objections, and relevant hearing dates. The Notice of Sale contains the types of information required under Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure. This information will enable qualified bidders or other interested parties to participate in the Auction. Accordingly, the Debtors request that the Court approve the Notice of Sale.

40.    Upon approval of the Notice of Sale, the Debtors will serve such Notice of Sale on, among others, the creditor matrix, applicable federal, state and local governmental and regulatory authorities, parties to executory contracts and unexpired leases with the Company to be assumed and assigned to the Proposed Buyer, all parties who have previously contacted the Debtors or their counsel during the cases regarding the purchase of the Purchased Assets or who submitted written indications of interest during the sales and marketing process prior to the filing, and any other parties that the Debtors, in consultation with the Senior Agent, believe may have interest in purchasing the Purchased Assets. In addition, the Debtors will serve copies of this Motion, and its exhibits on (a) the creditor matrix; (b) the United States Trustee; (c) counsel for the Senior Agent; (d) each Senior Lender; (e) counsel for the Second Lien Agent; (f) all parties having filed a notice of appearance in the Debtors' cases pursuant to Bankruptcy Rule 2002; (g) applicable federal, state and local governmental and regulatory authorities, including tax and environmental authorities applicable to the Debtors and their assets and properties and those government agencies required to receive notice of proceedings under the Federal Rules of Bankruptcy Procedure; (h) all counterparties to Executory Contracts; (i) parties known to the Debtors to have liens on the Purchased Assets, and (j) all parties

who have previously contacted the Debtors or their counsel regarding the purchase of the Purchased Assets during the cases or who provided written indications of interest during the sales and marketing process prior to the commencement of the cases and any other parties that the Debtors believed may have had an interest in purchasing the Purchased Assets.

41.    Accordingly, the Debtors submit that the notice to be provided is reasonable and appropriate and will be more than adequate to ensure that all interested parties have the opportunity to bid for the Purchased Assets and/or to object to the relief sought at the Sale Hearing.

### The Sale of the Purchased Assets Should Be Approved at the Sale Hearing

42.    Section 363(b) of the Bankruptcy Code provides that a debtor-in-possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."

43.    The Debtors recognize that the sale of the Purchased Assets will, in effect, result in the sale of substantially all of the Company's assets outside of a chapter 11 plan. This is permitted where there is an articulated business justification for selling a debtor's property out of the ordinary course of business.  Bankruptcy courts should consider all of the salient factors and to act to further the diverse interests of the debtor, creditors, and equity holders alike. In re Lionel Corp, 722 F.2d 1063 (2d Cir. 1983); see also, In re Chateaugay Corporation, 973 F.2d 141 (2d Cir. 1992).  For example, the Court may consider such relevant factors as: (i) the proportionate value of the assets to the estate as a whole, (ii) the amount of elapsed time since the filing; (iii) the likelihood that a plan of reorganization will be proposed in the near future; (iv) the effect of the proposed

disposition on future plans of reorganization; (v) the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property; (vi) which of the alternatives of use, sale or lease the proposal envisions; and (vii) whether the asset is increasing or decreasing in value. Lionel, 722 F.2d at 1071. The Lionel decision has been widely accepted and applied by numerous other courts facing a debtor's request to sell assets, including requests to approve a sale of substantially all of the assets of a debtor's estate. See, e.g., In the Delaware & Hudson Railway Co., 124 B.R. 169 D. Del. 1991); In re Thomas McKinnon Securities, Inc. 120 B.R. 301 (Bankr. S.D.N.Y. 1990); In the Matter of Engineering Products Co., Inc., 121 B.R. 246 (Bankr. E.D. Wis. 1990); In re Channel One Communications, Inc., 117 B.R. 493 (Bankr. E.D. Mo. 1990).

44.     It is also well settled that Section 363(b) of the Bankruptcy Code permits the sale of substantially all of a debtor's assets outside of a plan where a valid business reason exists. Moreover, the Bankruptcy Court need not wait for confirmation of a plan to approve a disposition of a substantial portion of a debtor's assets if there is a possibility that the debtor will lose a lucrative business opportunity or risk serious harm to the debtor or its assets. See, Chateaugay Corporation, 973 F.2d 141; Lionel, 722 F.2d 1063; In the Matter of St. Petersburg Hotel Assoc., Ltd., 37 B.R. 341 (Bankr. M.D. Fla. 1984).

45.     The Debtors have concluded that an immediate sale of the Purchased Assets is the best way to preserve and maintain the value of the Purchased Assets for creditors and avoid a diminution of that value. Given that the Company is in the highly specialized limestone industry, the Purchased Assets, net of liabilities, are of little value if sold piecemeal, and have maximum value only if conveyed as part of a going concern.

For these reasons, the Debtors submit that there is sufficient business justification to satisfy the Lionel criteria and to permit the Debtors to consummate the sale outside of a chapter 11 plan.

46.    In the Debtors' business judgment, the consideration to be given by the Proposed Buyer (which includes, significantly, the payment of liabilities including the Debtors' obligations under the First Lien Credit Agreement) pursuant to the Asset Purchase Agreement is fair and reasonable under the circumstances.  To ensure that fair value is being received, however, the Asset Purchase Agreement is expressly subject to higher and better offers.  As a result, the purchase price and the form and structure of the Proposed Buyer's offer will continue to be tested in the marketplace.

47.    The transaction contemplated by the Asset Purchase Agreement will create a substantial income tax liability to the Company due to capital gain on the sale. The Proposed Buyer is not assuming this liability (and the proposed order approving the Motion, if entered, prevents governmental authorities from seeking to recover such liability of the Company from the Proposed Buyer or the Purchased Assets) and the Company will have no unencumbered assets with which to satisfy any such liablity.

48.    The negotiations with the Proposed Buyer and the Senior Lenders have been at arms' length and have occurred over a period of many months.  All negotiations have been conducted in good faith.  Therefore, the Proposed Buyer is entitled to the protections of Section 363(m) of the Bankruptcy Code.

### Sale Free and Clear of Interests Under Section 363(f) of the Bankruptcy Code

49.    Section 363(f) of the Bankruptcy Code permits the sale of property free and clear of any interests in such property of an entity other than the estate if, among

other things,

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

In the context of a security interest, sections 363(f)(1) and 363(f)(5) permit a sale of property of the estate free and clear of any such interest in such property if the debtor in possession could, in a legal or equitable proceeding, extinguish such interest without full satisfaction of the secured debt.  See, In re Terrace Chalet Apartments, Ltd., 159 B.R. 821, 829 (Bankr. N.D. Ill. 1993); In re Jolan, Inc., 403 B.R. 866 (Bankr. W.D. Wash. 2009).

50.     Indiana law clearly permits the sale of Victor Oolitic's assets free and clear of junior liens by foreclosure of the Senior Lenders' Mortgages on Victor Oolitic's real property and, likewise, foreclosure, pursuant to I.C. §26-1-9.1 et seq., of their liens on Victor Oolitic's personal property.  In both events, pursuant to paragraph 6.1 of the Intercreditor Agreement, the Senior Lenders have the authority, together with a power of attorney, to release all liens arising in connection with the Second Lien Agreement.

51.     Further, several courts have concluded that a "cramdown" under section

1129(b) of the Bankruptcy Code[6] is a "legal or equitable proceeding" contemplated under section 365(f)(5). See, e.g., In re Healthco International, Inc., 174 B.R. 174, 177 (Bankr. D. Mass. 1994); In re Terrace Chalet, 159 B.R. at 829; In re Hunt Energy Co., Inc., 48 B.R. 472, 485 (Bankr.N.D. Ohio 1985). Therefore, after concluding that a secured creditor's claim could be crammed down under a hypothetical chapter 11 plan, these courts authorized the sale of property of the estate free and clear of the interests of such creditor in such property under section 365(f)(5) of the Bankruptcy Code, even if the purchase price was for less than the aggregate value of such creditor's liens. See, e.g., In re Healthco International, Inc., 174 B.R. 174, 177 (Bankr. D. Mass. 1994); In re Terrace Chalet Apartments, Ltd., 159 B.R. 821, 829 (Bankr. N.D. Ill. 1993); In re Hunt Energy Co., Inc., 48 B.R. 472, 485 (Bankr.N.D. Ohio 1985).

52.     As noted above, the Senior Lenders have consented to the proposed sale of the Purchased Assets, thereby satisfying the requirement of 363(f)(2). While the Second Lien Lenders have not expressly consented to the sale, they are prohibited from objecting under the terms of the Intercreditor Agreement. In addition, the proposed sale satisfies sections 363(f)(1) and 363(f)(5) of the Bankruptcy Code. First, any valid liens on the Purchased Assets will be preserved, as they will attach to the proceeds of sale thereof pursuant to the proposed Sale Order. Second, the Debtors submit that the proposed Auction and Overbid Procedures, if approved, are likely to yield the highest value for the Purchased Assets. As such, by obtaining a replacement lien on the proceeds of sale of the

---

[6] Section 1129(b)(1) of the Bankruptcy Code provides that a bankruptcy court may confirm a chapter 11 plan over the objection of an impaired class of claims that has not accepted a chapter 11 plan if the plan does not discriminate unfairly and it is fair and equitable with respect to such dissenting class. 11 U.S.C. §1129(b)(1). Section 1129(b)(2) of the Bankruptcy Code provides that, with respect to a dissenting class of secured creditors, a chapter 11 plan is fair an equitable if such creditors obtain the "indubitable equivalent" of their claims under the chapter 11 plan. 11 U.S.C. §1129(b)(2)(A)(iii).

Purchased Assets, creditors with liens on the Purchased Assets will receive the "indubitable equivalent" of their claims.  See id.

53.     Therefore, the Debtors request that the Court authorize the sale of the Purchased Assets free and clear of any and all interests pursuant to section 363(f) of the Bankruptcy Code.

## Assumption and Assignment of Executory Contracts and Unexpired Leases

54.     Section 365 of the Bankruptcy Code authorizes a debtor-in-possession to assume and assign or reject an executory contract or unexpired lease subject to court approval.   The Company seeks approval to assume and assign certain executory contracts and unexpired leases (defined in the Asset Purchase Agreement as the "Assumed Contracts") to the Proposed Buyer (or other buyer).

55.     The decision whether an executory contract or unexpired lease should be assumed and assigned or rejected is based on the debtor's exercise of its "business judgment." NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional"); In re III Enterprises Inc. V. 163 B.R. 453, 469 (Bankr. E. D. Pa. 1994) (citations omitted) ("Generally, a court will give great deference to a debtor's decision to assume or reject the contract. A debtor need only show that its decision to assume or reject the contract is an exercise of sound business judgment --a standard which we have concluded many times is not difficult to meet.").  Section 365(b) of the Bankruptcy Code requires that a debtor in possession satisfy certain requirements at the time of assumption if a default exists under the contract or lease to be assumed.

56.     As discussed above, the Debtors have made the business decision to sell the assets of the Company pursuant to the Asset Purchase Agreement.  The Company is

party to various executory contracts that are necessary to the operation of its business. The assumption and assignment of the Assumed Contracts is, therefore, an integral term of the Asset Purchase Agreement. If the Company is not able to assume and assign the Assumed Contracts, the sale of the Purchased Assets will likely be impaired – resulting in reduced proceeds for the benefit of the estate.

57.     To accomplish the goal of assuming and assigning the Assumed Contracts in the most fair and expeditious manner, prior to the Sale Hearing, at a time to be designated by the Court, the Debtors will serve a notice on all counterparties to any executory contracts and unexpired leases of the Company (whether or not Assumed Contracts)(collectively, the "Executory Contracts") listing the monetary defaults and pecuniary damages, if any, the Debtors believe are owing under such Executory Contracts (the "Cure Notice").

58.     Under the terms of the Asset Purchase Agreement, the Proposed Buyer is responsible for paying the cure costs under Assumed Contracts. The Debtors seek an order that the payment by the successful bidder of the amounts set forth in the Cure Notice be deemed to fully and completely satisfy the requirements of cure requisite to the Debtors' assumption and assignment of the Assumed Contracts under section 365 of the Bankruptcy Code, and that the Court bar counterparties to such Assumed Contracts from objecting to the adequacy of such cure amount or taking any action or asserting any claim against either the Proposed Buyer (or other buyer to whom such Assumed Contracts are to be assigned) or the Debtors, if no objection to the Cure Notice is timely filed and served pursuant to the procedures outlined below.

59.     The Debtors request that objections to the cure amounts set forth in the

Cure Notice be filed and served at least one week prior to the Sale Hearing and that the Court hear any objections with respect to such cure amounts at a later date to be determined.

60.     The Debtors propose that with respect to any counterparty to an Assumed Contract, all objections to any relief requested at the Sale Hearing, including objections to the assumption and assignment or rejection of the Assumed Contracts, shall be filed with the Bankruptcy Court and served on Debtors' counsel and Proposed Buyer's counsel so as to actually be received by them before 5:00 p.m. prevailing Eastern Time, on a day to be determined by the Court, and shall be in writing and set forth with particularity the grounds for such objection or other statements of position.

61.     The foregoing procedures are designed to provide counterparties to Executory Contracts with adequate notice of any planned effort to assume and assign any Executory Contracts and to permit any such parties an opportunity to object to the proposed assumption and assignment before the Sale Hearing.

## Notice

62.     Notice of this Motion has been provided to all parties listed on the Master Service List.  In light of the nature of the relief requested herein, and pursuant to Bankruptcy Rule 2002(i), the Debtors submit that no other or further notice is required.

GSDOCS\1935971

WHEREFORE, the Debtors respectfully request that this Court:

1. Enter the Order Approving Bid Procedures in the form attached hereto as Exhibit D, providing for, *inter alia,* the approval of the Auction and Overbid Procedures, the Expense Reimbursement, and the date and time of the Auction;

2. Approve the form and content of the Notice of Sale in the form attached hereto as Exhibit C;

3. Approve the sale to the Proposed Buyer in accordance with the terms of the Asset Purchase Agreement at the Sale Hearing, by entering the Sale Approval Order in the form attached hereto as Exhibit E, or to such buyer who makes a higher and better offer for the assets of the Company;

4. Schedule the Sale Hearing; and

5. Grant the Debtors such other and further relief as is just and equitable.

GSDOCS\1935971

Dated: September 16, 2009        Respectfully submitted by:


/s/ James F. Wallack
James F. Wallack, Esq.
Christine D. Lynch, Esq.
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, Massachusetts 02110-3333
Tel:   (617) 482-1776
Fax:   (617) 574-4112

      - and -

Henry A. Efroymson, Esq.
Michelle J. Fisk, Esq.
ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, Indiana 46282-0200
Tel:   (317) 236-2100
Fax:   (317) 236-2219


*Counsel to Victor Oolitic Stone Company*
*and Victor Oolitic Holdings, Inc.*

GSDOCS\1935971