## EXHIBIT A

**ASSET PURCHASE AND SALE AGREEMENT**

EXECUTION COPY

ASSET PURCHASE AND SALE AGREEMENT

BY AND BETWEEN

VICTOR OOLITIC STONE COMPANY

AND

LIMESTONE ACQUISITION CORP.

AS OF SEPTEMBER 16, 2009

# TABLE OF CONTENTS

Page No.

1.    SALE AND PURCHASE OF ASSETS; ASSUMPTION OF CERTAIN LIABILITIES ........................................................................................................ 2
1.1.    Agreement to Sell and Purchase. ............................................................... 2
1.2.    Purchased Assets. ........................................................................................ 2
1.3.    Excluded Assets. ......................................................................................... 3
1.4.    Assumption of Liabilities. ........................................................................... 4
1.5.    Assumed Contracts and Leases. .................................................................. 5

2.    CLOSING; DELIVERIES ............................................................................. 5
2.1.    Closing. ........................................................................................................ 5
2.2.    Deliveries at the Closing. ............................................................................ 5

3.    PURCHASE PRICE ..................................................................................... 6
3.1.    Purchase Price. ............................................................................................ 6
3.2.    Payment of Purchase Price. ........................................................................ 6
3.3.    Purchase Price Allocation. .......................................................................... 6

4.    REPRESENTATIONS AND WARRANTIES OF SELLER............................... 6
4.1.    Organization and Qualification. .................................................................. 6
4.2.    Corporate Authority. ................................................................................... 6
4.3.    Litigation; Disputes. .................................................................................... 7
4.4.    Brokers. ........................................................................................................ 7
4.5.    Assets. .......................................................................................................... 7
4.6.    Legal Compliance. ....................................................................................... 7

5.    REPRESENTATIONS AND WARRANTIES OF BUYERS.............................. 7
5.1.    Organization. ............................................................................................... 7
5.2.    Authority. ..................................................................................................... 8
5.3.    No Conflict. .................................................................................................. 8
5.4.    Consents. ...................................................................................................... 8
5.5.    Litigation. ..................................................................................................... 8
5.6.    Brokers. ........................................................................................................ 8
5.7.    Financing; Due Diligence. ........................................................................... 9

6.    ADDITIONAL COVENANTS AND AGREEMENTS ..................................... 9
6.1.    Bankruptcy Covenants; Bankruptcy Scheduling; Expense Reimbursement. ........ 9
6.2.    Consents; Satisfaction of Closing Conditions............................................ 10
6.3.    Collection of Accounts Receivable. ........................................................... 10
6.4.    Transfer Taxes. .......................................................................................... 11
6.5.    Supplemental Information. ......................................................................... 11
6.6.    Employees. ................................................................................................. 11
6.7.    Payment and Performance of Assumed Liabilities. ................................... 11
6.8.    "AS IS" TRANSACTION. ......................................................................... 11

7.      MUTUAL CONDITIONS PRECEDENT TO OBLIGATIONS TO
CLOSE.................................................................................................................... 12
7.1.    Absence of Litigation.................................................................................... 12
7.2.    Bankruptcy Court Order; Other Approvals..................................................... 12

8.      CONDITIONS TO BUYER'S OBLIGATION TO CLOSE................................. 12
8.1.    Representations and Warranties...................................................................... 12
8.2.    Performance.................................................................................................. 12

9.      CONDITIONS TO SELLER'S OBLIGATIONS TO CLOSE............................. 12
9.1.    Representations and Warranties...................................................................... 13
9.2.    Performance.................................................................................................. 13
9.3     Capitalization of Buyer ................................................................................ 13

10.     ACTION TO BE TAKEN AT CLOSING ......................................................... 13
10.1.   Action to be Taken by Seller. ....................................................................... 13
10.2.   Action to be Taken by Buyer. ....................................................................... 13

11.     TERMINATION............................................................................................... 13
11.1.   Termination.................................................................................................. 13
11.2.   Effect of Termination.................................................................................... 14

12.     SURVIVAL. .................................................................................................... 14

13.     MISCELLANEOUS. ........................................................................................ 14
13.1.   Certain Definitions........................................................................................ 14
13.2.   Buyer not Successor...................................................................................... 18
13.3.   Written Agreement to Govern. ...................................................................... 18
13.4.   Severability. ................................................................................................. 18
13.5.   Notices and Other Communications. .............................................................. 18
13.6.   Counterparts. ................................................................................................ 19
13.7.   Law to Govern; Bankruptcy Court Jurisdiction............................................... 19
13.8.   Successors and Assigns.................................................................................. 20
13.9.   Interpretation. ............................................................................................... 20
13.10.  Schedules and Exhibits. ................................................................................ 20
13.11.  Modification. ................................................................................................ 20
13.12.  Waiver of Provisions..................................................................................... 21
13.13.  Expenses ...................................................................................................... 21
13.14.  Further Assurances........................................................................................ 21

EXECUTION COPY

## ASSET PURCHASE AND SALE AGREEMENT

THIS ASSET PURCHASE AND SALE AGREEMENT (this "Agreement") is entered into as of this 16th day of September, 2009, by and between Limestone Acquisition Corp., a Delaware corporation ("Buyer"), and Victor Oolitic Stone Company, an Indiana corporation ("Seller").

## RECITALS

WHEREAS, on April 28, 2009 (the "Petition Date"), Seller and its parent company, Victor Oolitic Holdings, Inc. each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Indiana (the "Bankruptcy Court"), commencing cases which are jointly administered under Case No. 09-05786 (the "Bankruptcy Cases"); and

WHEREAS, subject to the approval of the Bankruptcy Court, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the properties, assets, business operations and goodwill of Seller that are specified herein; and

WHEREAS, defined terms used in this Agreement have the meanings ascribed to them by definition in Section 13.1.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements hereinafter set forth, the parties hereto hereby agree as follows:

## 1.    SALE AND PURCHASE OF ASSETS; ASSUMPTION OF CERTAIN LIABILITIES

### 1.1.    Agreement to Sell and Purchase.

Subject to the terms and conditions hereof, at the Closing, Seller shall sell, assign, transfer, convey and deliver to and cause the same to be vested in Buyer, and Buyer shall purchase from Seller, the Purchased Assets free and clear of all Liens except for Permitted Liens.

### 1.2.    Purchased Assets.

For purposes of this Agreement, "Purchased Assets" means the right, title, and interest of Seller in all of its assets, properties, and rights (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any assets acquired by Seller after the date hereof but prior to the Closing), except for the Excluded Assets, including without limitation all right, title and interest in Seller in and to the following:

(a) all bank accounts, cash, cash equivalents and marketable securities, including all rights to any amounts received by or on behalf of Seller in any lock-box or depository account;

GSDOCS\1935990

(b) all royalties, advances, prepaid assets, prepayments and other current assets of the Seller as of the Closing;

(c) the furniture, fixtures, furnishings, vehicles, machinery, computers, equipment (mobile or otherwise), inventory, tools, office materials and other tangible property of Seller that are listed on Schedule 1.2(c);

(d) those Contracts that are listed on Schedule 1.2(d) (the "Assumed Contracts");

(e) subject to Section 6.3, all Accounts Receivable;

(f) all real property used or usable in connection with the Business as set forth and described on Schedule 1.2(f), (the "Real Property");

(g) all lists, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items of the Seller as of the Closing, including customer and supplier lists, mailing lists, sales and promotional literature, other sales related materials related to the Business;

(h) all books, records, accounts, checks, payment records, personnel files, Tax records (including payroll, unemployment, real estate and other Tax records) and other similar books, records and information of Seller, or copies thereof, to the extent relating specifically to the Business (the "Records"); provided, however, if Seller is required by Applicable Law to retain any Records, Seller shall retain such Records and provide Buyer with reasonable access to such Records for a period of three (3) years following the Closing, subject, however, to any requirements of Applicable Law regarding employee consent to disclosure of confidential employee records and to any other Applicable Law requiring the confidentiality of such Records;

(i) all Seller Intellectual Property, including (A) all computer software, (B) all rights of Seller to the names "Victor Oolitic" and "Victor Oolitic Stone Company," including, without limitation, all related trade names, trademarks, identifying logos or service marks and (C) all right, title and interest of Seller in and to the internet domain name "www.victoroolitic.com";

(j) all claims and causes of action (other than, in each case, to the extent related to Excluded Assets or Excluded Liabilities) of the Seller as of the Closing (regardless of whether or not such claims and causes of action have been asserted by the Seller) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery possessed by the Seller as of the Closing (regardless of whether such rights are currently exercisable) to the extent related to the Purchased Assets;

(k) all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Seller Intellectual Property and all rights under any confidentiality agreements executed by any third party for the benefit of any of the Seller to the extent relating to the Business;

(l) all rights of the Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees (current or former) or current or former directors,

2

consultants, independent contractors and agents of any of the Seller or any of its Affiliates or with third parties to the extent primarily relating to the Business or the Purchased Assets (or any portion thereof);

(m) any rights, demands, claims, credits, allowances, rebates (including any vendor or supplier rebates), or rights of setoff arising out of or relating to any of the Purchased Assets as of the Closing (but excluding all interests in the Excluded Assets);

(n) all other assets that are related to or used in connection with the Business and that are owned by the Seller as of the Closing; and

(o) the other items, if any, that are listed on Schedule 1.2(o).

**1.3.    Excluded Assets.**

Notwithstanding Section 1.2 or anything to the contrary in this Agreement, the following assets, properties or rights of Seller (collectively, the "Excluded Assets") shall not constitute Purchased Assets:

(a) all refunds of any Taxes relating to any and all periods or partial periods ending on or prior to the Closing Date;

(b) the articles of incorporation, by-laws, minute books, corporate seal, stock transfer records and other corporate records of Seller;

(c) any Records that Seller is required by Applicable Law to retain; provided, however, that the Buyer shall have the right, at its expense, to make copies of any portions of such books and records related to the Purchased Assets;

(d) all Contracts that are not Assumed Contracts;

(e) all Employee Benefit Plans;

(f) any rights and claims of Seller, whether known or unknown, absolute or contingent, matured or unmatured, against third parties whether in tort, contract, or contingent or otherwise, (I) under the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or, except to the extent arising from Assumed Contracts, the Bankruptcy Code and (II) against any directors, officers and/or employees of Seller relating to actions or failures to act at any time prior to the Closing Date;

(g) all insurance policies and benefits thereunder, including all refunds, all proceeds and all claims against officers and directors acting in such capacity, and directors and officers insurance policies;

(h) all intercompany claims and receivables of Seller against companies that own, are owned by or are under common ownership with Seller; and

(i) the other items listed on Schedule 1.3(i).

3

GSDOCS\1935990

**1.4.    Assumption of Liabilities.**

On the Closing Date, Buyer shall assume and agree to discharge the following Liabilities of Seller (the "Assumed Liabilities"):

(a) all amounts outstanding under the Swap Agreement;

(b) subject to Section 1.5, all Liabilities pursuant to or arising under Assumed Contracts, including the Cure Costs;

(c) solely the following post-petition administrative claims of Seller that arose during or relate to the period after the Petition Date: (1) real estate taxes, (2) income taxes relating to income recognized in a period prior to (x) the Closing Date and (y) the consummation of the transactions contemplated by the Purchase Agreement (not to exceed $150,000), (3) all payables to the vendors identified on Schedule 1.4(c), (4) payables not to exceed $50,000 in the aggregate to any vendors not identified on Schedule 1.4(c), and (5) the allowed fees and expenses of Seller's professionals in the Bankruptcy Case, whether allowed prior to or after the Closing, in each case to the extent unpaid.

(d) all accrued payroll for base salaries, wages and commissions (excluding all Liabilities for annual or other incentive bonuses), and all related employment taxes and expenses;

(e) all accrued vacation time and sick pay and related employment taxes; and

(f) the employment-related liabilities, including those arising under the US Consolidated Omnibus Budget Reconciliation Act, as described on Schedule 1.4(f).

Notwithstanding anything to the contrary contained in this Agreement or the Schedules hereto, or any Other Document, except for the assumption of the Assumed Liabilities pursuant to this Section 1.4, Buyer does not and will not at Closing assume or agree to pay, satisfy, discharge or perform, and is not and shall not be deemed by virtue of the execution and delivery of this Agreement or any Other Document, or as a result of the consummation of the transactions contemplated by this Agreement or otherwise, to have assumed, or to have agreed to pay, satisfy, discharge or perform, any Liabilities of Seller, the Business or any Affiliates of Seller, including all Liabilities relating to Excluded Assets unless otherwise specifically identified as Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as **"Excluded Liabilities"**).   Without limiting the foregoing, the Buyer is not assuming any Liabilities for Taxes resulting from or related to the consummation of the transactions contemplated by this Agreement, including any income Taxes related to any income or gains recognized as a result of the consummation of the transactions contemplated by this Agreement, notwithstanding that the Company will have no unencumbered funds to pay any such Taxes.

### 1.5.  Assumed Contracts and Leases

(a)   Buyer will be responsible for the payment of amounts necessary to cure defaults under the Assumed Contracts solely to the extent set forth on the Cure Cost Schedule (the "Cure Costs").

(b) Seller shall include in the Sale Motion the request to assume and assign to Buyer the Assumed Contracts and the request to establish the Cure Costs for the Assumed Contracts (scheduling the amount of such costs as determined in accordance with the Records; provided that where Seller is unable to determine the amount of such costs from the Records, the Sale Motion shall request that the applicable cure cost be set at zero dollars (such schedule, the **"Cure Cost Schedule"**), and will use best efforts to obtain entry of a court order authorizing the assumption and assignment of such Assumed Contracts to Buyer.

(c)   If the actual cure cost associated with any Assumed Contract exceeds the amount of such cure cost as listed on the Cure Cost Schedule, Buyer, in its sole discretion, may elect not to accept assignment of such Assumed Contract.

## 2.   CLOSING; DELIVERIES

### 2.1.   Closing.

The consummation of the transactions contemplated herein (the "Closing") shall take place at the offices of Ice Miller, One American Square, Suite 2900, Indianapolis, Indiana 46282, within two (2) Business Days following satisfaction (or waiver by the party entitled to such waiver) of the conditions set forth in Sections 7, 8 and 9, or at such other time and date as the parties hereafter agree in writing (the "Closing Date").  The Closing shall be effective as of 12:01 a.m. on the Closing Date.

### 2.2.   Deliveries at the Closing.

At the Closing, (i) Seller will deliver to Buyer the various certificates, instruments, and documents referred to in Section 10.1, (ii) Buyer will deliver to Seller the various certificates, instruments, and documents referred to in Section 10.2, (iii) Buyer will deliver to Seller the consideration specified in Section 3.1 in accordance with Section 3.2, and (iv) each party shall fulfill such other obligations as are imposed upon it under this Agreement or the Other Documents that are to be fulfilled on or prior to the Closing.

## 3.   PURCHASE PRICE

### 3.1.   Purchase Price.

For and in consideration of the conveyances and assignments described herein, and in addition to the other representations, warranties and covenants herein (including, without limitation, the Buyer's assumption of the Assumed Liabilities pursuant to Section 1.4 of this Agreement), Buyer shall pay the following (the "Purchase Price"):

(a) to the Administrative Agent at the Closing all amounts outstanding under the First Lien Credit Agreement (other than default interest, which will be waived, and excepting the Senior Lenders' professional fees and expenses, which will be paid by Buyer in cash at the Closing) (the "Loan Payoff"); and

(b) to Seller at the Closing two hundred thousand dollars ($200,000).

### 3.2.    Payment of Purchase Price.

At the Closing, (a) Buyer, Administrative Agent and the Senior Lenders shall execute the New Credit Agreement and all related loan documents and the Senior Lenders shall provide the financing contemplated thereunder to Buyer, as contemplated in Section 6.7 of this Agreement, and (b) Buyer shall pay to Seller or the Administrative Agent, as the case may be, the Purchase Price set forth in Section 3.1 of this Agreement by wire transfer of immediately available U.S. funds.

### 3.3.    Purchase Price Allocation.

The Purchase Price shall be allocated among the Purchased Assets pursuant to the allocation schedule set forth on Schedule 3.3. Each of Buyer and Seller agrees to file Form 8594 as required by Section 1060 of the Code, and all federal, state, local and foreign Tax Returns, in accordance with such agreed allocation. Each of Buyer and Seller shall report the transactions contemplated by this Agreement for federal Tax and all other Tax purposes in a manner consistent with the allocation determined pursuant to this Section 3.3. Each of Buyer and Seller agrees to provide the other promptly with any information required to complete the Form 8594. Buyer and Seller shall notify and provide the other with reasonable assistance in the event of an examination, audit or other proceeding regarding any allocation of the Purchase Price determined pursuant to this Section 3.3. Buyer and Seller shall not take any position in any Tax Return, Tax proceeding or audit that is inconsistent with such allocation.

## 4.    REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth or described on the Disclosure Schedule attached hereto (the "Disclosure Schedule"), Seller represents and warrants to Buyer that:

### 4.1.    Organization and Qualification.

Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana. Seller has all necessary corporate power and authority to own its properties and to carry on the Business and to enter into and perform its obligations under this Agreement, the Other Documents to which it is a party and the transactions contemplated hereby and thereby.

### 4.2.    Corporate Authority.

The execution, delivery and performance by Seller of this Agreement and the Other Documents and the consummation by Seller of the transactions contemplated hereby and thereby have been or, upon entry of the Sale Approval Order, will be duly authorized by all

GSDOCS\1935990

requisite corporate action on the part of Seller. This Agreement has been duly executed and delivered by Seller and constitutes, and upon execution and delivery of each of the Other Documents, such Other Documents will constitute, the legal, valid and binding obligation of Seller, enforceable in accordance with its terms (assuming approval of this Agreement by the Bankruptcy Court).

### 4.3.  Litigation; Disputes.

Other than the proceedings to be commenced before the Bankruptcy Court, to the Knowledge of Seller, there is no material action, claim, demand, suit, proceeding, arbitration, grievance, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, pending or threatened against or relating to Seller which seeks to enjoin or rescind the transactions contemplated by this Agreement or otherwise prevent Seller from complying with the terms and provisions of this Agreement.. To the Knowledge of Seller, the Business is not operating under, subject to or in default with respect to any order, award, writ, injunction, decree or judgment of any Governmental Authority.

### 4.4.  Contracts.

(a)     Each Assumed Contract is a valid and binding obligation of Seller, and to the Knowledge of the Seller, the other parties thereto, enforceable against each of them in accordance with its terms, except, in each case, (i) as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity, or (ii) as set forth in Schedule 4.4(a).

(b)     None of Seller or, to the Seller's Knowledge, the other parties thereto, are in breach in any material respect of any Assumed Contract and Seller has not received any notice of any such breach, except, in each case, (i) as a result of the Bankruptcy Case, (ii) as set forth in Schedule 4.4(b), or (iii) as has been previously cured or will be cured upon entry of the Sale Order and payment of the Cure Costs.

### 4.5.  Consents.

Other than the Sale Approval Order and other than as set forth on Schedule 4.5, no consent, approval or authorization of, or declaration or filing with, any Governmental Authority is required in connection with the execution, delivery or performance by Seller of this Agreement or the Other Documents, except to the extent that any of the foregoing: (a) have previously been obtained or made, as applicable or (b) if not obtained or made, as applicable, are not reasonably expected to materially affect the execution, delivery or performance by Seller of this Agreement or the Other Documents. No approval, consent or authorization of any lender, lessor or other third party is required in order for Seller to consummate the transactions contemplated hereby or thereby.

### 4.6.  Brokers.

No broker or finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement

7

based upon arrangements made by or on behalf of Seller for which Buyer could become liable or obligated.

### 4.7.    Assets.

Seller has good and transferable title to the Purchased Assets, free and clear of all Liens other than Permitted Liens.

### 4.8.    Legal Compliance.

To the Knowledge of Seller, Seller is not currently in material violation of any Applicable Law, other than bulk sales or similar laws, nor has Seller received within the past two (2) years any notice alleging any material conflict with, violation of, breach of or default under any such Applicable Law.

## 5.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller, on the date hereof and on the Closing Date, as follows:

### 5.1.    Organization.

Subject to Section 6.9 of this Agreement, Buyer is a corporation duly formed, validly existing and in good standing under the law of the State of Delaware. Buyer has all necessary power, authority, and capacity to own its property, to carry on its business, and to enter into and perform its obligations under this Agreement and the Other Documents to which it is a party and to carry out the transactions contemplated hereby and thereby.

### 5.2.    Authority.

The execution, delivery and performance by Buyer of this Agreement and the Other Documents to which it is a party and the consummation by Buyer of the transactions contemplated hereby or thereby have been duly authorized by all requisite limited liability company action on the part of Buyer. This Agreement has been duly executed and delivered by Buyer and constitutes, and upon execution and delivery by Buyer of each of the Other Documents to which it is a party, such Other Documents will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity.

### 5.3.    No Conflict.

Neither the execution or delivery by Buyer of this Agreement or the Other Documents to which it is a party, nor the consummation of the transactions contemplated hereby or thereby will (a) conflict with or result in a breach of any of the provisions of, or constitute a default under, the charter, by-laws, or other organizational document of Buyer, as amended to date, (b) result in a breach of any of the provisions of, or constitute a default under any material

8

contract to which Buyer is bound, or (c) result in a violation of any Applicable Law to which Buyer or its property is subject.

### 5.4.    Consents.

Other than the Sale Approval Order, no consent, approval or authorization of, or declaration or filing with, any Governmental Authority is required in connection with the execution, delivery or performance by Buyer of this Agreement or the Other Documents.  No approval, consent or authorization of any lender, lessor or other person is required in order for Buyer to consummate the transactions contemplated hereby or thereby.

### 5.5.    Litigation.

There is no action, claim, demand, suit, proceeding, arbitration, grievance, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, pending or, to the knowledge of Buyer, threatened against or relating to Buyer which seeks to enjoin or rescind the transactions contemplated by this Agreement or otherwise prevent Buyer from complying with the terms and provisions of this Agreement.

### 5.6.    Brokers.

No broker or finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer for which Seller could become liable or obligated.

### 5.7.    Financing; Due Diligence.

Other than the conditions in Sections 8.2 and 8.3 of this Agreement, Buyer's obligations under this Agreement are not subject to the satisfaction of any financing or further due diligence contingencies.  Subject to the receipt of financing pursuant to the New Credit Agreement, Buyer either has sufficient funds available to consummate the transactions contemplated by this Agreement or has binding commitments from lenders or investors to provide such funds.

## 6.    ADDITIONAL COVENANTS AND AGREEMENTS

### 6.1.    Bankruptcy Covenants; Bankruptcy Scheduling; Expense Reimbursement.

(a) <u>Operation as Debtor in Possession</u>.  Seller has and shall continue to operate its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Without limiting or modifying the foregoing, Seller shall use its commercially reasonable efforts to: (i) operate the Business in the ordinary course of business consistent with past practices, (ii) preserve in all material respects the Purchased Assets (excluding sales of inventory in the ordinary course of business), and (iii) preserve its current relationships with the suppliers, vendors, customers, clients, contractors and others having business dealings with the Business,

9

but taking into account, in each case, the fact that the Bankruptcy Case have commenced, and the fact that the Business will be operated while in bankruptcy.

(b) <u>Entry of Bankruptcy Orders</u>. Within one (1) business day after the date of this Agreement, Seller shall file a motion (the "<u>Sale Motion</u>") with the Bankruptcy Court seeking entry of the following orders in form and substance satisfactory to Seller and Buyer:

(i)     an order (the "<u>Sale Procedures Order</u>"), in substantially the form attached hereto as <u>Exhibit B</u>, which is mutually satisfactory to Buyer and Seller and which approves the auction and overbid procedures set forth on <u>Exhibit C</u> attached hereto and incorporates said auction and overbid protections as if set forth in full in the Sale Procedures Order and schedules a hearing on approval of the Sale Motion (the "<u>Sale Hearing</u>"); and

(ii)    an order (the "<u>Sale Approval Order</u>"), in the form attached hereto as <u>Exhibit D</u> (with only those changes that do not adversely affect the Buyer), which is mutually satisfactory to Buyer and Seller.

(c) <u>Expense Reimbursement</u>. In the event that each of the following occurs:

(i)  this Asset Purchase Agreement has not been terminated by Buyer or by mutual written consent pursuant to Section 11.1(a) hereof,

(ii) Buyer does not purchase the Purchased Assets,

(iii) Buyer has not otherwise materially breached this Asset Purchase Agreement (and not cured such breach), and

(iv) the Bankruptcy Court enters an order approving an offer to purchase the Purchased Assets submitted by a person or entity other than Buyer (a "<u>Third Party Buyer</u>") or enters an order confirming a plan of reorganization of Seller (other than a plan under which Buyer acquires Seller's assets) (an "<u>Approved Third Party Sale</u>").

then, as the case may be: (x) on the closing date of such Approved Third Party Sale or as soon thereafter as practicable, Seller shall reimburse Buyer for all of Buyer's out-of-pocket fees and expenses in an amount not to exceed $200,000 (the "<u>Expense Reimbursement</u>") payable from the proceeds of such Approved Third Party Sale or (y) on the effective date of such plan of reorganization Seller shall pay the Expense Reimbursement to Buyer.

**6.2.    Consents; Satisfaction of Closing Conditions.**

Seller and Buyer shall use all reasonable efforts to obtain all consents, waivers and other approvals which shall be required in order to effectuate the transactions contemplated hereby, and to satisfy promptly the conditions to the Closing specified in this Agreement. Seller and Buyer shall furnish to each other and to each other's counsel all such information as may be reasonably required in order to effectuate the foregoing actions.

### 6.3. Collection of Accounts Receivable.

The parties acknowledge that the Purchased Assets include Accounts Receivable. To the extent that Seller receives after the Closing any funds from customers of the Business which are paid in satisfaction of such Accounts Receivable, Seller shall hold such funds in trust for the benefit of Buyer and, within seven (7) business days, remit such funds to Buyer.

### 6.4. Transfer Taxes.

Buyer shall pay all Indiana state and local transfer taxes levied as a result of the transfer of the Purchased Assets pursuant to this Agreement and the Other Documents.

### 6.5. Supplemental Information.

From time to time after the date hereof until the Closing Date, Seller shall promptly disclose in writing to Buyer any material matter hereafter arising that, if existing, occurring or known as of the date hereof or at or prior to the Closing Date would have been required to be disclosed to Buyer or that would render materially inaccurate any of the representations, warranties or statements of such party set forth in Section 4 of this Agreement, and any such disclosure shall constitute an amendment to the Disclosure Schedule, effective as of the date of this Agreement.

### 6.6. Employees.

Buyer shall extend offers of employment to all Seller Employees and the terms of such offers shall assure that Seller shall incur no Liabilities under the Workers Adjustment and Retraining Notification Act, as amended; provided, however, such offers shall not prohibit Buyer from terminating the employment of any Seller Employees following the Closing, subject to the terms of such employment and any Applicable Laws, and Buyer shall be solely responsible for any Liabilities relating to such termination.  Immediately prior to Closing, Seller will terminate the employment of all employees at each Business location who have accepted Buyer's offer of employment, and Buyer shall assume the obligations with respect thereto that are specified in Section 1.4 hereof.

### 6.7. New Credit Agreement.

Buyer shall obtain, and at the Closing the Senior Lenders shall provide, the funds for the Loan Payoff from a new loan to be extended by the Senior Lenders to Buyer pursuant to loan documentation that shall contain the terms set forth on the term sheet attached hereto as Exhibit A and which shall be in a form and substance mutually acceptable to each of Buyer, Administrative Agent and the Senior Lenders.  Subject to the immediately preceding sentence, the Administrative Agent and Buyer shall use diligent efforts to agree on the form of credit agreement (the "New Credit Agreement") by no later than September 21, 2009.

**6.8.    Payment and Performance of Assumed Liabilities.**

From and after the Closing, Buyer shall pay, perform and discharge the Assumed Liabilities in accordance with their respective terms.

**6.9.    Assignment to Indiana Corporation.**

Prior to the Closing, Buyer shall assign all of its right, title and interests in this Agreement to an Indiana corporation, and such Indiana corporation shall assume all of the Buyer's obligations hereunder, and upon such assignment and assumption (a) such Indiana corporation shall be the "Buyer" for all purposes hereunder and shall be subject to all of the terms and conditions of this Agreement fully as if it were the "Buyer" hereunder at all times, (b) the Delaware corporation that was previously the "Buyer" shall no longer be party to this Agreement, and (c) the word "Delaware" in Section 5.1 shall be deemed to be replaced with the word "Indiana."

**6.10.    "AS IS" TRANSACTION.**

BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR AND SUBJECT TO THE EXPRESS REPRESENTATIONS AND WARRANTIES IN SECTION 4 OF THIS AGREEMENT, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS" AND SELLER MAKES NO OTHER REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS.

**7.    MUTUAL CONDITIONS PRECEDENT TO OBLIGATIONS TO CLOSE**

The obligations of each of Buyer and Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, unless otherwise waived in writing by Buyer and Seller:

**7.1.    Absence of Litigation.**

There shall be no claim, action, suit, investigation, litigation or proceeding, pending in or before any Governmental Authority that enjoins, restrains or prohibits, or seeks to effect the injunction, restraint of, or prohibition of, the consummation of the transactions contemplated by this Agreement.

**7.2.    Bankruptcy Court Order; Other Approvals.**

(a)  The Cash Collateral Order shall be in full force and effect; and

(b) The Bankruptcy Court shall have entered the Sale Approval Order and any other required material governmental, regulatory and third-party approvals, waivers, and/or consents in connection with the sale transaction will have been obtained.

## 8.  CONDITIONS TO BUYER'S OBLIGATION TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, unless otherwise waived in writing by Buyer:

### 8.1.  Representations and Warranties.

The representations and warranties of Seller contained herein (taking into account the Disclosure Schedule, as amended through the Closing) shall be true and correct as of the date hereof and on and as of the Closing Date in all material respects, except to the extent that such failure to be materially true and correct results from Buyer's determination not to (i) assume any Contract or (ii) breach by Buyer of its obligations or representations hereunder.

### 8.2.  Performance.

Seller, Administrative Agent and the Lenders shall have duly performed or complied with all of the covenants, acts and obligations to be performed or complied with by each of them as provided hereunder at or prior to the Closing, except to the extent that any such failure to so perform or comply does not materially impair the ability of the Seller, Administrative Agent or the Lenders to perform their obligations under this Agreement.

### 8.3.  New Credit Agreement.

Buyer, Administrative Agent and the Senior Lenders shall have duly executed and delivered the New Credit Agreement and the Senior Lenders shall have provided the financing contemplated thereunder.

## 9.  CONDITIONS TO SELLER'S OBLIGATIONS TO CLOSE

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions unless otherwise waived in writing by Seller:

### 9.1.  Representations and Warranties.

The representations and warranties of Buyer contained herein or in any document delivered pursuant hereto shall be true and correct as of the date hereof and on and as of the Closing Date in all material respects.

### 9.2.  Performance.

Buyer shall have performed or complied in all material respects with all covenants, acts and obligations to be performed or complied with by Buyer hereunder at or prior to the Closing.

### 9.3.    Capitalization of Buyer

Buyer shall be capitalized, immediately prior to the Closing, with and have cash on hand of no less than $2.75 million and, immediately after the Closing, with and have cash on hand of no less than $2.55 million, exclusive of the Purchased Assets.  The commitment to provide such equity is evidenced by the commitment letter attached hereto as Exhibit E.

## 10.    ACTION TO BE TAKEN AT CLOSING

### 10.1.    Action to be Taken by Seller.

At the Closing, Seller shall deliver to Buyer the following:

(a) an executed Bill of Sale, dated as of the Closing Date;

(b) an executed Assignment and Assumption, dated as of the Closing Date;

(c) a copy of the Sale Approval Order; and

(d) wire instructions of Seller.

### 10.2.    Action to be Taken by Buyer.

At the Closing, Buyer shall deliver the following:

(a) to Seller a certified copy of the resolutions duly adopted by the Board of Directors of Buyer authorizing or ratifying this Agreement and authorizing the consummation by Buyer of the transactions contemplated hereby and by the Other Documents;

(b) to the Administrative Agent, the fully executed New Credit Agreement together with all loan documents and other supporting materials required therein; and

(c) to Seller or the Administrative Agent, as the case may be, the Purchase Price set forth in Section 3.1 of this Agreement.

## 11.    TERMINATION

### 11.1.    Termination.

Subject to the provisions of Section 11.2, this Agreement may be terminated at any time before the Closing under any one or more of the following circumstances:

(a) by mutual written consent of Seller, Buyer, and Administrative Agent;

(b) by Seller or Buyer if the Closing shall not have been consummated on or before December 1, 2009; or

(c) (i) by Buyer, if any of the conditions in Section 7 or Section 8 has not been satisfied as of the Closing or if satisfaction of any such condition is or becomes impossible (other

14

than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition at or before the Closing; or (ii) by Seller, if any of the conditions in Section 7 or Section 9 has not been satisfied as of the Closing or if satisfaction of any such condition is or becomes impossible (other than through the failure of Seller to comply with its obligations under this Agreement) and Seller has not waived such condition at or before the Closing; or

(d) by Seller, in the event of an Approved Third Party Sale.

**11.2.   Effect of Termination.**

In the event of termination of this Agreement, as provided above, this Agreement shall forthwith become void and there shall be no liability or obligation hereunder on the part of Seller or Buyer except that the following shall survive the termination hereof: (a) the liability, if any, of Seller under Section 6.1(c) to pay the Expense Reimbursement, (b) Buyer's liability resulting from Buyer's breach of any representation, warranty, covenant or agreement in this Agreement, and (c) the agreement respecting expenses contained in Section 13.13.

## 12.   SURVIVAL.

None of the representations or warranties of Seller and Buyer herein, or in any Other Document delivered prior to or at the Closing, will survive the Closing, and except for the covenants and agreements by their terms to be performed after the Closing Date, none of the respective covenants and agreements of Seller and Buyer herein, or in any Other Document delivered prior to or at the Closing, will survive the Closing.  In addition to the foregoing, in the event of breach of a representation or warranty of Seller, Buyer's sole remedy shall be to terminate this Agreement pursuant to Section 11.1(d) on account of such breach (if such remedy is otherwise in all respects applicable and available to Buyer).

## 13.   MISCELLANEOUS.

**13.1.   Certain Definitions.**

As used herein, the following terms have the meanings set forth below:

**"Accounts Receivable"** means all trade accounts receivable and other rights to payment from customers of Seller, billed or unbilled, and the full benefit of all security for such accounts or rights to payment that have accrued on the records of Seller as of the Closing Date as determined in accordance with United States generally accepted accounting principles consistent with past practices of Seller.

**"Administrative Agent"** means M&I Marshall & Ilsley Bank as administrative agent under the First Lien Credit Agreement.

**"Affiliate"** means a Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the first Person. "Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management

15

policies of a person, whether through the ownership of voting securities, by contract or credit arrangement, as trustee or executor or otherwise.

"**Applicable Law**" means all applicable provisions of all (i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, ordinances, codes or orders of any Governmental Authority, (ii) Governmental Approvals and (iii) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

"**Assignment and Assumption**" means the Instrument of Assignment and Assumption for Seller, substantially in the form attached hereto as Exhibit F.

"**Assumed Contracts**" has the meaning given to it in Section 1.2(c).

"**Assumed Liabilities**" has the meaning given to it in Section 1.4.

"**Bankruptcy Case**" has the meaning given to it in the Recitals.

"**Bankruptcy Code**" has the meaning given to it in the Recitals.

"**Bankruptcy Court**" has the meaning given to it in the Recitals.

"**Bill of Sale**" means the Bill of Sale for Seller substantially in the form attached hereto as Exhibit G.

"**Business**" means the Seller's business of quarrying of limestone and the sale of limestone in the form of quarry blocks, slabs and ready-to-use sills, hearths, mantels and coping material.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized by law to close.

"**Cash Collateral Order**" means the *Final Order Authorizing Use of Cash Collateral, Granting Adequate Protection, and Other Related Relief* entered in the Bankruptcy Case on May 27, 2009 (Docket No. 85), as the same may be amended or extended with the Buyer's consent.

"**Closing**" has the meaning given to it in Section 2.1.

"**Closing Date**" has the meaning given to it in Section 2.1.

"**Code**" means the Internal Revenue Code of 1986, as amended, and all laws and regulations promulgated pursuant thereto or in connection therewith.

"**Contracts**" means all agreements, contracts, leases, commitments, purchase orders, understandings and other instruments and arrangements by which any of the Purchased Assets are bound or to which Seller is a party or by which Seller is bound in connection with the Business of Seller or the Purchased Assets.

"**Cure Costs**" has the meaning given to it in Section 1.5(a).

16

"**Employee Benefit Plans**" means an employee benefit plan within the meaning of Section 3(3) of ERISA.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Excluded Assets**" has the meaning given to it in Section 1.3.

"**Expense Reimbursement**" has the meaning given to it in Section 6.1(c).

"**First Lien Credit Agreement**" means that certain Credit Agreement dated as of August 25, 2005 (as amended) among Seller, M&I Marshall & Ilsley Bank (successor by merger to First Indiana Bank, N.A.), as administrative agent, and the other lenders party thereto.

"**Governmental Approvals**" means permits, approvals, orders, authorizations, consents, security clearances, franchises, exemptions of, or filings or registrations with, any Governmental Authority in any jurisdiction, which have been issued or granted to or are owned or used by Seller in connection with the Business and all pending applications therefor.

"**Governmental Authority**" means any court, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign.

"**Intellectual Property**" means all rights, title and interest in or relating to intellectual property of the following types, which may exist or be created under the laws of any jurisdiction in the world: (a) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof, (b) trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, corporate names, trade styles, logos and other source or business identifiers and general intangibles of a like nature, along with applications, registrations, renewals and extensions thereof, (c) trade secrets, (d) patents and applications therefore, including all continuations, divisionals, and continuations-in-part thereof and patents issuing thereon, along with all reissues, reexaminations and extensions thereof, (e) all Internet domain names, and (f) all other intellectual property rights.

"**Knowledge**" means the actual and conscious (and not constructive) knowledge of Terry Reutell.

"**Liabilities**" means all liabilities and obligations, secured or unsecured, whether absolute, accrued, contingent or otherwise, and whether or not due.

"**Lien**" means any mortgage, pledge, hypothecation, right of others, claim, security interest, encumbrance, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, interest, equity, option, lien, right of first refusal, charge or other restrictions or limitations of any nature whatsoever, including but not limited to such as may arise under any Contracts, and any "claim," "lien," or "security interest," as those terms are defined in the Bankruptcy Code.

17

"**Other Document**" means the Bill of Sale and the Assignment and Assumption and any other document or instrument executed in connection with the transactions contemplated hereby or thereby.

"**Permitted Liens**" means (a) zoning, entitlement, building and other land use regulations imposed by Governmental Authorities having jurisdiction over the Real Property used in the Business; (b) Liens upon assets subject to capital lease obligations arising under capital leases included in the Purchased Assets, provided that such Liens only serve to secure payments arising under such capital lease obligations and that Seller identified such Purchased Assets as being subject to lease; (c) Liens arising under precautionary UCC financing statement filings regarding operating leases included in the Purchased Assets (provided that each Seller identified such Purchased Assets as being subject to lease); (d) Liens upon vehicles arising under financing agreements (including, without limitation, installment sales contracts); ; and (e) Liens upon any Real Property that arise in favor of any Governmental Authority with respect to unpaid Taxes.

"**Person**" means an individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization or Governmental Authority (or any department, agency or political subdivision thereof), or any other entity.

"**Petition Date**" has the meaning given to it in the Recitals.

"**Purchase Price**" has the meaning given to it in Section 3.1.

"**Purchased Assets**" has the meaning given to it in Section 1.2, as modified by Section 1.3.

"**Qualified Bid**" means a competing bid that meets the requirements of a Competing Offer as set forth in the auction and overbid procedures attached hereto as <u>Exhibit D</u>.

"**Real Property**" has the meaning given to it in Section 1.2(e).

"**Records**" has the meaning given to it in Section 1.2(h).

"**Sale Motion**" has the meaning given to it in Section 6.1(b).

"**Sale Approval Order**" has the meaning given to it in Section 6.1(b)(ii).

"**Sale Hearing**" has the meaning given to it in Section 6.1(b)(i).

"**Sale Procedures Order**" has the meaning given to it in Section 6.1(b)(i).

"**Seller Employees**" means the employees of Seller as of the date hereof.

"**Seller Intellectual Property**" means all rights, title and interest in and to Intellectual Property owned by Seller as of the Closing.

18

"**Senior Lenders**" means collectively M&I Marshall & Ilsley Bank, Fifth Third Bank (Central Indiana), RBS Citizens Bank and Huntington National Bank.

"**Swap Agreement**" means that certain ISDA Master Agreement between Charter One Bank, N.A. and the Company, dated as of September 14, 2005.

"**Tax Return**" means any return, report declaration, form, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Taxes**" means all federal, state, local and foreign taxes and other assessments of a similar nature (whether imposed directly or through withholding), including any interest, additions to tax or penalties applicable thereto.

### 13.2.    Buyer not Successor.

It is expressly understood by Buyer and Seller that in no respect is Buyer intended to be deemed the successor in interest to Seller under any theory of law or equity.

### 13.3.    Written Agreement to Govern.

This Agreement (together with the Schedules and Exhibits hereto, and the other instruments and documents delivered pursuant hereto) sets forth the entire understanding and supersedes all prior oral and written agreement among the parties relating to the subject matter contained herein, and merges all prior discussions among them.

### 13.4.    Severability.

The parties expressly agree that it is not their intention to violate any public policy or Applicable Law.  If any provision of this Agreement is judicially or administratively interpreted or construed as being so in violation, such provision shall be inoperative and the remainder this Agreement shall remain binding upon the parties hereto.

### 13.5.    Notices and Other Communications.

Any notice or other communication required, contemplated or permitted by this Agreement by any party shall be in writing and shall be deemed served (a) when personally delivered, (b) when transmitted via facsimile machine to the party for whom it is intended at the number shown below, (c) on the next business day after delivery to a reputable overnight courier for next business day delivery, or (d) five (5) business days after deposit in the mail, registered or certified mail, return receipt requested, postage prepaid, addressed, in the case of deliveries made pursuant to clause (c) or (d), as follows:

If to Buyer:

Limestone Acquisition Corp.
c/o Audax Group
101 Huntington Avenue
Boston, Massachusetts  02199
Attention:  Donald Bramley
        Daniel Weintraub, Esq.
Facsimile number: (617) 859-1600


With a copy (which shall not constitute notice) to:

Kirkland & Ellis LLP
300 North LaSalle
Chicago, Illinois 60654
Attention: James A. Stempel, Esq.
Facsimile number: (312) 862-2200

If to Seller:

Victor Oolitic Stone Company
7850 South Victor Pike
P.O. Box 668
Bloomington, Indiana 47402
Attention: Marjorie Shymske


With a copy (which shall not constitute notice) to:

Goulston & Storrs, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
Attention: James F. Wallack, Esq.
        Christine D. Lynch, Esq.
Facsimile number: (617) 574-7646


or to such other address or addresses as any addressee may designate for itself by written notice served in accordance herewith.

### 13.6.   Counterparts.

This Agreement may be executed in any number of counterparts, and each counterpart shall constitute an original instrument, but all such separate counterparts shall constitute one and the same agreement.

**13.7.    Law to Govern; Bankruptcy Court Jurisdiction.**

(a) THE VALIDITY, CONSTRUCTION AND ENFORCEABILITY OF THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ITS CONFLICT OF LAWS RULES.

(b) THE PARTIES AGREE THAT THE BANKRUPTCY COURT LOCATED IN THE SOUTHERN DISTRICT OF INDIANA SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE PURCHASED ASSETS AND/OR ASSUMED LIABILITIES AND/OR ASSUMED CONTRACTS; AND (iii) ANY OTHER MATTER IN DISPUTE HEREUNDER.  BUYER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION AND, ACCORDINGLY, WAIVES ITS RIGHTS TO A JURY TRIAL.

**13.8.    Successors and Assigns.**

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, provided, however, that no party may assign its rights and obligations hereunder without the prior written consent of the other party hereto; provided that prior to Closing Buyer may assign all or any portion of its rights and obligations to an Affiliate provided that (a) such Affiliate shall have cash, immediately prior to Closing of at least $2,750,000 and, immediately after the Closing, exclusive of the Purchased Assets, of at least $2,550,000, and (b) no such assignment shall relieve Buyer of any of its obligations hereunder.

**13.9.    Interpretation.**

The masculine, feminine or neuter pronouns used herein shall be interpreted without regard to gender, and the use of the singular or plural shall be deemed to include the other whenever the context so requires.  The headings in this Agreement are inserted for convenience of reference only and shall not be a part of or control or affect the meaning of this Agreement.  Unless otherwise expressly stated herein, all references herein to Articles, Sections and paragraphs are to Articles, Sections and paragraphs in this Agreement and all references herein to Schedules and Exhibits are to Schedules and Exhibits to this Agreement.  The phrase "including" means "including, without limiting the generality of the foregoing."  The parties have each been represented by counsel in connection with the negotiation of this Agreement.  The fact that any provision hereof may have been drafted by counsel for a given party shall not be taken into consideration in interpreting such provision.

**13.10.    Schedules and Exhibits.**

The Schedules and Exhibits referred to herein and attached to this Agreement are incorporated herein by such reference as if fully set forth in the text hereof.  The inclusion of information in the Schedules hereto shall not be construed as an admission that such information is material to the Purchased Assets or the Business.  Terms used in the Schedules and not specifically defined shall have the same meanings as ascribed to them in this Agreement.  An

item disclosed in a Schedule which is relevant to another Schedule shall be deemed disclosed in such other Schedule, but only if a person reading such Schedule would reasonably conclude that such item is relevant to the other Schedule.

### 13.11. Modification.

The parties to this Agreement may, by mutual written consent, executed by an authorized officer of each the Buyer, Seller, and Administrative Agent, modify or supplement this Agreement in such manner as may be mutually agreed upon by them in writing.

### 13.12. Waiver of Provisions.

The terms, covenants, representations, warranties and conditions of this Agreement may be waived only by a written instrument executed by each the Buyer, Seller, and Administrative Agent waiving compliance. The failure of any party at any time to require performance of any provisions hereof shall, in no manner, affect the right at a later date to enforce the same. No waiver by any party of any condition, or breach of any provision, term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

### 13.13. Expenses.

Except as otherwise provided in Section 3.1(a) and Section 6.1(c) of this Agreement, each party shall bear its own expenses incident to this Agreement and the transactions contemplated hereby, including without limitation, all fees of counsel, accountants and consultants provided that, if any party breaches this Agreement any non-breaching party shall be entitled to reimbursement from the breaching party of its reasonable attorneys fees incurred in connection with the enforcement of its rights hereunder (whether or not judicial proceedings are instituted).

### 13.14. Further Assurances.

At any time on or after the Closing, the parties hereto shall each perform such acts, execute and deliver such instruments, assignments, endorsements and other documents and do all such other things consistent with the terms of this Agreement as may be reasonably necessary to accomplish the transactions contemplated in this Agreement or otherwise carry out the purpose of this Agreement and the Other Documents.

GSDOCS\1935990

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be executed on its behalf by its officer thereunto duly authorized, all on or as of the day and year first above written.

**VICTOR OOLITIC STONE COMPANY**

By: _____

Name: TERRENCE G. REUTELL

Title: CHIEF FINANCIAL OFFICER

**LIMESTONE ACQUISITION CORP.**

By: _____

Name: Donald Bramley

Title: President & Assistant Secretary

Acknowledged and Agreed (with respect to Sections 1.4(b), 3.1, 3.2, 6.7, 8.2, 8.3, 9.3, 11.1(a), 13.8, 13.11, 13.12, and 13.13):

**M&I MARSHALL & ILSLEY BANK,**
as Administrative Agent

By: _____
Name: MARK E. TRUAN
Title: SVP

Asset and Other Schedules

## Schedule 1.2(c)
## Furniture, Fixtures, Equipment

Automobiles used in the ordinary course of business

Various office equipment used in the ordinary
course of business
All machinery, fixtures and equipment used in
the ordinary course of business

All quarry blocks, slabs and finished sills

Mineral reserves

# Schedule 1.2(d)
# Assumed Contracts

Pitney Bowes Global Financial Services LLC      Mailing System Lease
PO Box 856460
Louisville, KY 40285-6460

Various Farm-Lease Arrangements

Rental Arrangements with respect to the following properties:

7070 South Victor Pike
Bloomington, IN 47403

7080 South Victor Pike
Bloomington, IN 47403

7255 South Victor Pike
Bloomington, IN 47403

7749 South Victor Pike
Bloomington, IN 47403

7750 South Victor Pike
Bloomington, IN 47403

7885 South Victor Pike
Bloomington, IN 47403

## Schedule 1.2(f)
## Real Property

7850 South Victor Pike, Bloomington, IN

Approx. 280 Acres Near Stinesville, IN

Approx. 260 Acres Near Peerless, IN

All production and maintenance buildings and real estate improvements (fences, parking lots, paved roads, etc.) on the foregoing properties.

7070 South Victor Pike, Bloomington, IN

7080 South Victor Pike, Bloomington, IN

7255 South Victor Pike, Bloomington, IN

7749 South Victor Pike, Bloomington, IN

7750 South Victor Pike, Bloomington, IN

7885 South Victor Pike, Bloomington, IN

## Schedule 1.2(o)
## Other Purchased Assets

Refunds in connection with any workers' compensation policies.

Schedule 1.3(i)
Other Excluded Assets


Employment Agreement, dated February 12, 2007, by and between
Seller and Richard M. Gold.

Aggregate Production and Lease Agreement dated as of December 10,
2003 between Seller and Justin Blackwell Trucking and Conveying,
Incorporated.

Letter Agreement dated June 10, 2008 [sic] and executed June 15, 2009
between Seller and BTI Crushed Stone Sales, LLC.

## Schedule 1.4(c)
### Vendors

Bank of America MasterCard
Brandeis, Inc.
Chase, Indiana NA
Cintas Corporation LOC 529
City of Bloomington Utilities
Community Hardware, Inc.
Cornwell Communications
Diamond Stone Technologies
Farmers & Mechanics Federal Savings
FedEx
Indylift, Inc.
interrupt
Lawson Products, Inc.
Napa Auto Parts
Northern Safety Co., Inc.
Office Depot
REMC
Smith Western Wear & Tack
White River Co-op

## Schedule 1.4(f)
## Employment Liabilities

Health insurance for YJ Zhang through December 31, 2009

Potential COBRA obligations for Richard Gold and YJ Zhang

Employee Travel and Related Expenses

Schedule 3.3
Purchase Price Allocation


To be provided.

# DISCLOSURE SCHEDULE

## to

# ASSET PURCHASE AGREEMENT

## ASSET PURCHASE AGREEMENT
## DISCLOSURE SCHEDULE
### September 16, 2009

This is the Disclosure Schedule referred to in the Asset Purchase Agreement dated as of the 16th day of September, 2009 (the "Agreement"), by and between Limetone Acquisition Corp., a Delaware Corporation ("Buyer"), and Victor Oolitic Stone Company, an Indiana corporation ("Seller")

Unless otherwise defined herein, all capitalized terms used herein shall have the meanings given to them in the Agreement.

The information contained in this Disclosure Schedule is subject to the following general qualifications:

(i)     such information is not limited to matters required by the Agreement to be reflected or disclosed in this Disclosure Schedule;

(ii)    a section of this Disclosure Schedule relating to one Section of the Agreement may cross-reference matter(s) disclosed on a section of this Disclosure Schedule relating to any other Section of the Agreement;

(iii)   to the extent that a certain section of this Disclosure Schedule describes with particularity a matter relating to the subject matter of any other section of this Disclosure Schedule such that the relevance of such matter to such section of this Disclosure Schedule is reasonably apparent, the matter shall be deemed disclosed for purposes of each such section of this Disclosure Schedule;

(iv)    the headings used herein are for convenience purposes only and in no way expand or otherwise modify the information requests in the Agreement; and

(v)     no reference to or disclosure of any item or other matter in this Disclosure Schedule shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in this Disclosure Schedule.

Any and all documents, agreements or other materials referred to in this Disclosure Schedule, and any annexes hereto, are hereby incorporated herein by reference as if set forth herein in their entirety. References to "undated" documents are to those documents in the forms provided or made available to the Buyer.

In addition to the foregoing, the following documents, agreements or materials are hereby deemed disclosed for all purposes of the Agreement and are hereby incorporated into this Disclosure Schedule by reference as if set forth herein in their entirety:

1.     All organizational and formation documents of the Seller which are of public record and generally available for public review or procurement;

2.     All Liens which are reflected within any public filings or public records generally available for public review; any title, survey and other real estate-related encumbrances which are of public record and generally available for public review or procurement; any zoning or land use laws generally applicable to the relevant properties;

3.     The Agreement and all exhibits, schedules and other attachments thereto.

4.    All pleadings and filings in the Bankruptcy Case, and all other documents, transcripts, and other information made available pursuant to or a part of the Bankruptcy Case.

The following Schedules to the Agreement are set forth elsewhere and not included in this Disclosure Schedule:

| Schedule | |
|---|---|
| 1.2(c) | Equipment |
| 1.2(d) | Assumed Contracts |
| 1.2(f) | Real Property |
| 1.2(o) | Other Purchased Assets |
| 1.3(i) | Other Excluded Assets |
| 1.4(d) | Vendors |
| 1.4(g) | Employment Liabilities |
| 3.3 | Purchase Price Allocation |

Schedule 4.4(a)
Limitations on Assumed Contracts

None.

## Schedule 4.4(b)
## Breaches of Assumed Contracts

None.

Schedule 4.5
Consents


None.

**EXHIBIT A**

## TERM SHEET FOR NEW CREDIT AGREEMENT

CONFIDENTIAL - NOT FOR DISTRIBUTION

**Summary of Proposed Terms**
**Amended Credit Facility and Bidder Equity Arrangements**

CREDIT FACILITY

| | |
|---|---|
| **Principal:** | A term loan in an amount equal to the reconciled amount set forth above. |
| **Interest Rate:** | Libor plus 5.0% per annum. |
| | In addition, the existing Swap Agreement will be assumed by Newco on a going forward basis. |
| **Maturity:** | 3 years from Closing Date. |
| **Principal Prepayments:** | Beginning first quarter of fiscal year 2010, and quarterly thereafter, principal amortization equal to $125,000 per quarter in 2010, $175,000 per quarter in 2011, and $250,000 per quarter in 2012. VO may make principal prepayments at any time without penalty. |
| **Financial Covenants:** | Interest Coverage of 1.0:1.0, tested quarterly beginning December 31, 2009. |
| **Affirmative and Negative Covenants:** | No cash dividends/distributions (other than payment on Preferred Stock described below). |
| | Minimum working capital measured by cash on hand (*i.e.*, bank balance), measured monthly, of $250,000. There will be an ability to cure any default in the minimum working capital balance within some reasonable period of time following the applicable test date. |
| **Events of Default:** | Customary. |
| **Lender's Expenses:** | Reimbursed through Closing Date. Reasonable out-of-pocket expenses to be reimbursed thereafter. |
| **Excess Cash:** | Subject to the floor and cap described below, to the extent that cash exceeds (i) $3.0 million for the first year, and (ii) 2.0 million for the 2nd and 3rd year following Closing (on June 30th of each year), the first $260,000 of such excess cash will be split 50% to prepay principal and 50% to the pay management fee). Once the management fee has been paid in full, any excess cash flow from the period will be used to prepay principal. |
| | There will be a guaranteed monthly management fee (regardless of the amount of excess cash) of $10,000 per month. The maximum management fee (the monthly guaranteed fee plus the excess cash fee) following Closing will be $250,000 per year. |

CONFIDENTIAL - NOT FOR DISTRIBUTION

**EQUITY ARRANGEMENTS**

**New Money:**       $2.75 million of Participating Preferred Stock (*i.e.*, $2.65 million for working capital and transaction expenses (subject to caps above) plus $100,000 for payment to creditors), to be funded by existing shareholders of VO and their affiliates.

**Security:**       Participating Preferred Stock with a 6% current dividend, payable in cash monthly and convertible into 100% of the common equity. Management option pool (common equity) to be determined following the closing.

CONFIDENTIAL - NOT FOR DISTRIBUTION

## Exhibit A

| Effective Date | To Date | Note # | Principal Balance | Rate | Number of Days | Basis | Interest Due |
|---|---|---|---|---|---|---|---|
| 4/28/2009 | 8/12/2009 | 501 | $11,000,000.00 | 3.520000% | 105 | 360 | 112,933.33 |
| 4/28/2009 | 8/12/2009 | 601 | $8,250,000.00 | 3.520000% | 105 | 360 | 84,700.00 |
| 4/28/2009 | 8/12/2009 | 701 | $8,250,000.00 | 3.520000% | 105 | 360 | 84,700.00 |
| 4/28/2009 | 8/12/2009 | 801 | $5,500,000.00 | 3.520000% | 105 | 360 | 56,466.67 |
| | | | | | | | |
| 4/28/2009 | 8/12/2009 | 503 | $333,333.33 | 3.518130% | 105 | 360 | 3,420.40 |
| 4/28/2009 | 8/12/2009 | 603 | $250,000.00 | 3.518130% | 105 | 360 | 2,565.30 |
| 4/28/2009 | 8/12/2009 | 703 | $250,000.00 | 3.518130% | 105 | 360 | 2,565.30 |
| 4/28/2009 | 8/12/2009 | 803 | $166,666.67 | 3.518130% | 105 | 360 | 1,710.20 |
| | | | | | | | |
| 4/28/2009 | 8/12/2009 | 2102 | $5,000,000.00 | 3.770000% | 105 | 360 | 54,979.17 |
| 4/28/2009 | 8/12/2009 | 2202 | $3,750,000.00 | 3.770000% | 105 | 360 | 41,234.38 |
| 4/28/2009 | 8/12/2009 | 2302 | $3,750,000.00 | 3.770000% | 105 | 360 | 41,234.38 |
| 4/28/2009 | 8/12/2009 | 2402 | $2,500,000.00 | 3.770000% | 105 | 360 | 27,489.58 |
| | | | | | | | |
| 4/28/2009 | 8/12/2009 | 3101 | $1,417,830.58 | 3.250000% | 105 | 360 | 13,439.85 |
| 4/28/2009 | 8/12/2009 | 3201 | $1,063,368.25 | 3.250000% | 105 | 360 | 10,079.84 |
| 4/28/2009 | 8/12/2009 | 3301 | $1,063,368.25 | 3.250000% | 105 | 360 | 10,079.84 |
| 4/28/2009 | 8/12/2009 | 3401 | $708,905.91 | 3.250000% | 105 | 360 | 6,719.84 |
| | | | | | | | |
| | | | | | | | |

Total Accrued Interest @ Contract Rate                  554,318.09

**Less: Adequate Protection Payments**

June                              165,000.00
July                              165,000.00
August                            165,000.00

**Net Accrued Interest Due**                     59,318.09

7

**EXHIBIT B**

## FORM OF SALE PROCEDURES ORDER

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | |
| | ) | |
| VICTOR OOLITIC | ) | Case Nos. 09-05786 and 09-05787 |
| STONE COMPANY, *et al.*, | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| | ) | |

ORDER (I) SCHEDULING HEARING ON PROPOSED SALE OF
SUBSTANTIALLY ALL OF THE ASSETS OF VICTOR OOLITIC STONE
COMPANY AND ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES FREE AND
CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (II)
APPROVING (A) AUCTION AND OVERBID PROCEDURES IN
CONNECTION WITH THE PROPOSED SALE TO OBTAIN HIGHER AND
BETTER OFFERS, (B) AN EXPENSE REIMBURSEMENT, (C) THE
MANNER AND FORM OF NOTICE OF SALE, AND GRANTING CERTAIN
RELATED RELIEF

Upon the motion (the "Motion")[1] of Victor Oolitic Stone Company ("Victor Oolitic" or

"Company") and Victor Oolitic Holdings, Inc. ("Holdings"), the above-captioned debtors and

debtors-in-possession (collectively, the "Debtors") for orders: (I) authorizing the sale of

substantially all of the assets of the Company and assumption and assignment of executory

contracts and unexpired leases to Limestone Acquisition Corp. (the "Proposed Buyer") free and

clear of liens, claims, interests and encumbrances, and (II) approving (A) auction and overbid

procedures in connection with the proposed sale to obtain higher and better offers, (B) an

expense reimbursement, (C) the manner and form of notice of sale, and granting certain related

relief; and a hearing to approve the proposed Auction and Overbid Procedures and Expense

---

[1] All capitalized terms not otherwise defined herein shall have the meaning assigned to such terms in the Asset
Purchase Agreement, which is attached to the Motion as Exhibit A, or the Motion, as the case may be.

Reimbursement having been held on September 22, 2009 (the "Sale Procedures Hearing"), and any objections having been resolved, withdrawn or overruled.

NOW, THEREFORE, based upon the Motion and it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties-in-interest; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334; and it appearing that the Motion is a core proceeding pursuant to 28 U.S.C. §157; and adequate notice of the Motion and opportunity for objection having been given; and it appearing that no other notice need be given; and good cause appearing therefor,

IT IS HEREBY FOUND, CONCLUDED AND DETERMINED THAT:

A.      Notice of the Sale Procedures Hearing, the Motion and the Auction and Overbid Procedures was provided to all necessary parties in interest and is otherwise adequate and appropriate in the circumstances.

B.      The Debtors have concluded that the best method for maximizing the return to the creditors of their estates is, among other things, through a sale of substantially all of the Company's assets (the "Purchased Assets") and the assumption and assignment of certain executory contracts and unexpired leases of the Company (the "Executory Contracts").

C.      In the exercise of its business judgment, the Company has agreed to sell the Purchased Assets to the Proposed Buyer pursuant to an asset purchase and sale agreement (the "Asset Purchase Agreement"), a copy of which is attached to the Motion, subject to higher and better offers.

D.      The Company will maximize the sale price of the Purchased Assets by holding an auction sale thereof (the "Auction") in accordance with the Auction and Overbid Procedures attached hereto as Exhibit A.

GSDOCS\1934708

E.     The sale of the Purchased Assets in accordance with the Auction and Overbid Procedures is in the best interests of the Debtors, their estates, creditors and other parties in interest.

F.     The Debtors have demonstrated a compelling and sound business justification for the authorization to pay the Expense Reimbursement under the terms and conditions set forth in the Asset Purchase Agreement.

G.     The Debtors' granting of the Expense Reimbursement to the Proposed Buyer is (i) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of section 503(b) of the Bankruptcy Code, (ii) of substantial benefit to the Debtors' estates, and (iii) fair, reasonable and appropriate in light of, among other things, (a) the size and nature of the proposed sale of the Purchased Assets, (b) the substantial efforts that have been expended by the Proposed Buyer, and (c) the benefits the Proposed Buyer has provided to the Debtors' estates and creditors and all parties-in-interest herein.

H.     All other findings made by the Court during the Sale Procedures Hearing are incorporated herein by reference.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

1.     The Auction and Overbid Procedures attached hereto as <u>Exhibit A</u> are hereby approved, and the terms of the Auction and Overbid Procedures are incorporated by reference as if fully set forth herein.  The Debtors are hereby authorized to obtain the highest and best bids for the Purchased Assets in accordance with the Auction and Overbid Procedures.  The failure to specifically include or reference any particular provision, section or article of the Auction and Overbid Procedures in this Order shall not diminish or impair the effectiveness of

GSDOCS\1934708

such Procedures, it being the intent of this Court that the Auction and Overbid Procedures be authorized and approved in their entirety.

2.    The Notice of Sale substantially in the form attached hereto as <u>Exhibit B</u>, is hereby approved.  The Debtors shall serve, by first-class mail within three (3) business days after the entry of this Order, a copy of this Order, the Motion and the Notice of Sale on (a) the United States Trustee; (b) counsel to the agent for the Senior Lenders (the "Senior Agent") and each of the Senior Lenders; (c) counsel to the agent for the Second Lien Lenders (the "Second Lien Agent"); (d) all other parties on the Master Service List established in these cases; (e) those government agencies required to receive notice of proceedings under the Bankruptcy Rules; (f) all counterparties to the Executory Contracts; (g) all parties who are known to the Debtors to have liens on the Purchased Assets; (h) all federal, state and local tax and environmental authorities applicable to the Debtors and their assets and properties; and (i) all parties who have during these cases contacted the Debtors or their counsel regarding the purchase of the Purchased Assets and the parties who provided written indications of interest prior to the commencement of the case in the previous sales and marketing process, and any other parties that the Debtors in consultation with the Senior Agent believe may have interest in purchasing the Purchased Assets. Such service is hereby deemed to be sufficient notice of the sale of the Purchased Assets under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure.

3.    Any person seeking to submit a Competing Offer (as defined in the Auction and Overbid Procedures) for the Purchased Assets shall comply with the Auction and Overbid Procedures and shall submit such Competing Offer to Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, Massachusetts  02110 (Attn: James F. Wallack, Esq. and Christine D. Lynch, Esq.), and Ice Miller LLP, One American Square, Suite 2900, Indianapolis, Indiana

GSDOCS\1934708

46204 (Attn: Henry Efroymson, Esq.) with copies to the following: (i) counsel to the Proposed

Buyer, Kirkland & Ellis, 300 North LaSalle, Chicago, Illinois 60654 (Attn: James A. Stempel,

Esq.); and (ii) counsel to the Administrative Agent, Hopper Blackwell, PC, 111 Monument

Circle, #452, Indianapolis, Indiana 46204 (Attn: George W. Hopper, Esq. and Jason R. Burke,

Esq.), no later than 5:00 p.m. (EDT), on October 16, 2009 (the "Bid Deadline").

       4.    If a Qualified Competing Offer (as defined in the Auction and Overbid

Procedures) is received in accordance with the terms of this Order and the Auction and Overbid

Procedures, the Auction will be conducted on October 20, 2009, at 10:00 a.m. (EDT) at the

offices of Ice Miller LLP, One American Square, Suite 2900, Indianapolis, Indiana.  The

Proposed Buyer is deemed to be a Qualified Bidder, and the Proposed Buyer's bid for the

Purchased Assets is deemed a Qualified Bid, as such terms are defined in the Auction and

Overbid Procedures.  Notwithstanding the foregoing, the Senior Lenders by the Administrative

Agent will be permitted to submit their credit bid as an Alternate Bid.

       5.    A hearing to consider approval of the results of the Auction, or, if no

Auction is held, the sale of the Purchased Assets to the Proposed Buyer (the "Sale Hearing") will

be held in Courtroom 329, United States Bankruptcy Court for the Southern District of Indiana,

46 East Ohio Street, Indianapolis, Indiana 46204 (the "Bankruptcy Court") on October 21, 2009

at 9:30 a.m. (EDT).  In the event there are no other Qualifying Bids, the Debtors shall accept the

Proposed Buyer's bid pursuant to the Asset Purchase Agreement.

       6.    In accordance with section 6.1(c) of the Asset Purchase Agreement, if (i)

the Asset Purchase Agreement has not been terminated by mutual consent pursuant to § 11.1(a)

thereof, (ii) the Proposed Buyer does not purchase the Purchased Assets, (iii) the Proposed Buyer

is not otherwise in default, and (iv) this Court enters an order approving an offer to purchase the

Purchased Assets submitted by a person or entity other than the Proposed Buyer or enters an order confirming a plan of reorganization of the Debtors (other than a plan under which the Proposed Buyer acquires the assets of the Company), the Debtors shall pay to the Proposed Buyer an expense reimbursement of up to $200,000 (the "Expense Reimbursement"). If applicable, the Debtors shall pay the Expense Reimbursement to the Proposed Buyer upon the closing of the sale of the Purchased Assets to a third party (or as soon thereafter as practicable) or the effective date of a plan of reorganization (other than a plan under which the Proposed Buyer acquires the assets of the Company), as the case may be, and the Expense Reimbursement will be payable from the proceeds of the sale of the Purchased Assets notwithstanding any liens, claims, interests or encumbrances thereon.

7. Except as otherwise provided herein, any objection to the Motion shall be filed with the Bankruptcy Court and served by overnight delivery upon Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, Massachusetts 02110 (Attn: James F. Wallack, Esq. and Christine D. Lynch, Esq.), and Ice Miller LLP, One American Square, Suite 2900, Indianapolis, Indiana 46204 (Attn: Henry Efroymson, Esq.) with copies to the following: (i) counsel to the Proposed Buyer, Kirkland & Ellis, 300 North LaSalle, Chicago, Illinois 60654 (Attn: James A. Stempel, Esq.); and (ii) counsel to the Administrative Agent, Hopper Blackwell, PC, 111 Monument Circle, #452, Indianapolis, Indiana 46204 (Attn: George W. Hopper, Esq. and Jason R. Burke, Esq.) (collectively, the "Interested Parties") so as to be received not later than 4:00 p.m. (EDT), on October 16, 2009 (the "Objection Deadline"). An objection shall set forth with particularity the grounds for such objection or other statements of position.

8.      On or before October 6, 2009, the Debtors shall serve a notice (the "Cure Notice") on the counterparties to each Executory Contract, setting forth the cure amount (the "Cure Cost") the Debtors believe is owed under each such Executory Contract.

9.      Any objection to the Cure Notice (including any objection to a Cure Cost or to the assumption and assignment of an Executory Contract, for any reason) shall be filed with the Bankruptcy Court not later than the Objection Deadline and served on the Interested Parties so as to be actually received not later than the Objection Deadline.  An objection shall set forth with particularity the grounds for such objection or other statements of position.  If a counterparty to an Executory Contract fails to object to the Cure Notice in a timely manner and timely serve such objection, such counterparty shall be forever barred from (i) contesting the assumption and assignment of such Executory Contract, and (ii) disputing or otherwise asserting any cure amount other than as set forth in the Cure Notice, and the payment of the Cure Cost set forth in the Cure Notice shall be deemed to satisfy fully and completely the requirements of cure and compensation requisite to the Company's assumption and assignment of such Executory Contract.  A hearing will be held before the Bankruptcy Court on October 21, 2009 at 9:30 a.m. (EDT), or at such later date as this Court may designate upon request by the Debtors and with the prior consent of the successful bidder, to consider any and all timely objections to the Cure Notice.

10.      This Order shall be binding on the Debtors, including any chapter 7 or chapter 11 trustee or other fiduciary appointed for the estates of the Debtors.

11.      This Order shall constitute findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

12.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 7062, 9014, or otherwise, this Court, for good cause shown, orders that the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

13.    This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order, including, but not limited to, any matter, claim or dispute arising from or relating to the Expense Reimbursement, the Asset Purchase Agreement, the Auction and Overbid Procedures and the implementation of this Order.

Dated: September ___, 2009
          Indianapolis, Indiana

_____
Hon. Frank J. Otte
United States Bankruptcy Judge

GSDOCS\1934708

# EXHIBIT A

## FORM OF AUCTION AND OVERBID PROCEDURES

## AUCTION AND OVERBID PROCEDURES

On September 16, 2009, Victor Oolitic Stone Company, (the "Company") and Victor Oolitic Holdings, Inc. (collectively, the "Debtors"), filed a motion (the "Motion") for orders: (I) authorizing the sale of substantially all of the Company's assets and assumption and assignment of executory contracts and leases to Limestone Acquisition Corp. (the "Proposed Buyer") free and clear of liens, claims, interests and encumbrances, and (II) approving (A) auction and overbid procedures in connection with the proposed sale to obtain higher and better offers, (B) expense reimbursement, and (C) the manner and form of notice of sale. The Company has agreed to sell substantially all of its assets to the Proposed Buyer pursuant to the terms of a certain asset purchase and sale agreement (the "Asset Purchase Agreement"), subject to Bankruptcy Court approval and subject to higher and better offers. A copy of the Asset Purchase Agreement[1], as well as the Motion, are available upon request to the Debtors' attorneys, Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, Massachusetts 02110 (Attn: James F. Wallack, Esq. and Christine D. Lynch, Esq.)

The following procedures (the "Bidding Procedures") shall govern the auction process by which the Company will accept and consider higher and better offers for the Assets (as defined in the Asset Purchase Agreement):

1.      The Company shall provide within 3 business days of entry of the Sale Procedures Order (a) notice of the Auction (as defined below), the Sale Procedures Order and these Auction and Overbid Procedures, together with a copy of the Asset Purchase Agreement, to those persons who contacted the Company or its counsel with respect to the potential purchase of the Assets during the case or who provided written indications of interest during the previous sales and marketing process; and (b) copies of the Asset Purchase Agreement to all other prospective offerors upon written request to the Company or their professionals.

2.      In order to pre-qualify ("Pre-Qualification") as a prospective bidder ("Prospective Bidder"), any party desiring to become a Prospective Bidder shall deliver to the Debtors: (i) a signed confidentiality agreement in form and substance satisfactory to the Company, and (ii) evidence establishing to the satisfaction of the Company and the Administrative Agent such Prospective Bidder's financial capability to timely consummate its proposed alternative transaction.

3.      Following Pre-Qualification, the Company shall provide such Prospective Bidder with access to information concerning the assets and liabilities, projected cash flow and future prospects of the Company reasonably requested by a Prospective Bidder for the sole purpose of submitting a counteroffer for the Assets (a "Competing Offer").

4.      Any party that submits a Competing Offer in compliance with the relevant provisions of paragraph 5 below shall be designated as a "Qualified Bidder." The Proposed Buyer shall be deemed to be a Qualified Bidder.

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Asset Purchase Agreement.

5.    To be considered, each Competing Offer shall:

(a) be submitted in writing by no later than 5:00 p.m. (EDT) on October 16, 2009 (the "Bid Deadline") to Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, Massachusetts 02110 (Attn: James F. Wallack, Esq. and Christine D. Lynch, Esq.), and Ice Miller LLP, One American Square, Suite 2900, Indianapolis, Indiana 46204 (Attn: Henry Efroymson, Esq.) with copies to the following: (i) counsel to the Proposed Buyer, Kirkland & Ellis, 300 North LaSalle, Chicago, Illinois 60654 (Attn: James A. Stempel, Esq.); and (ii) counsel to the Administrative Agent, Hopper Blackwell, PC, 111 Monument Circle, #452, Indianapolis, Indiana 46204 (Attn: George W. Hopper, Esq. and Jason R. Burke, Esq.).

(b) at a minimum, exceed the sum of (i) the Purchase Price, plus (ii) $450,000, for a total minimum bid of $53,980,069.74 plus any interest accruing at the non-default rate and owing to the Senior Lender subsequent to the Petition Date (less any adequate protection payments received) (the "Minimum Overbid Amount");

(c) be accompanied by a signed asset purchase agreement in the form of the Asset Purchase Agreement, together with a marked copy showing all changes to the Asset Purchase Agreement, which changes shall not be less favorable to the Company, its creditors and employees in any material respect including, without limitation, with respect to Assumed Liabilities to the extent unpaid prior to the Closing Date;

(d) not be subject to, or conditioned on, any contingency or condition, including without limitation, the outcome of unperformed due diligence by the bidder or upon any financing contingency;

(e) be irrevocable until the earlier to occur of (i) the Closing, or (ii) for thirty (30) days following the conclusion of the Auction;

(f) be submitted with a cash deposit equal to $100,000 (the "Deposit") in the form of a wire transfer or a certified check made payable to the Company and sent to the Company's counsel, which Deposit shall be non-refundable if the Bankruptcy Court approves the sale of the Company's assets to such Qualified Bidder;

(g) be substantially on the same or better terms and conditions as set forth in the Asset Purchase Agreement;

(h) be submitted with evidence establishing to the satisfaction of the Company and the Senior Lenders, in consultation with their professionals, that such Prospective Bidder has the financial capability to timely consummate its Competing Offer and can provide all non-debtor parties to those executory contracts and unexpired leases to be assumed and assigned with adequate assurance of future performance as contemplated by Section 365 of the Bankruptcy Code; and

(i) Notwithstanding the foregoing, the Senior Lenders will be permitted to submit their credit bid which will be deemed to be a Qualified Bid. Any such credit bid by the Senior Lenders will be an Alternate Bid and will be accepted if the Proposed Buyer fails to close timely on the Asset Purchase Agreement and there is no Qualified Bidder other than the Proposed Buyer and the Senior Lenders.

6.    If the Company does not receive any Competing Offers that satisfy the provisions set forth in paragraph 5 above, the Company will report the same to the Bankruptcy Court, and the Company shall proceed to seek court approval of the Asset Purchase Agreement with Proposed Buyer.

7.    Competing Offers that the Company, in consultation with the Senior Agent, determines satisfy the provisions set forth in paragraph 5 above shall be deemed to be "Qualified Bids."

8.    In the event that one or more Qualified Bids are received, an auction (the "Auction") will be conducted at the offices of Ice Miller LLP, One American Square, Suite 2900, Indianapolis, Indiana on October 20, 2009, beginning at 10:00 a.m. (EDT) or such later time or other place as the Company shall notify all Qualified Bidders that have submitted Qualified Bids. Only the Proposed Buyer, Qualified Bidders and the Senior Lenders will be entitled to participate in and make any subsequent bids at the Auction. Bidding at the Auction will continue until such time as the highest and best offer is determined. The Company may announce at the Auction additional rules or procedures for conducting the Auction so long as such rules are not inconsistent with these Auction Procedures. At the Auction, bidding will commence at the amount of the Opening Bid, and each subsequent bid shall be in increments of no less than $100,000. The Senior Lenders shall be permitted to submit credit bids at the Auction without deposit or Pre-Qualification requirements.

9.    All bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to a jury trial in connection with any disputes relating to the Auction and the sale of the Assets.

10.    The Company reserves the right, after consultation with its professionals and the Senior Agent, to (i) determine, at its discretion, which bid, if any, is the highest and best offer, taking into consideration, inter alia, that the Expense Reimbursement would be payable if a party other than the Proposed Buyer is the Successful Bidder, (ii) reject any bid that the Company deems to be inadequate, insufficient or otherwise unsatisfactory, (iii) change the location of the Auction, and/or (iv) adjourn the Auction by announcing such adjournment at the Auction. Notwithstanding the foregoing, the Company and the Senior Lenders shall not reject the bid of the Proposed Buyer under the Asset Purchase Agreement unless a higher and better bid is received from a Qualified Bidder pursuant to these procedures, and the Auction shall not be adjourned beyond a date that would put the Company in default of the Asset Purchase Agreement without the consent of the Proposed Buyer.

11.   If, for any reason, the entity that makes the highest and best bid (such entity, the "Successful Bidder") fails to close on the purchase of the Company's assets, then: (i) the Successful Bidder shall forfeit the Deposit and be subject to such other rights and remedies as the Company may have for such failure (ii) the Qualified Bidder who, as of the conclusion of the Auction, has made the second and the next highest and best bid automatically will be deemed to have submitted the highest and best bid without further order of the Bankruptcy Court (such bidder, the "Alternate Bidder"); and (iii) the Alternate Bidder will be required to proceed as the purchaser at closing and its bid will be treated as the Successful Bid without further order of the Bankruptcy Court. Notwithstanding the foregoing, the Proposed Buyer shall in no event be required to serve as the Alternate Bidder.

12.   No party other than the Proposed Buyer may seek an expense reimbursement, break-up fee or similar fee.

GSDOCS\1935956.4

**EXHIBIT B**

**FORM OF NOTICE OF SALE**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| VICTOR OOLITIC | )    Case Nos. 09-05786 and 09-05787 |
| STONE COMPANY, *et al.*, | )    (Jointly Administered) |
| | ) |
| Debtors. | ) |
| | ) |

NOTICE OF SALE OF SUBSTANTIALLY ALL OF THE
ASSETS OF VICTOR OOLITIC STONE COMPANY AND THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES

TO CREDITORS AND PARTIES IN INTEREST:

PLEASE TAKE NOTICE, that, pursuant to 11 U.S.C. §§ 363 and 365 and Rules 2002, 4001, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure, Victor Oolitic Stone Company (the "Company") intends to sell substantially all of its assets and assume and assign certain executory contracts and leases as further described in this notice.

The Company has entered into an Asset Purchase Agreement ("Asset Purchase Agreement") with Limestone Acquisition Corp. (the "Proposed Buyer"), under which the Proposed Buyer intends to purchase the Purchased Assets (as defined in the Asset Purchase Agreement). On September 16, 2009, the Debtors filed their Motion (the "Motion")[1] For Orders: (I) Authorizing The Sale Of Substantially All Of The Assets Of Victor Oolitic Stone Company And The Assumption And Assignment Of Certain Executory Contracts And Unexpired Leases To Limestone Acquisition Corp. Free And Clear Of Liens, Claims, Interests And Encumbrances, And (II) Approving (A) Auction And Overbid Procedures In Connection With The Proposed Sale To Obtain Higher And Better Offers, (B) An Expense Reimbursement, And (C) The Manner And Form Of Notice Of Sale. Pursuant to the Motion, the Company is seeking authority to sell the Purchased Assets to the Proposed Buyer or a higher and better bidder, and authority to assume and assign certain executory contract and unexpired leases.

The Debtors are soliciting higher and better offers by means of an auction (discussed below), which shall be governed by the terms of the Auction and Overbid Procedures attached as Exhibit A to this notice (the "Auction and Overbid Procedures"). The Auction and Overbid Procedures have been approved by the United States

---

[1] All capitalized terms not otherwise defined herein shall have the meaning assigned to such terms in the Motion, the Asset Purchase Agreement, which is attached to the Motion as Exhibit A, or the Auction and Overbid Procedures, as the case may be.

Bankruptcy Court for the Southern District of Indiana (the "Bankruptcy Court") by order dated September ___, 2009.

The Motion and the Asset Purchase Agreement are on file with the Bankruptcy Court, 46 East Ohio Street, Indianapolis, Indiana 46204, and are available for review on business days during regular business hours at the Clerk's office or at the Bankruptcy Court's website, www.insb.uscourts.gov (a password and payment of a fee is required for viewing pleadings online). In addition, copies of the Motion and the Asset Purchase Agreement are available upon request from the undersigned.

OBJECTIONS, if any, to the relief requested in the Motion or to final approval of the Asset Purchase Agreement must be filed with the Bankruptcy Court and served by overnight delivery upon Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, Massachusetts 02110 (Attn: James F. Wallack, Esq. and Christine D. Lynch, Esq.), and Ice Miller LLP, One American Square, Suite 2900, Indianapolis, Indiana 46204 (Attn: Henry Efroymson, Esq.) with copies to the following: (i) counsel to the Proposed Buyer, Kirkland & Ellis, 300 North LaSalle, Chicago, Illinois 60654 (Attn: James A. Stempel, Esq.); (ii) counsel to the Senior Agent, Hopper Blackwell, PC, 111 Monument Circle, #452, Indianapolis, Indiana 46204 (Attn: George W. Hopper, Esq. and Jason Burke, Esq.); and (iii) Laura A. Duvall, Office of the United States Trustee, 101 West Ohio Street, Suite 1000, Indianapolis, Indiana 46204 (collectively, the "Interested Parties") so as to be received not later than 5:00 p.m. (ET), on October 16, 2009 (the "Objection Deadline"). An objection shall set forth with particularity the grounds for such objection or other statements of position.

On or before October 6, 2009, the Debtors shall serve a notice (the "Cure Notice"), setting forth the cure amount (the "Cure Amount") the Debtors believe is owed under each executory contract or unexpired lease to be assumed and assigned by the Company (collectively, the "Executory Contracts") on the non-debtor parties to each such contract or lease.

Any Objection to the Cure Notice (including any objection to a Cure Amount or to the assumption and assignment of leases or contracts for any reason) shall be filed with the Bankruptcy Court as specified above and served on the Interested Parties so as to be actually received not later than the Objection Deadline. An objection shall set forth with particularity the grounds for such objection or other statements of position. If a non-debtor party to an Executory Contract fails to object to the Cure Notice in a timely manner and timely serve such objection, such non-debtor party shall be forever barred from (i) contesting the assumption and assignment of such Executory Contract, and (ii) disputing or otherwise asserting any cure amount other than as set forth in the Cure Notice and payment of the amount set forth in the Cure Notice shall be deemed to satisfy fully and completely the requirements of cure and compensation requisite to the Company's assumption and assignment of such Executory Contract. A hearing will be held before the Bankruptcy Court on October 21, 2009, at 10:00 a.m. (ET), or at a later date to be determined by the Court, to consider any and all objections to the Cure Notice.

Through this notice, HIGHER AND BETTER OFFERS TO PURCHASE THE ASSETS ARE HEREBY SOLICITED subject to the terms and conditions of the Auction and Overbid Procedures. To be considered a Qualified Bid, an offer must comply with the Auction and Overbid Procedures and be served upon the Interested Parties so as to be received on or before 5:00 p.m. (ET) on October 16, 2009. If a Qualified Bid is timely received, the Debtors will hold an auction at the offices of Ice Miller LLP, One American Square, Suite 2900, Indianapolis, Indiana 46204, on October 20, 2009, beginning at 10:00 a.m. (ET) or such later time or other place as the Company shall notify all Qualified Bidders who have submitted Qualified Bids.

A HEARING on the Motion seeking approval of the sale of the Purchased Assets is scheduled to take place at 10:00 a.m. (ET) on October 21, 2009 at the Bankruptcy Court, located at 46 East Ohio Street, Indianapolis, Indiana 46204, Courtroom 329, before the Honorable Frank J. Otte, United States Bankruptcy Judge. If no objection to the sale is timely filed, the Bankruptcy Court may cancel the scheduled hearing and may grant the Motion.

GSDOCS\1937587

Dated: September ____, 2009

Respectfully submitted by:

_____

Henry A. Efroymson, Esq.
Michelle J. Fisk, Esq.
ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, Indiana 46282-0200
Tel:    (317) 236-2100
Fax:    (317) 236-2219

- and -

James F. Wallack, Esq.
Christine D. Lynch, Esq.
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, Massachusetts  02110-3333
Tel:    (617) 482-1776
Fax:    (617) 574-4112

*Counsel to Victor Oolitic Stone Company
and Victor Oolitic Holdings, Inc.*

GSDOCS\1937587

## EXHIBIT A

## AUCTION AND OVERBID PROCEDURES

On September 11, 2009, Victor Oolitic Stone Company, (the "Company") and Victor Oolitic Holdings, Inc. (collectively, the "Debtors"), filed a motion (the "Motion") for orders: (I) authorizing the sale of substantially all of the Company's assets and assumption and assignment of executory contracts and leases to Limestone Acquisition Corp. (the "Proposed Buyer") free and clear of liens, claims, interests and encumbrances, and (II) approving (A) auction and overbid procedures in connection with the proposed sale to obtain higher and better offers, (B) expense reimbursement, and (C) the manner and form of notice of sale. The Company has agreed to sell substantially all of its assets to the Proposed Buyer pursuant to the terms of a certain asset purchase and sale agreement (the "Asset Purchase Agreement"), subject to Bankruptcy Court approval and subject to higher and better offers. A copy of the Asset Purchase Agreement[1], as well as the Motion, are available upon request to the Debtors' attorneys, Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, Massachusetts 02110 (Attn: James F. Wallack, Esq. and Christine D. Lynch, Esq.)

The following procedures (the "Bidding Procedures") shall govern the auction process by which the Company will accept and consider higher and better offers for the Assets (as defined in the Asset Purchase Agreement):

1.    The Company shall provide within 3 business days of entry of the Sale Procedures Order (a) notice of the Auction (as defined below), the Sale Procedures Order and these Auction and Overbid Procedures, together with a copy of the Asset Purchase Agreement, to those persons who contacted the Company or its counsel with respect to the potential purchase of the Assets during the case or who provided written indications of interest during the previous sales and marketing process; and (b) copies of the Asset Purchase Agreement to all other prospective offerors upon written request to the Company or their professionals.

2.    In order to pre-qualify ("Pre-Qualification") as a prospective bidder ("Prospective Bidder"), any party desiring to become a Prospective Bidder shall deliver to the Debtors: (i) a signed confidentiality agreement in form and substance satisfactory to the Company, and (ii) evidence establishing to the satisfaction of the Company and the Administrative Agent such Prospective Bidder's financial capability to timely consummate its proposed alternative transaction.

3.    Following Pre-Qualification, the Company shall provide such Prospective Bidder with access to information concerning the assets and liabilities, projected cash flow and future prospects of the Company reasonably requested by a Prospective Bidder for the sole purpose of submitting a counteroffer for the Assets (a "Competing Offer").

4.    Any party that submits a Competing Offer in compliance with the relevant provisions of paragraph 5 below shall be designated as a "Qualified Bidder." The Proposed Buyer shall be deemed to be a Qualified Bidder.

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Asset Purchase Agreement.

5.    To be considered, each Competing Offer shall:

(a) be submitted in writing by no later than 5:00 p.m. (EDT) on October 16, 2009 (the "Bid Deadline") to Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, Massachusetts 02110 (Attn: James F. Wallack, Esq. and Christine D. Lynch, Esq.), and Ice Miller LLP, One American Square, Suite 2900, Indianapolis, Indiana 46204 (Attn: Henry Efroymson, Esq.) with copies to the following: (i) counsel to the Proposed Buyer, Kirkland & Ellis, 300 North LaSalle, Chicago, Illinois 60654 (Attn: James A. Stempel, Esq.); and (ii) counsel to the Administrative Agent, Hopper Blackwell, PC, 111 Monument Circle, #452, Indianapolis, Indiana 46204 (Attn: George W. Hopper, Esq. and Jason R. Burke, Esq.).

(b) at a minimum, exceed the sum of (i) the Purchase Price, plus (ii) $450,000, for a total minimum bid of $53,980,069.74 plus any interest accruing at the non-default rate and owing to the Senior Lender subsequent to the Petition Date (less any adequate protection payments received) (the "Minimum Overbid Amount");

(c) be accompanied by a signed asset purchase agreement in the form of the Asset Purchase Agreement, together with a marked copy showing all changes to the Asset Purchase Agreement, which changes shall not be less favorable to the Company, its creditors and employees in any material respect including, without limitation, with respect to Assumed Liabilities to the extent unpaid prior to the Closing Date;

(d) not be subject to, or conditioned on, any contingency or condition, including without limitation, the outcome of unperformed due diligence by the bidder or upon any financing contingency;

(e) be irrevocable until the earlier to occur of (i) the Closing, or (ii) for thirty (30) days following the conclusion of the Auction;

(f) be submitted with a cash deposit equal to $100,000 (the "Deposit") in the form of a wire transfer or a certified check made payable to the Company and sent to the Company's counsel, which Deposit shall be non-refundable if the Bankruptcy Court approves the sale of the Company's assets to such Qualified Bidder;

(g) be substantially on the same or better terms and conditions as set forth in the Asset Purchase Agreement;

(h) be submitted with evidence establishing to the satisfaction of the Company and the Senior Lenders, in consultation with their professionals, that such Prospective Bidder has the financial capability to timely consummate its Competing Offer and can provide all non-debtor parties to those executory contracts and unexpired leases to be assumed and assigned with adequate assurance of future performance as contemplated by Section 365 of the Bankruptcy Code; and

(i) Notwithstanding the foregoing, the Senior Lenders will be permitted to submit their credit bid which will be deemed to be a Qualified Bid. Any such credit bid by the Senior Lenders will be an Alternate Bid and will be accepted if the Proposed Buyer fails to close timely on the Asset Purchase Agreement and there is no Qualified Bidder other than the Proposed Buyer and the Senior Lenders.

6. If the Company does not receive any Competing Offers that satisfy the provisions set forth in paragraph 5 above, the Company will report the same to the Bankruptcy Court, and the Company shall proceed to seek court approval of the Asset Purchase Agreement with Proposed Buyer.

7. Competing Offers that the Company, in consultation with the Senior Agent, determines satisfy the provisions set forth in paragraph 5 above shall be deemed to be "Qualified Bids."

8. In the event that one or more Qualified Bids are received, an auction (the "Auction") will be conducted at the offices of Ice Miller LLP, One American Square, Suite 2900, Indianapolis, Indiana on October 20, 2009, beginning at 10:00 a.m. (EDT) or such later time or other place as the Company shall notify all Qualified Bidders that have submitted Qualified Bids. Only the Proposed Buyer, Qualified Bidders and the Senior Lenders will be entitled to participate in and make any subsequent bids at the Auction. Bidding at the Auction will continue until such time as the highest and best offer is determined. The Company may announce at the Auction additional rules or procedures for conducting the Auction so long as such rules are not inconsistent with these Auction Procedures. At the Auction, bidding will commence at the amount of the Opening Bid, and each subsequent bid shall be in increments of no less than $100,000. The Senior Lenders shall be permitted to submit credit bids at the Auction without deposit or Pre-Qualification requirements.

9. All bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to a jury trial in connection with any disputes relating to the Auction and the sale of the Assets.

10. The Company reserves the right, after consultation with its professionals and the Senior Agent, to (i) determine, at its discretion, which bid, if any, is the highest and best offer, taking into consideration, inter alia, that the Expense Reimbursement would be payable if a party other than the Proposed Buyer is the Successful Bidder, (ii) reject any bid that the Company deems to be inadequate, insufficient or otherwise unsatisfactory, (iii) change the location of the Auction, and/or (iv) adjourn the Auction by announcing such adjournment at the Auction. Notwithstanding the foregoing, the Company and the Senior Lenders shall not reject the bid of the Proposed Buyer under the Asset Purchase Agreement unless a higher and better bid is received from a Qualified Bidder pursuant to these procedures, and the Auction shall not be adjourned beyond a date that would put the Company in default of the Asset Purchase Agreement without the consent of the Proposed Buyer.

11. If, for any reason, the entity that makes the highest and best bid (such entity, the "Successful Bidder") fails to close on the purchase of the Company's assets, then: (i) the Successful Bidder shall forfeit the Deposit and be subject to such other rights and remedies as the Company may have for such failure (ii) the Qualified Bidder who, as of the conclusion of the Auction, has made the second and the next highest and best bid automatically will be deemed to have submitted the highest and best bid without further order of the Bankruptcy Court (such bidder, the "Alternate Bidder"); and (iii) the Alternate Bidder will be required to proceed as the purchaser at closing and its bid will be treated as the Successful Bid without further order of the Bankruptcy Court. Notwithstanding the foregoing, the Proposed Buyer shall in no event be required to serve as the Alternate Bidder.

12. No party other than the Proposed Buyer may seek an expense reimbursement, break-up fee or similar fee.

GSDOCS\1935956.4

**EXHIBIT C**

## FORM OF AUCTION AND OVERBID PROCEDURES

## AUCTION AND OVERBID PROCEDURES

On September 16, 2009, Victor Oolitic Stone Company, (the "Company") and Victor Oolitic Holdings, Inc. (collectively, the "Debtors"), filed a motion (the "Motion") for orders: (I) authorizing the sale of substantially all of the Company's assets and assumption and assignment of executory contracts and leases to Limestone Acquisition Corp. (the "Proposed Buyer") free and clear of liens, claims, interests and encumbrances, and (II) approving (A) auction and overbid procedures in connection with the proposed sale to obtain higher and better offers, (B) expense reimbursement, and (C) the manner and form of notice of sale. The Company has agreed to sell substantially all of its assets to the Proposed Buyer pursuant to the terms of a certain asset purchase and sale agreement (the "Asset Purchase Agreement"), subject to Bankruptcy Court approval and subject to higher and better offers. A copy of the Asset Purchase Agreement[1], as well as the Motion, are available upon request to the Debtors' attorneys, Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, Massachusetts 02110 (Attn: James F. Wallack, Esq. and Christine D. Lynch, Esq.)

The following procedures (the "Bidding Procedures") shall govern the auction process by which the Company will accept and consider higher and better offers for the Assets (as defined in the Asset Purchase Agreement):

1.     The Company shall provide within 3 business days of entry of the Sale Procedures Order (a) notice of the Auction (as defined below), the Sale Procedures Order and these Auction and Overbid Procedures, together with a copy of the Asset Purchase Agreement, to those persons who contacted the Company or its counsel with respect to the potential purchase of the Assets during the case or who provided written indications of interest during the previous sales and marketing process; and (b) copies of the Asset Purchase Agreement to all other prospective offerors upon written request to the Company or their professionals.

2.     In order to pre-qualify ("Pre-Qualification") as a prospective bidder ("Prospective Bidder"), any party desiring to become a Prospective Bidder shall deliver to the Debtors: (i) a signed confidentiality agreement in form and substance satisfactory to the Company, and (ii) evidence establishing to the satisfaction of the Company and the Administrative Agent such Prospective Bidder's financial capability to timely consummate its proposed alternative transaction.

3.     Following Pre-Qualification, the Company shall provide such Prospective Bidder with access to information concerning the assets and liabilities, projected cash flow and future prospects of the Company reasonably requested by a Prospective Bidder for the sole purpose of submitting a counteroffer for the Assets (a "Competing Offer").

4.     Any party that submits a Competing Offer in compliance with the relevant provisions of paragraph 5 below shall be designated as a "Qualified Bidder." The Proposed Buyer shall be deemed to be a Qualified Bidder.

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Asset Purchase Agreement.

1

5.    To be considered, each Competing Offer shall:

(a) be submitted in writing by no later than 5:00 p.m. (EDT) on October 16, 2009 (the "Bid Deadline") to Goulston & Storrs, P.C., 400 Atlantic Avenue, Boston, Massachusetts 02110 (Attn: James F. Wallack, Esq. and Christine D. Lynch, Esq.), and Ice Miller LLP, One American Square, Suite 2900, Indianapolis, Indiana 46204 (Attn: Henry Efroymson, Esq.) with copies to the following: (i) counsel to the Proposed Buyer, Kirkland & Ellis, 300 North LaSalle, Chicago, Illinois 60654 (Attn: James A. Stempel, Esq.); and (ii) counsel to the Administrative Agent, Hopper Blackwell, PC, 111 Monument Circle, #452, Indianapolis, Indiana 46204 (Attn: George W. Hopper, Esq. and Jason R. Burke, Esq.).

(b) at a minimum, exceed the sum of (i) the Purchase Price, plus (ii) $450,000, for a total minimum bid of $53,980,069.74 plus any interest accruing at the non-default rate and owing to the Senior Lender subsequent to the Petition Date (less any adequate protection payments received) (the "Minimum Overbid Amount");

(c) be accompanied by a signed asset purchase agreement in the form of the Asset Purchase Agreement, together with a marked copy showing all changes to the Asset Purchase Agreement, which changes shall not be less favorable to the Company, its creditors and employees in any material respect including, without limitation, with respect to Assumed Liabilities to the extent unpaid prior to the Closing Date;

(d) not be subject to, or conditioned on, any contingency or condition, including without limitation, the outcome of unperformed due diligence by the bidder or upon any financing contingency;

(e) be irrevocable until the earlier to occur of (i) the Closing, or (ii) for thirty (30) days following the conclusion of the Auction;

(f) be submitted with a cash deposit equal to $100,000 (the "Deposit") in the form of a wire transfer or a certified check made payable to the Company and sent to the Company's counsel, which Deposit shall be non-refundable if the Bankruptcy Court approves the sale of the Company's assets to such Qualified Bidder;

(g) be substantially on the same or better terms and conditions as set forth in the Asset Purchase Agreement;

(h) be submitted with evidence establishing to the satisfaction of the Company and the Senior Lenders, in consultation with their professionals, that such Prospective Bidder has the financial capability to timely consummate its Competing Offer and can provide all non-debtor parties to those executory contracts and unexpired leases to be assumed and assigned with adequate assurance of future performance as contemplated by Section 365 of the Bankruptcy Code; and

(i) Notwithstanding the foregoing, the Senior Lenders will be permitted to submit their credit bid which will be deemed to be a Qualified Bid. Any such credit bid by the Senior Lenders will be an Alternate Bid and will be accepted if the Proposed Buyer fails to close timely on the Asset Purchase Agreement and there is no Qualified Bidder other than the Proposed Buyer and the Senior Lenders.

6. If the Company does not receive any Competing Offers that satisfy the provisions set forth in paragraph 5 above, the Company will report the same to the Bankruptcy Court, and the Company shall proceed to seek court approval of the Asset Purchase Agreement with Proposed Buyer.

7. Competing Offers that the Company, in consultation with the Senior Agent, determines satisfy the provisions set forth in paragraph 5 above shall be deemed to be "Qualified Bids."

8. In the event that one or more Qualified Bids are received, an auction (the "Auction") will be conducted at the offices of Ice Miller LLP, One American Square, Suite 2900, Indianapolis, Indiana on October 20, 2009, beginning at 10:00 a.m. (EDT) or such later time or other place as the Company shall notify all Qualified Bidders that have submitted Qualified Bids. Only the Proposed Buyer, Qualified Bidders and the Senior Lenders will be entitled to participate in and make any subsequent bids at the Auction. Bidding at the Auction will continue until such time as the highest and best offer is determined. The Company may announce at the Auction additional rules or procedures for conducting the Auction so long as such rules are not inconsistent with these Auction Procedures. At the Auction, bidding will commence at the amount of the Opening Bid, and each subsequent bid shall be in increments of no less than $100,000. The Senior Lenders shall be permitted to submit credit bids at the Auction without deposit or Pre-Qualification requirements.

9. All bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to a jury trial in connection with any disputes relating to the Auction and the sale of the Assets.

10. The Company reserves the right, after consultation with its professionals and the Senior Agent, to (i) determine, at its discretion, which bid, if any, is the highest and best offer, taking into consideration, inter alia, that the Expense Reimbursement would be payable if a party other than the Proposed Buyer is the Successful Bidder, (ii) reject any bid that the Company deems to be inadequate, insufficient or otherwise unsatisfactory, (iii) change the location of the Auction, and/or (iv) adjourn the Auction by announcing such adjournment at the Auction. Notwithstanding the foregoing, the Company and the Senior Lenders shall not reject the bid of the Proposed Buyer under the Asset Purchase Agreement unless a higher and better bid is received from a Qualified Bidder pursuant to these procedures, and the Auction shall not be adjourned beyond a date that would put the Company in default of the Asset Purchase Agreement without the consent of the Proposed Buyer.

11.     If, for any reason, the entity that makes the highest and best bid (such entity, the "Successful Bidder") fails to close on the purchase of the Company's assets, then: (i) the Successful Bidder shall forfeit the Deposit and be subject to such other rights and remedies as the Company may have for such failure (ii) the Qualified Bidder who, as of the conclusion of the Auction, has made the second and the next highest and best bid automatically will be deemed to have submitted the highest and best bid without further order of the Bankruptcy Court (such bidder, the "Alternate Bidder"); and (iii) the Alternate Bidder will be required to proceed as the purchaser at closing and its bid will be treated as the Successful Bid without further order of the Bankruptcy Court. Notwithstanding the foregoing, the Proposed Buyer shall in no event be required to serve as the Alternate Bidder.

12.     No party other than the Proposed Buyer may seek an expense reimbursement, break-up fee or similar fee.

GSDOCS\1935956.4

4

**EXHIBIT D**

## FORM OF SALE APPROVAL ORDER

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

In re:                                  )
                                        )
VICTOR OOLITIC                          )        Case Nos. 09-05786 and 09-05787
STONE COMPANY, *et al.*,                )        (Jointly Administered)
                                        )
                      Debtors.          )
                                        )

ORDER AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE
ASSETS OF VICTOR OOLITIC STONE COMPANY TO LIMESTONE
ACQUISITION CORP. FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS AND ENCUMBRANCES AND ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES

Upon the motion (the "Motion")[1] of Victor Oolitic Stone Company (the

"Company") and Victor Oolitic Holdings, Inc. (collectively, the "Debtors") for orders:

(I) authorizing the sale of substantially all of the assets of Victor Oolitic Stone Company

and the assumption and assignment of certain executory contracts and unexpired leases to

Limestone Acquisition Corp. (the "Buyer") free and clear of liens, claims, interests and

encumbrances, and (II) approving (A) auction and overbid procedures in connection with

the proposed sale to obtain higher and better offers, (B) an expense reimbursement, and

(C) the manner and form of notice of sale; and the Court having entered an order on

September __, 2009 approving (i) the Auction and Overbid Procedures attached as

Exhibit B to the Motion, (ii) an expense reimbursement in connection with the auction;

and (iii) the form and manner of notice of the sale of the Purchased Assets; and a hearing

---

[1] All capitalized terms not otherwise defined herein shall have the meaning assigned to such terms in the Asset Purchase Agreement between the Company and the Buyer, which is attached to the Motion as Exhibit A, or the Motion, as the case may be (the "Asset Purchase Agreement").

-1-

on the Motion having been held on October ___, 2009 (the "Sale Hearing") at which time all interested parties were offered the opportunity to be heard with respect to the Motion, the Asset Purchase Agreement and the transactions contemplated thereby (the "Transactions").

NOW, THEREFORE, based upon the Motion, the objections, if any, raised at the Sale Hearing, the representations and argument of counsel, the entire record of the Sale Hearing, and after due deliberation thereon, and good cause appearing therefor,

IT IS HEREBY FOUND, CONCLUDED AND DETERMINED THAT:[2]

a.      The Court has jurisdiction over the Motion and the transactions contemplated therein and in the Asset Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

b.      Proper, timely, adequate and sufficient notice of the Motion and the Sale Hearing has been provided in accordance with Federal Rules of Bankruptcy Procedure 2002, 6004, 6006 and 9016 and the Sale Procedures Order, and such notice was properly served on all required persons and entities, including (a) the creditor matrix; (b) the United States Trustee; (c) counsel for the Senior Agent; (d) each Senior Lender; (e) counsel for the Second Lien Agent; (f) all parties having filed a notice of appearance in the Debtors' cases pursuant to Bankruptcy Rule 2002; (g) applicable federal, state and local governmental and regulatory authorities, including tax and environmental authorities applicable to the Debtors and their assets and properties and those government agencies required to receive notice of proceedings under the Federal Rules of Bankruptcy

GSDOCS\1934713

Procedure; (h) all counterparties to Executory Contracts; (i) parties known to the Debtors to have liens on the Purchased Assets, and (j) all parties who have previously contacted the Debtors or their counsel regarding the purchase of the Purchased Assets during the cases or who provided written indications of interest during the sales and marketing process prior to the commencement of the cases and any other parties that the Debtors believed may have had an interest in purchasing the Purchased Assets.  Such notice was good and sufficient and appropriate under the circumstances and complied with the various applicable requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the procedural due process requirements of the United States Constitution, and no other or further notice of the Motion or the Sale Hearing is or shall be required.

c.    As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors and the Debtors' professionals have adequately marketed the Purchased Assets and conducted the sale process in compliance with the Sale Procedures Order and in a non-collusive, fair and good faith manner.

d.    Approval of the Asset Purchase Agreement and the sale of the Purchased Assets at this time are in the best interests of the Debtors, their estates, creditors and other parties in interest.

e.    The Debtors have demonstrated both (i) good, sufficient, and sound business purpose and justification for the sale of the Purchased Assets and the assumption

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  See Fed.R.Bankr.P. 7052.

and assignment of the Assumed Contracts, and (ii) compelling circumstances for the sale of the Purchased Assets pursuant to Section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, a sale of the Purchased Assets at this time presents the best opportunity to maximize their value.

      f.     The Purchased Assets are property of the Company's estate and title thereto is vested in such estate.

      g.     The Company (i) has the full corporate power and authority necessary to execute the Asset Purchase Agreement and all other documents contemplated thereby, and (ii) has the full corporate power and authority necessary to consummate the Transactions, and no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Company to consummate such Transactions.

      h.     The Asset Purchase Agreement was negotiated by the Company, the Buyer and the Senior Agent without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Company nor the Buyer has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.

      i.     The Buyer is purchasing the Purchased Assets in good faith and is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that: (a) Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Purchased Assets; (b) Buyer agreed to provisions in the Asset Purchase Agreement which were approved in the

Sales Procedures Order which would enable the Debtors to accept a higher and better offer for the Purchased Assets at the Sale Hearing; (c) Buyer in no way induced or caused the Chapter 11 filing of the Debtors; (d) all payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Transactions have been disclosed; (e) Buyer has not violated 11 U.S.C. §363(n) by any action or inaction; and (f) the negotiation and execution of the Asset Purchase Agreement and any other agreements or instruments related thereto was in good faith.

j.      The Purchase Price to be paid by the Buyer for the Purchased Assets under the Agreement is fair and reasonable and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession thereof and the District of Columbia.

k.      The Buyer's offer, as set forth in the Asset Purchase Agreement, represents the highest and best offer received by the Debtors for the Purchased Assets.

l.      The Company may sell the Purchased Assets to the Buyer free and clear of any and all interests, claims, liens and encumbrances of any kind (other than those expressly assumed or permitted to survive under the Asset Purchase Agreement).

m.      The Company and the Buyer have provided adequate assurance of the Buyer's future performance of and under the Assumed Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

n.      Upon the closing of the sale, the Senior Loans shall be repaid from the proceeds of the sale and the new credit agreement between the Buyer and Senior Lenders shall become effective (the "New Credit Agreement").

o.      Pursuant to section 363(f) of the Bankruptcy Code, the Senior Lenders have consented to the Transactions including the sale of the Purchased Assets, free and clear of any of such lenders' liens, claims, encumbrances, and interests and shall be granted new liens on substantially all of the assets of the Buyer pursuant to the New Credit Agreement.

p.      The transactions contemplated by the Asset Purchase Agreement do not amount to a consolidation, merger or de facto merger of Buyer and the Debtors and/or the Debtors' estates, Buyer is not a mere continuation of the Debtors or their estates, and Buyer does not constitute a successor to the Debtors or their estates.

q.      Pursuant to that certain intercreditor agreement dated August 25, 2005 (the "Intercreditor Agreement") among the Debtors, the Senior Agent and the Second Lien Agent, the Second Lien Agent and Freeport may not object to the sale of the Purchased Assets.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      The Motion is GRANTED in its entirety, as further described herein.

2.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled on the merits.

-6-

3.    The Asset Purchase Agreement, and all of the terms and conditions thereof, together with all other related documents and instruments, are hereby approved.

4.    Pursuant to section 363(b) of the Bankruptcy Code, the Company is authorized to perform its obligations under and comply with the terms of the Asset Purchase Agreement, and consummate the sale of the Purchased Assets to the Buyer, pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement and this Order.

5.    The Company is authorized to execute and deliver, and empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring the Purchased Assets to the Buyer, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement.

6.    Except as expressly provided for in the Asset Purchase Agreement or this Sale Order, pursuant to Bankruptcy Code sections 105(a) and 363(f), the Company is authorized and directed to transfer the Purchased Assets to the Buyer and upon the Closing (as defined in the Asset Purchase Agreement), the transfer of the Purchased Assets to Buyer under the Asset Purchase Agreement will be a legal, valid and effective transfer, and will vest at the Closing the Buyer with all right, title and interest of the Company to the Purchased Assets, free and clear of all of the following (collectively, the "Interests"):  liens, claims (as defined in section 101(5) of the Bankruptcy Code),

-7-

encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights of first refusal, rights of setoff or recoupment (to the extent permitted under applicable law), or interests of any kind or nature whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise, excluding Permitted Liens, but including, but not limited to (i) those Interests that purport to give any party a right or option to effect a setoff against or any forfeiture, modification or termination of the Company's interests in the Purchased Assets, or any similar rights if any; (ii) those Interests arising under all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, if any, (iii) those Interests that are Excluded Liabilities set forth in the Asset Purchase Agreement; and (iv) those Interests arising in connection with any agreements, transactions (including but not limited to the Transactions), acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors, affiliates, or representatives including, but not limited to, Interests arising under any doctrines of successor liability or similar theories under applicable state or federal law or otherwise; provided that all such Interests attach to the cash proceeds of the sale of the Purchased Assets in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to any claims and defenses the Debtors or their estates may possess with respect thereto.  Without limiting the foregoing, the

-8-

Buyer is not assuming any Liabilities for Taxes resulting from or related to the consummation of the Transactions, including any income Taxes related to any income or gains recognized as a result of the consummation of the Transactions, notwithstanding that the Company will have no unencumbered funds to pay any such Taxes.

7.    Buyer would not have entered into the Asset Purchase Agreement and would not have consummated the Transactions, thus adversely affecting the Debtors, their estates and creditors, if the sale of the Purchased Assets to the Buyer, and the assumption and assignment or transfer of the Assumed Contracts, were not free and clear of all Interests of any kind or nature, as set forth in this Order, or if the Buyer would, or in the future could, be liable for any of the Interests.

8.    The Company may sell the Purchased Assets free and clear of any Interests because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Those holders of Interests who did not object to, could not by contract object to, or who withdrew their objections to the sale of the Purchased Assets or the Transactions are deemed to have consented to the Motion and the Transactions pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests attach to the net proceeds ultimately attributable to the Purchased Assets against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Purchased Assets or their proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

GSDOCS\1934713

9.      Upon the Closing, the following Liabilities of the Company shall be paid from the proceeds of the sale: (i) all amounts outstanding under the First Lien Credit Agreement (other than default interest) as of the Closing; and (ii) all real estate taxes assessed for the prepetition period and which would be payable in 2009 in the ordinary course of business.  The balance of the cash proceeds that remain after payment of the foregoing Liabilities (approximately $120,000) shall be paid to the Second Lien Agent.

10.      Promptly and timely following the Closing, Buyer shall assume and agree to discharge the following Liabilities of the Company: (i) all Liabilities pursuant to or arising under Assumed Contracts, including all Cure Costs related to Assumed Contracts; (ii) the following post-petition administrative claims of the Company that arose during or relate to the period after the Petition Date and prior to the Closing Date, in each case to the extent unpaid: real estate taxes payable after 2009; administrative income taxes relating to the period prior to the Closing not to exceed $150,000 (and expressly excluding any state or federal income or similar taxes arising out of or related to any income or gain recognized as a result of the Transactions); payables owing to all current vendors as listed on Schedule 1.4(d) of the Asset Purchase Agreement and new vendors with which the Company does business prior to the Closing  (subject to a $50,000 cap); and the allowed fees and expenses of the Company's professionals in the Chapter 11 Cases whether allowed before or after the Closing) (iii) all employment-related Liabilities including accrued payroll for salaries, wages, bonuses and commissions, vacation time and sick pay and related employment taxes and all "COBRA" obligations; and (iv) all other obligations expressly identified in Section 1.4 of the Asset Purchase Agreement.

GSDOCS\1934713

11.    Except for the Assumed Liabilities set forth in the Asset Purchase Agreement, the transfer of the Purchased Assets to Buyer under the Asset Purchase Agreement shall not result in Buyer having any liability or responsibility for, or any Purchased Assets being recourse for, (i) any Interest asserted against the Debtors or against an insider of Debtors or against any of the Purchased Assets or any other assets of the Debtors, or (ii) the satisfaction in any manner, whether at law or in equity, whether by payment, setoff, recoupment, or otherwise, directly or indirectly, and whether from the Purchased Assets or otherwise, of any Interest or Excluded Liability, or (iii) otherwise to third parties or the Debtors, except, with respect to the Debtors, as is expressly set forth in the Asset Purchase Agreement.  Without limiting the foregoing, the Buyer is not assuming any Liabilities for Taxes resulting from or related to the consummation of the Transactions, including any income Taxes related to any income or gains recognized as a result of the consummation of the Transactions, notwithstanding that the Company will have no unencumbered funds to pay any such Taxes.  The Debtors will release and forever discharge Buyer and its successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the sale and assignment of the Purchased Assets, except for the Assumed Liabilities and the other obligations under the Asset Purchase Agreement.

12.    Without limiting the effect or scope of the foregoing, the transfer of the Purchased Assets from the Company to Buyer does not and will not subject Buyer or its affiliates, successors or assigns or their respective properties (including the Purchased Assets) to any liability for Interests against the Debtors or the Debtors' Interests in such

-11-

Purchased Assets by reason of such transfer or otherwise under the laws of the United States or any state, territory, possession thereof, or the District of Columbia applicable to such Transaction, including, without limitation, any successor liability or similar theories.

13.     Each creditor, governmental unit, person and entity, and other party in interest is permanently enjoined and prohibited from taking any action against the Buyer or the Purchased Assets, or otherwise interfering with the Buyer's use of the Purchased Assets or the conduct of the Business or any action in contravention of the rights granted to Buyer hereunder, based upon or by reason of any Interest or agreement which such person had against the Company provided that such Interest or agreement existed against the Debtors or their estates as of, prior to, or by reason of the Closing.

14.     All entities in possession of some or all of the Purchased Assets at the Closing are directed to surrender possession of the Purchased Assets to the Buyer at the Closing.

15.     This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, territorial and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

16.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the sale of the Purchased Assets pursuant to the

-12-

Asset Purchase Agreement, the Company's assumption and assignment of the Assumed Contracts to the Buyer is hereby approved, and upon satisfaction of the requirements of Paragraph 13 hereof, the requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code with respect thereto shall be deemed satisfied.

17. The Company is hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code, to (a) assume and assign to the Buyer, effective upon the Closing of the sale of the Purchased Assets under the Asset Purchase Agreement, the Assumed Contracts free and clear of any and all Interests of any kind or nature whatsoever (other than those expressly assumed under the Asset Purchase Agreement), and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer such Assumed Contracts to the Buyer.

18. The Assumed Contracts shall be transferred free and clear of any and all Interests of any kind or nature whatsoever (other than those expressly assumed under the Asset Purchase Agreement) to, and shall remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assumed Contracts (including those of the type described in sections 365(b)(2) and (f)(1) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer. Neither the Debtors nor their estates shall have any liability for any obligations under Assumed Contracts which arise on or after the Closing. Each counterparty to an Assumed Contract is hereby forever barred, estopped and permanently enjoined from raising or asserting against the Debtors, Buyer or Buyer's lenders, or the property of any of them, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or

GSDOCS\1934713

non-contingent, senior or subordinate) arising under or related to the Assumed Contracts existing as of the Closing Date or arising by reason of the Closing.

19.    Notwithstanding anything to the contrary herein, as a condition to the Company's assumption and assignment of the Assumed Contracts the Buyer shall pay all Cure Costs.  All Cure Costs shall be determined in accordance with the Sale Procedures Order.  In the event that the Debtors or the Buyer dispute the cure amount asserted by a party to an Assumed Contract in its objection to the Cure Notice filed and served in accordance with the Sale Procedures Order (the "Asserted Cure"), then if the Buyer determines to pursue the assumption and assignment of the Assumed Contract (a) the undisputed portion of the Asserted Cure shall be paid upon the Closing, and (b) the Buyer shall provide for a reasonable escrow to account for the disputed portion of the Asserted Cure.

20.    This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order, all amendments thereto and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Purchased Assets to Buyer, (ii) interpret, implement and enforce the provisions of the Sale Procedures Order, this Sale Order, and any related order; (iii) protect Buyer, its affiliates, partners, principals or shareholders against any Interests against the Debtors or the Purchased Assets of any kind or nature whatsoever, including, without limitation, through the grant of declaratory and injunctive relief determining that Buyer, its affiliates, partners, principals or shareholders and their assets (including the Purchased Assets) are not subject to such Interests and prohibiting persons and entities from asserting such

-14-

GSDOCS\1934713

Interests against Buyer, its affiliates, partners, principals or shareholders and their assets (including the Purchased Assets), and (iv) enter any orders under sections 363 and 365 of the Bankruptcy Code with respect to the Assumed Contracts.

21.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of this Order shall not affect the validity of the sale of the Purchased Assets to the Buyer, as well as the transactions contemplated and/or authorized by this Order (including the assumption and assignment of any of the Assumed Contracts), unless the same is stayed pending appeal prior to the closing of the transactions authorized herein.

22.    The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon all creditors (whether known or unknown) of the Debtors, all non-debtor parties to the Assumed Contracts, all successors and assigns of the Buyer, the Debtors and their affiliates and subsidiaries, and any affected third parties including, but not limited to, any persons asserting a claim or lien against any of the Purchased Assets to be sold to the Buyer pursuant to the Asset Purchase Agreement, and any subsequent trustee appointed in the Debtors' chapter 11 cases or upon conversion to chapter 7 of the Bankruptcy Code or upon a dismissal of any of the cases.

23.    This Sale Order (i) shall be effective as a determination that, on the Closing, all Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (ii) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents,

-15-

GSDOCS\1934713

filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets. Upon the Closing, the Debtors and persons holding an Interest in the Purchased Assets as of the Closing are authorized to execute such documents and take all other actions as may be reasonably necessary to release their Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist.

24.    Nothing contained in any chapter 11 plan confirmed in these cases or the order confirming any such plan shall conflict with or deviate from the provisions of the Asset Purchase Agreement or the terms of this Order.

25.    The Asset Purchase Agreement and related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

26.    The Transactions must be approved by the Court and consummated promptly in order to preserve the viability of the business subject to the sale as a going concern, and to thereby maximize the value of the Debtors' estates, for the reasons set forth in the Motion and on the record at the Sale Hearing. For those reasons, as provided by Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, this Order

GSDOCS\1934713

shall not be stayed for ten days after entry of the Order and shall be effective and

enforceable immediately upon entry.

Dated: _____, 2009
          Indianapolis, Indiana                _____
                                            Hon. Frank J. Otte
                                            United States Bankruptcy Judge

**EXHIBIT E**

## AUDAX EQUITY COMMITMENT LETTER

| AUDAX PRIVATE EQUITY FUND, L.P.<br>101 HUNTINGTON AVENUE<br>BOSTON, MA 02199 | AUDAX PRIVATE EQUITY FUND II, L.P.<br>101 HUNTINGTON AVENUE<br>BOSTON, MA 02199 |
|---|---|

September 16, 2009

Limestone Acquisition Holdings Corp.
c/o Audax Management Company, LLC
101 Huntington Avenue
Boston, MA 02199

Re:    Financing Commitment

Ladies and Gentlemen:

Audax Private Equity Fund, L.P. ("Fund I") and Audax Private Equity Fund II, L.P. ("Fund II" and, together with Fund I, the "Investors") intend to purchase, directly or indirectly, equity securities of Limestone Acquisition Holdings Corp., a Delaware corporation ("Parent"), in connection with the acquisition (the "Acquisition") of certain assets of Victor Oolitic Stone Company, an Indiana corporation (the "Company"), pursuant to that certain Asset Purchase and Sale Agreement, dated as of the date hereof, by and among Limestone Acquisition Corp. ("Buyer"), M&I Marshal & Isley Bank, as Administrative Agent and the Company (the "Purchase Agreement").

This is to advise you that, upon the terms and subject to the conditions set forth below, (i) Fund I hereby commits to contribute an amount of equity financing equal to $100,000 (the "Fund I Commitment") and (ii) Fund II hereby commits to contribute an amount of equity financing equal to $100,000 (the "Fund II Commitment" and, together with Fund I Commitment, the "Commitments"). The Commitments made hereby are on a several, and not joint and several, basis and the Investors' respective obligations to fund prior to or simultaneously with the consummation of the Acquisition shall in no event exceed their respective Commitments and the Commitments shall be reduced on a dollar for dollar basis for any purchase by any co-investor (including affiliates of the Investors and employees of the Company) of equity securities of Parent, the proceeds from which are to be used by Parent to fund the Acquisition. Concurrently with the consummation of the transactions contemplated by the Purchase Agreement the Investors each severally, and not jointly and severally, agree to contribute an additional amount of equity financing equal to $1,275,000, the proceeds from which are to be contributed to Buyer by Parent and which shall not be available to fund the Acquisition.

The Investors' respective obligations under this letter is subject to the satisfaction, or waiver thereof, of each of the conditions precedent to the obligations of Buyer set forth in Sections 8 of the Purchase Agreement.

The Commitments set forth herein shall automatically expire with no further liabilities or obligations upon the termination of the Purchase Agreement pursuant to Section 11 thereof.

Each of the Commitments set forth herein shall not be assignable by you without the applicable Investor's prior written consent, and the granting of such consent in a given instance shall be solely in the discretion of the applicable Investor and, if granted, shall not constitute a waiver of this requirement as to any subsequent assignment.

Notwithstanding anything that may be expressed or implied in this letter, each party hereto, by its acceptance of the benefits hereof, covenants, agrees and acknowledges that, notwithstanding that the Investors are partnerships, no recourse hereunder or under any documents or instruments delivered in connection herewith shall be had against any Related Party of either Investor or any Related Party of any of such Related Parties, whether by the enforcement of any assessment or by any legal or equitable proceedings, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on, or otherwise be incurred by any Related Party of either Investor or any Related Party of any of such Related Parties, as such for any obligations of the Investors under this letter or any documents or instruments delivered in connection herewith or for any claim based on, in respect of, or by reason of, such obligations or their creation. None of the Investors or any of its Related Parties or any Related Party of such Related Parties shall have any liability for any debts, obligations or liabilities of the Parent or any other person. None of the Investors' Related Parties or any Related Party of such Related Parties shall have any liability or obligation of any kind to the Company, any of the Company's stockholders, any of their respective Related Parties, or any other person (in all cases, whether directly or indirectly and whether arising under contract, by operation of law or otherwise), in connection with the Purchase Agreement or any of the transactions contemplated thereby. For the purposes of this commitment letter, the terms "Related Party" and "Related Parties" shall mean any and all former, current or future directors, officers, employees, agents, general or limited partners, managers, members, stockholders or affiliates of a person.

All issues and questions concerning the construction, validity, enforcement and interpretation of this letter shall be governed by, and construed in accordance with, the laws of the State of Delaware without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. In furtherance of the foregoing, the internal law of the State of Delaware shall control the interpretation and construction of this letter, even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

Whenever possible, each provision of this letter shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this letter or the application of any such provision to any person or circumstance shall be held to be prohibited by, illegal or unenforceable under applicable law or rule in any respect by a court of competent jurisdiction, such provision shall be ineffective only to the extent of such prohibition, illegality or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this letter.

This letter may be executed in counterparts (including by means of telecopied signature pages or signature pages delivery by electronic transmission in portable document format (.pdf)), any one of which need not contain the signatures of more than one party, but all such

counterparts taken together shall constitute one and the same letter.  The exchange of copies of this letter and of signature pages by facsimile transmission or electronic transmission in portable document format (.pdf) shall constitute effective execution and delivery of this letter as to the parties and may be used in lieu of the original letter for all purposes.  Signatures of the parties transmitted by facsimile or electronic transmission in portable document format (.pdf) shall be deemed to be their original signatures for all purposes.

This letter and the documents referred to herein contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, do not create any rights other than as expressly set forth herein and supersede all prior letters and understandings, whether written or oral, relating to such subject matter in any way.

Each party to this letter, by its execution hereof, (a) hereby irrevocably submits to the exclusive jurisdiction of the state courts of the State of Delaware located in New Castle County or the United States District Court for the District of Delaware for the purpose of any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry proceeding or investigation arising out of or based upon this letter or relating to the subject matter hereof, (b) hereby waives, to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such action, any claim that it is not subject personally to the jurisdiction of the above named courts, that its property is exempt or immune from attachment or execution, that any such proceeding brought in one of the above named courts is improper, or that this letter or the subject matter hereof may not be enforced in or by such court and (c) hereby agrees not to commence any action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation arising out of or based upon this letter or relating to the subject matter hereof other than before one of the above named courts nor to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action, claim, cause of action or suit (in contract, tort or otherwise), inquiry, proceeding or investigation to any court other than one of the above named court whether on the grounds of inconvenient forum or otherwise.  Each party hereby consents to service of process in any such proceeding in any manner permitted by Delaware law, and agrees that service of process by registered or certified mail, return receipt requested.

TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW WHICH CANNOT BE WAIVED, EACH OF THE PARTIES HERETO HEREBY WAIVES AND COVENANTS THAT IT WILL NOT ASSERT (WHETHER AS PLAINTIFF, DEFENDANT OR OTHERWISE) ANY RIGHT TO TRIAL BY JURY IN ANY FORUM IN RESPECT OF ANY ISSUE, ACTION, CLAIM, CAUSE OF ACTION, SUIT (IN CONTRACT, TORT OR OTHERWISE), INQUIRY, PROCEEDING OR INVESTIGATION ARISING OUT OF OR BASED UPON THIS LETTER OR THE SUBJECT MATTER HEREOF OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE TRANSACTIONS CONTEMPLATED HEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING.  EACH PARTY ACKNOWLEDGES THAT IT HAS BEEN INFORMED BY THE OTHER PARTY THAT THIS PARAGRAPH CONSTITUTES A MATERIAL INDUCEMENT UPON WHICH THE PARTIES ARE RELYING AND WILL RELY IN ENTERING INTO THIS LETTER AND ANY OTHER LETTERS RELATING HERETO OR CONTEMPLATED HEREBY.  ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS PARAGRAPH WITH ANY COURT AS

WRITTEN EVIDENCE OF THE CONSENT OF EACH SUCH PARTY TO THE WAIVER OF ITS RIGHT TO TRIAL BY JURY.

* * * * * *

If this letter is agreeable to you, please so indicate by signing in the space indicated below.

Very truly yours,

AUDAX PRIVATE EQUITY FUND, L.P.

By: Audax Private Equity Business III, L.P.
Its: General Partner

By: Audax Holdings I, L.L.C.
Its: General Partner

By:
Name: Daniel Weintraub
Its: Authorized Signatory

AUDAX PRIVATE EQUITY FUND II, L.P.

By: Audax Private Equity Business III, L.P.
Its: General Partner

By: Audax Holdings I, L.L.C.
Its: General Partner

By:
Name: Daniel Weintraub
Its: Authorized Signatory

Accepted and agreed as of the date first written above:

LIMESTONE ACQUISITION HOLDINGS CORP.

By:
Name: Andrew Fortier
Its: Vice President & Secretary

*Signature Page to Equity Commitment Letter*

**EXHIBIT F**

## INSTRUMENT OF ASSIGNMENT AND ASSUMPTION

Instrument of Assignment and Assumption (this "Assignment and Assumption"), dated _____, 2009, by and between Victor Oolitic Stone Company, an Indiana corporation ("Seller"), and [Buyer], an _____ ("Buyer").

WHEREAS, Seller has, pursuant to an Asset Purchase Agreement, dated August ___, 2009, between Seller and Buyer (the "Asset Purchase Agreement"), agreed to sell, convey, assign, transfer and deliver to Buyer all of Seller's right, title and interest in and to all of the Purchased Assets; and

WHEREAS, Buyer has pursuant to the Asset Purchase Agreement, agreed to assume the Assumed Liabilities.

NOW, THEREFORE, the parties hereto agree as follows, intending said agreements to become effective as of the Closing Date, and intending to be legally bound hereby:

1.  For good and valuable consideration to Seller in hand (receipt of which is hereby acknowledged), pursuant to and in accordance with the terms of the Asset Purchase Agreement, Seller hereby sells, conveys, transfers and delivers over unto Buyer, its successors and assigns, all of the right, title and interest of Seller in, to and under all Assumed Contracts.

2.  For good and valuable consideration to Buyer in hand (receipt of which is hereby acknowledged), pursuant to and in accordance with the terms of the Asset Purchase Agreement, Buyer hereby assumes (a) all of the right, title and interest of Seller in, to and under all Assumed Contracts and (b) the Assumed Liabilities (as set forth in Annex A).

3.  Buyer covenants and agrees to pay, perform, discharge, fulfill and observe the Assumed Liabilities in accordance with their respective terms, as required under Applicable Laws.

4.  This Assignment and Assumption and the covenants and agreements set forth herein shall be binding upon and inure to the benefit of Buyer and Seller and their respective successors and assigns.

5.  This Assignment and Assumption shall be governed by the laws of the State of Indiana (regardless of the laws that might be applicable under principles of conflicts of law) as to all matters, including, but not limited to, matters of validity, construction, effect and performance.

6.  Buyer and Seller will execute and deliver such instruments, certificates and other documents and take such other actions reasonably as may be required to effect the transfers contemplated by the Asset Purchase Agreement and this Assignment and Assumption.

7.  Each capitalized term used herein and not otherwise defined shall have the meaning assigned to such term in the Asset Purchase Agreement.

IN WITNESS WHEREOF, each of the parties hereto has caused this Instrument of Assignment and Assumption to be signed on the date first written above.

**VICTOR OOLITIC STONE COMPANY**

By:_____
Name:
Title:

**[BUYER]**

By:_____
Name:
Title:

**EXHIBIT G**

## BILL OF SALE

Victor Oolitic Stone Company, an Indiana corporation ("Seller"), for good and valuable consideration to Seller in hand paid (receipt of which is hereby acknowledged), pursuant to the Asset Purchase and Sale Agreement, dated August ___, 2009 (the "Asset Purchase Agreement"), by and among Seller and [Buyer], a _____ ("Buyer"), does hereby sell, convey, assign, transfer and deliver unto Buyer, its successors and assigns, all of Seller's right, title and interest, as of the Closing Date (as defined in the Asset Purchase Agreement), in and to all of the Purchased Assets (as defined in the Asset Purchase Agreement), including without limitation those listed on Annex A attached hereto.

This Bill of Sale shall not in any manner affect, modify, expand upon or derogate from the representations, warranties, covenants or other agreements expressly set forth in the Asset Purchase Agreement.

IN WITNESS WHEREOF, this Bill of Sale has been duly executed and delivered by the duly authorized officers of Seller and Buyer on this __ day of _____, 2009.

**VICTOR OOLITIC STONE COMPANY**

By:_____
Name:
Title:

ACCEPTED AND AGREED TO:

**[BUYER]**

By:_____
Name:
Title:

GSDOCS\1935990