**SO ORDERED: November 20, 2009.**

Frank J. Otte
**Frank J. Otte**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) |
| VICTOR OOLITIC | ) Case Nos. 09-05786 and 09-05787 |
| STONE COMPANY, *et al.,* | ) (Jointly Administered) |
| | ) |
| Debtors. | ) |
| | ) |

**AMENDED ORDER AUTHORIZING SALE OF SUBSTANTIALLY ALL OF THE
ASSETS OF VICTOR OOLITIC STONE COMPANY TO VICTOR
ACQUISITION CORP. FREE AND CLEAR OF LIENS, CLAIMS,
INTERESTS AND ENCUMBRANCES AND ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
<u>UNEXPIRED LEASES</u>**

Upon the motion (the "<u>Motion</u>")[1] of Victor Oolitic Stone Company (the "<u>Company</u>") and

Victor Oolitic Holdings, Inc. (collectively, the "<u>Debtors</u>") for orders:  (I) authorizing the sale of

substantially all of the assets of Victor Oolitic Stone Company and the assumption and

assignment of certain executory contracts and unexpired leases to Limestone Acquisition Corp.

or a higher and better bidder free and clear of liens, claims, interests and encumbrances, and

---

[1]     All capitalized terms not otherwise defined herein shall have the meaning assigned to such terms in the
Asset Purchase Agreement (as defined below).

(II) approving (A) auction and overbid procedures in connection with the proposed sale to obtain

higher and better offers, (B) an expense reimbursement, and (C) the manner and form of notice

of sale; and the Court having entered an order on September 24, 2009 approving (i) the Auction

and Overbid Procedures attached as Exhibit A to the Sale Procedures Order, (ii) an expense

reimbursement in connection with the auction; and (iii) the form and manner of notice of the sale

of the Purchased Assets; and the auction contemplated in the Sale Procedures Order

(the "Auction") and a hearing on the Motion having both been held on November 17, 2009

(the "Sale Hearing") at which time all interested parties were offered the opportunity to be heard

with respect to the Motion, the Asset Purchase Agreement by and between the Company and

Victor Acquisition Corp. (the "Buyer"), a copy of which is attached hereto as Exhibit A

(the "Asset Purchase Agreement"), and the transactions contemplated thereby or related thereto

(including, without limitation, the contribution agreement between VO Stone Holdings, Inc.,

Victor Acquisition Corp., North Coast Materials LLC, Freeport Financial LLC, Freeport

Onshore Fund LLC and Freeport Offshore Fund LLC, dated as of November 13, 2009

(the "Contribution Agreement," and together with the additional transactions, the "Transactions").

NOW, THEREFORE, based upon the Motion, the objections, if any, raised at the Sale

Hearing, the representations and argument of counsel, the entire record of the Sale Hearing, and

after due deliberation thereon, and good cause appearing therefor,

IT IS HEREBY FOUND, CONCLUDED AND DETERMINED THAT:[2]

a.    The Court has jurisdiction over the Motion and the transactions contemplated

therein and in the Asset Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334.  This

---

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate. See Fed.R.Bankr.P. 7052.

matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (N).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

       b.      Proper, timely, adequate and sufficient notice of the Motion and the Sale Hearing has been provided in accordance with Federal Rules of Bankruptcy Procedure 2002, 6004, 6006 and 9016 and the Sale Procedures Order, and such notice was properly served on all required persons and entities, including:  (a) the creditor matrix; (b) the United States Trustee; (c) counsel for M&I Marshall & Ilsley Bank (the "Senior Agent"); (d) each Senior Lender; (e) counsel for Freeport Financial LLC (the "Second Lien Agent"); (f) all parties having filed a notice of appearance in the Debtors' cases pursuant to Bankruptcy Rule 2002; (g) applicable federal, state and local governmental and regulatory authorities, including tax and environmental authorities applicable to the Debtors (including, but not limited to, the Internal Revenue Service) and their assets and properties and those government agencies required to receive notice of proceedings under the Federal Rules of Bankruptcy Procedure; (h) all counterparties to executory contracts (as such term is utilized in § 365 of the Bankruptcy Code); (i) parties known to the Debtors to have liens on the Purchased Assets; and (j) all parties who have previously contacted the Debtors or their counsel regarding the purchase of the Purchased Assets during the cases or who provided written indications of interest during the sales and marketing process prior to the commencement of the cases and any other parties that the Debtors believed may have had an interest in purchasing the Purchased Assets.  Such notice was good and sufficient and appropriate under the circumstances and complied with the various applicable requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the procedural due process requirements of the United States Constitution, and no other or further notice of the Motion or the Sale Hearing is or shall be required.

c.      As demonstrated by (i) the proffered testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors and the Debtors' professionals have adequately marketed the Purchased Assets and conducted the sale process in compliance with the Sale Procedures Order and in a non-collusive, fair and good faith manner.

d.      Approval of the Asset Purchase Agreement and the sale of the Purchased Assets at this time are in the best interests of the Debtors, their estates, creditors and other parties in interest.

e.      The Debtors have demonstrated both (i) good, sufficient, and sound business purpose and justification for the sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts, and (ii) compelling circumstances for the sale of the Purchased Assets pursuant to Section 363(b) of the Bankruptcy Code prior to, and outside of, a plan of reorganization in that, among other things, a sale of the Purchased Assets at this time presents the best opportunity to maximize their value.

f.      The Purchased Assets are property of the Debtors' estates and title thereto is vested in such estates.

g.      The Debtors possess (i) the full corporate power and authority necessary to execute the Asset Purchase Agreement and all other documents contemplated thereby, and (ii) the full corporate power and authority necessary to consummate the Transactions, and no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Debtors to consummate such Transactions.

h.      The Debtors, the Buyer (including the Buyer's equity holders) and the Senior Agent negotiated the Asset Purchase Agreement and all other agreements relating to the

Transactions as applicable (including, without limitation, the Contribution Agreement) without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors nor the Buyer (including the Buyer's equity holders) has engaged in any conduct, or failed to take any action, in either case that would cause or permit the Asset Purchase Agreement to be avoided or any cause of action to exist under section 363(n) of the Bankruptcy Code.

i.      The Buyer (including the Buyer's equity holders) is purchasing the Purchased Assets in good faith and is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, and otherwise has proceeded in good faith in all respects in connection with this proceeding.

j.      The Purchase Price to be paid by the Buyer for the Purchased Assets under the Agreement is fair and reasonable and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act and under the laws of the United States, any state, territory, possession thereof and the District of Columbia.

k.      All funded obligations under the First Lien Credit Agreement, which in the aggregate equals not less than $53,989,759.00 as of November 17, 2009 constitute, solely for the purposes of section 363(k) of the Bankruptcy Code, an allowed secured claim pursuant to section 506(a) of the Bankruptcy Code.  The Senior Lenders were authorized to submit their credit bid as the alternate bid at the Auction.

l.      All funded obligations under the Second Lien Credit Agreement, which in the aggregate equals not less than $19,449,877.52 as of November 17, 2009 constitute, solely for the purposes of section 363(k) of the Bankruptcy Code, an allowed secured claim pursuant to section

506(a) of the Bankruptcy Code.  The Buyer was authorized to submit the Credit Bid (as defined below) at the Auction.

       m.     As set forth in the Contribution Agreement, 100% of the Debtors' obligations pursuant to the Second Lien Credit Agreement were contributed to VO Stone Holdings, Inc. in order to submit the Prevailing Bid (as defined below), including, without limitation, the credit bid of all Loans, Commitments (each as defined in the Second Lien Credit Agreement) or other interests pursuant to the Second Lien Credit Agreement, which shall, in the aggregate, equal not less than  $19,449,877.52 as of November 17, 2009 (the "Credit Bid").

       n.     The Debtors conducted the Auction in accordance with the Sale Procedures Order. The Buyer's offer (the "Prevailing Bid"), as established at the Auction, represents the highest and best offer received by the Debtors for the Purchased Assets, and the acceptance of the Prevailing Bid as the highest and best offer for the Purchased Assets represents a sound exercise of the Debtors' business judgment.  The portion of the Prevailing Bid represented by the Credit Bid was a valid and proper offer pursuant to sections 363(b) and 363(k) of the Bankruptcy Code.

       o.     The Debtors may sell the Purchased Assets to the Buyer free and clear of any and all interests, claims, liens and encumbrances of any kind (other than those expressly assumed or permitted to survive under the Asset Purchase Agreement).

       p.     The Debtors and the Buyer have provided adequate assurance of the Buyer's future performance of and under the Assumed Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

       q.     Upon the closing of the sale, the amounts necessary to satisfy the amounts outstanding under the First Lien Credit Agreement (excluding postpetition default interest) shall be repaid from the proceeds of the sale, and the New Credit Agreement shall become effective.

r.      Pursuant to section 363(f) of the Bankruptcy Code, the Senior Lenders and the Second Lien Lender have consented to the Transactions including the sale of the Purchased Assets, free and clear of any of such lenders' liens, claims, encumbrances, and interests.  The Senior Lenders shall be granted new liens on substantially all of the assets of the Buyer pursuant to the New Credit Agreement.

s.      The transactions contemplated by the Asset Purchase Agreement do not amount to a consolidation, merger or de facto merger of Buyer and the Debtors and/or the Debtors' estates, Buyer is not a mere continuation of the Debtors or their estates, and Buyer does not constitute a successor to the Debtors or their estates.

t.      At the Auction, the second highest bid for the Purchased Assets was submitted by Indiana Stone Acquisition Company (the "Backup Bid").  The Backup Bid shall remain in full force and effect for thirty days following the date of this Order.

u.      The Senior Lenders, by and through the Senior Agent, submitted their credit bid of the unpaid principal, accrued and unpaid interest, attorney's fees, professional fees and expenses due to the Senior Lenders, which, as of November 17, 2009, totaled not less than $53,989,759.00 (the "Senior Lender Credit Bid").

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      The Motion is GRANTED in its entirety, as further described herein.

2.      All objections to the Motion or the relief requested therein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled on the merits.

3.      The Asset Purchase Agreement, attached hereto as Exhibit A, and all of the terms and conditions thereof, together with all other related documents and instruments, are hereby approved and incorporated herein in their entirety.

4.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized and directed to perform the Debtors' obligations under and comply with the terms of the Asset Purchase Agreement, and consummate the sale of the Purchased Assets to the Buyer, pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement and this Order.

5.      The Debtors are authorized to execute and deliver, and empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring the Purchased Assets to the Buyer, or as may be necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement.

6.      Pursuant to Bankruptcy Code sections 105(a) and 363(f), the Debtors are authorized and directed to transfer the Purchased Assets to the Buyer and upon the Closing (as defined in the Asset Purchase Agreement), the transfer of the Purchased Assets to Buyer under the Asset Purchase Agreement will be a legal, valid and effective transfer, and will vest at the Closing the Buyer with all right, title and interest of the Debtors to the Purchased Assets, free and clear of all of the following (collectively, the "Interests"):  liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights of first refusal, rights of setoff or recoupment (to the extent

permitted under applicable law), or interests of any kind or nature whether known or unknown, legal or equitable, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether arising prior to or subsequent to the commencement of these chapter 11 cases, whether imposed by agreement, understanding, law, equity or otherwise, excluding Permitted Liens, but including, but not limited to (i) those Interests that purport to give any party a right or option to effect a setoff against or any forfeiture, modification or termination of the Debtors' interests in the Purchased Assets, or any similar rights if any; (ii) those Interests arising under all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, if any, (iii) those Interests that are Excluded Liabilities set forth in the Asset Purchase Agreement; and (iv) those Interests arising in connection with any agreements, transactions (including but not limited to the Transactions), acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors, affiliates, or representatives including, but not limited to, Interests arising under any doctrines of successor liability or similar theories under applicable state or federal law or otherwise; provided that all such Interests attach to the cash proceeds of the sale of the Purchased Assets in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets, subject to any claims and defenses the Debtors or their estates may possess with respect thereto.  Without limiting the foregoing, the Buyer is not assuming any Liabilities for Taxes resulting from or related to the consummation of the Transactions, including any income Taxes related to any income or gains recognized as a result of the consummation of the Transactions, notwithstanding that the Debtors will have no unencumbered funds to pay any such Taxes.

7.     A portion of the Purchase Price equal to $100,000 shall be used by the Debtors to pay unpaid 2008 real estate taxes and any excess funds after payment of such taxes shall be used for the payment of any unpaid United States Trustee fees and for costs to prepare the Debtors' final tax returns.  In addition, a portion of the Purchase Price, not to exceed $200,000, shall be utilized to satisfy the Expense Reimbursement at the Closing.

8.     Buyer would not have entered into the Asset Purchase Agreement and would not have consummated the Transactions, thus adversely affecting the Debtors, their estates and creditors, if the sale of the Purchased Assets to the Buyer, and the assumption and assignment or transfer of the Assumed Contracts, were not free and clear of all Interests of any kind or nature, as set forth in this Order, or if the Buyer would, or in the future could, be liable for any of the Interests.

9.     The Debtors may sell the Purchased Assets free and clear of any Interests because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied.  Those holders of Interests who did not object to or who withdrew their objections to the sale of the Purchased Assets or the Transactions are deemed to have consented to the Motion and the Transactions pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Interests who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are adequately protected by having their Interests attach to the net proceeds ultimately attributable to the Purchased Assets against or in which such Interests are asserted, subject to the terms of such Interests, with the same validity, force and effect, and in the same order of priority, which such Interests now have against the Purchased Assets or their proceeds, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto.

10.     Upon the Closing, the following Liabilities of the Company shall be paid from the proceeds of the sale: (i) all amounts outstanding under the First Lien Credit Agreement (other than default interest) as of the Closing; and (ii) all real estate taxes assessed for the prepetition period and which would be payable in 2009 in the ordinary course of business.

11.     At the Closing, the Buyer shall pay all professional fees and expenses incurred by the Senior Lenders in relation to the Debtors and all amounts necessary to cure the obligations of the Debtors pursuant to the Swap Agreement.

12.     As of the Closing, Buyer shall assume and agree to discharge promptly and timely the following Liabilities of the Company pursuant to and as expressly set forth in section 1.4 of the Asset Purchase Agreement: (i) all Liabilities pursuant to or arising under Assumed Contracts, including all Cure Costs related to Assumed Contracts; (ii) the following post-petition administrative claims of the Company that arose during or relate to the period after the Petition Date and prior to the Closing Date, in each case to the extent unpaid: real estate taxes payable after 2009; administrative income taxes relating to the period prior to the Closing not to exceed $150,000 (and expressly excluding any state or federal income or similar taxes arising out of or related to any income or gain recognized as a result of the Transactions); payables owing to all current vendors as listed on Schedule 1.4(c) of the Asset Purchase Agreement and new vendors with which the Company does business prior to the Closing (subject to a $50,000 cap); and the allowed fees and expenses of the Company's professionals in the Chapter 11 Cases (whether allowed before or after the Closing); (iii) all employment-related Liabilities described on schedule 1.4(f) of the Asset Purchase Agreement; (iv) any accrued payroll for salaries, wages, commissions, vacation time and sick pay and related employment taxes and all "COBRA"

obligations; and (v) all other obligations expressly identified in Section 1.4 of the Asset Purchase Agreement.

13.     Except for the Assumed Liabilities set forth in the Asset Purchase Agreement, the transfer of the Purchased Assets to Buyer under the Asset Purchase Agreement shall not result in Buyer having any liability or responsibility for, or any Purchased Assets being recourse for, (i) any Interest asserted against the Debtors or against an insider of Debtors or against any of the Purchased Assets or any other assets of the Debtors, or (ii) the satisfaction in any manner, whether at law or in equity, whether by payment, setoff, recoupment, or otherwise, directly or indirectly, and whether from the Purchased Assets or otherwise, of any Interest or Excluded Liability, or (iii) otherwise to third parties or the Debtors, except, with respect to the Debtors, as is expressly set forth in the Asset Purchase Agreement.  Without limiting the foregoing, the Buyer is not assuming any Liabilities for Taxes resulting from or related to the consummation of the Transactions, including any income Taxes related to any income or gains recognized as a result of the consummation of the Transactions, notwithstanding that the Debtors will have no unencumbered funds to pay any such Taxes.  The Debtors will release and forever discharge Buyer and its successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the sale and assignment of the Purchased Assets, except for the Assumed Liabilities and the other obligations under the Asset Purchase Agreement.

14.     Without limiting the effect or scope of the foregoing, the transfer of the Purchased Assets from the Debtors to Buyer does not and will not subject Buyer or its affiliates, successors or assigns or their respective properties (including the Purchased Assets) to any liability for

Interests against the Debtors or the Debtors' Interests in such Purchased Assets by reason of such transfer or otherwise under the laws of the United States or any state, territory, possession thereof, or the District of Columbia applicable to such Transaction, including, without limitation, any successor liability or similar theories.

15.     Each creditor, governmental unit, person and entity, and other party in interest is permanently enjoined and prohibited from taking any action against the Buyer or the Purchased Assets, or otherwise interfering with the Buyer's use of the Purchased Assets or the conduct of the Business or any action in contravention of the rights granted to Buyer hereunder, based upon or by reason of any Interest or agreement which such person had against the Debtors provided that such Interest or agreement existed against the Debtors or their estates as of, prior to, or by reason of the Closing.

16.     All entities in possession of some or all of the Purchased Assets at the Closing are directed to surrender possession of the Purchased Assets to the Buyer at the Closing.

17.     This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, title agents, title companies, recorders of mortgages, recorders of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, territorial and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

18.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the sale of the Purchased Assets pursuant to the Asset Purchase Agreement, the Debtors' assumption and assignment of the Assumed Contracts to the Buyer is

hereby approved, and the requirements of sections 365(b)(1) and 365 (f)(2) of the Bankruptcy Code with respect thereto shall be deemed satisfied.

19. The Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code, to (a) assume and assign to the Buyer, effective upon the Closing of the sale of the Purchased Assets under the Asset Purchase Agreement, the Assumed Contracts free and clear of any and all Interests of any kind or nature whatsoever (other than those expressly assumed under the Asset Purchase Agreement), and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer such Assumed Contracts to the Buyer.

20. The Assumed Contracts shall be transferred free and clear of any and all Interests of any kind or nature whatsoever (other than those expressly assumed under the Asset Purchase Agreement) to, and shall remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assumed Contracts (including those of the type described in sections 365(b)(2) and (f)(1) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer. Neither the Debtors nor their estates shall have any liability for any obligations under Assumed Contracts which arise on or after the Closing. Each counterparty to an Assumed Contract is hereby forever barred, estopped and permanently enjoined from raising or asserting against the Debtors, Buyer or Buyer's lenders, or the property of any of them, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinate) arising under or related to the Assumed Contracts existing as of the Closing Date or arising by reason of the Closing.

21.    Notwithstanding anything to the contrary herein, as a condition to the Debtors' assumption and assignment of the Assumed Contracts the Buyer shall pay all Cure Costs.  All Cure Costs shall be determined in accordance with the Sale Procedures Order.  In the event that the Debtors or the Buyer dispute the cure amount asserted by a party to an Assumed Contract in its objection to the Cure Notice filed and served in accordance with the Sale Procedures Order (the "Asserted Cure"), then if the Buyer determines to pursue the assumption and assignment of the Assumed Contract (a) the undisputed portion of the Asserted Cure shall be paid upon the Closing, and (b) the Buyer shall provide for a reasonable escrow to account for the disputed portion of the Asserted Cure.

22.    Effective as of the Closing, the Debtors shall assume the Swap Agreement (with the consent of all parties thereto, including, but not limited to, any necessary waiver of existing defaults or termination rights) and assign it to the Buyer, and the Buyer shall be responsible for all existing and future obligations arising under the Swap Agreement.  The Debtors and the Buyer are hereby authorized and directed to execute and deliver such documents or other instruments as may be necessary to assign and transfer the Swap Agreement to the Buyer.

23.    This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order, all amendments thereto and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Purchased Assets to Buyer, (ii) interpret, implement and enforce the provisions of the Sale Procedures Order, this Order, any related order and the Asset Purchase Agreement; (iii) protect Buyer, its affiliates, partners, principals, members or shareholders against any Interests against the Debtors or the Purchased Assets of any kind or nature whatsoever, including, without limitation, through the grant of

declaratory and injunctive relief determining that Buyer, its affiliates, partners, principals, members or shareholders and their assets (including the Purchased Assets) are not subject to such Interests and prohibiting persons and entities from asserting such Interests against Buyer, its affiliates, partners, principals, members or shareholders and their assets (including the Purchased Assets) and (iv) enter any orders under sections 363 and 365 of the Bankruptcy Code with respect to the Assumed Contracts.

24.     The transactions contemplated by the Asset Purchase Agreement are undertaken by the Buyer (including the Buyer's equity holders) in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of this Order shall not affect the validity of the sale of the Purchased Assets to the Buyer, as well as the transactions contemplated and/or authorized by this Order (including the assumption and assignment of any of the Assumed Contracts), unless the same is stayed pending appeal prior to the closing of the transactions authorized herein.

25.     The Transactions shall not be avoided and no damages may be assessed against the Buyer (or the Buyer's equity holders) under § 363(n) of the Bankruptcy Code.

26.     The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon all creditors (whether known or unknown) of the Debtors, all non-debtor parties to the Assumed Contracts, all successors and assigns of the Buyer, the Debtors and their affiliates and subsidiaries, and any affected third parties including, but not limited to, any persons asserting a claim or lien against any of the Purchased Assets to be sold to the Buyer pursuant to the Asset Purchase Agreement, and any subsequent trustee appointed in the Debtors' chapter 11 cases or upon conversion to chapter 7 of the Bankruptcy Code or upon a dismissal of any of the cases.

27.     If the Transactions fail to be consummated prior to December 16, 2009, the Debtors, Indiana Stone Acquisition Company and the Senior Lenders are directed to promptly consummate and close the sale to Indiana Stone Acquisition Company pursuant to the Backup Bid and this Order.  In such event, Indiana Stone Acquisition Company shall be afforded all the rights and protections provided to the Buyer as set forth herein.

28.     The Senior Lender Credit Bid is approved as the "Alternate Bid" (the "Alternate Bid").  In the event that the Transactions fail to be consummated and closed by December 16, 2009 and the sale is not consummated and closed with Indiana Stone Acquisition Company pursuant to the Backup Bid within thirty (30) days of the date of this Order, the Senior Lenders and the Debtors are authorized and directed to close the sale pursuant to the Alternate Bid and this Order.  In such event, the Senior Lenders or their assignee shall be afforded all the rights and protections provided to the Buyer as set forth herein.

29.     This Order (i) shall be effective as a determination that, on the Closing, all Interests of any kind or nature whatsoever existing as to the Purchased Assets prior to the Closing have been unconditionally released, discharged and terminated, and that the conveyances described herein have been effected, and (ii) shall be binding upon and shall govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.  Upon the Closing, the Debtors and persons holding an Interest in the Purchased Assets

as of the Closing are authorized to execute such documents and take all other actions as may be reasonably necessary to release their Interests in the Purchased Assets, if any, as such Interests may have been recorded or may otherwise exist.

30.    Nothing contained in any chapter 11 plan confirmed in these cases or the order confirming any such plan shall conflict with or deviate from the provisions of the Asset Purchase Agreement or the terms of this Order.

31.    The Asset Purchase Agreement and related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

32.    The Transactions must be approved by the Court and consummated promptly in order to preserve the viability of the business subject to the sale as a going concern, and to thereby maximize the value of the Debtors' estates, for the reasons set forth in the Motion and on the record at the Sale Hearing.  For those reasons, as provided by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, this Order shall not be stayed for ten days after entry of the Order and shall be effective and enforceable immediately upon entry.


# # #

GOULSTON & STORRS, P.C.
James F. Wallack, Esq.
Christine D. Lynch, Esq.
400 Atlantic Avenue
Boston, Massachusetts  02110-3333
Tel:    (617) 482-1776
Fax:    (617) 574-4112
jwallack@goulstonstorrs.com
clynch@goulstonstorrs.com

-and-

Henry A. Efroymson, Esq.
Michelle J. Fisk, Esq.
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, Indiana 46282-0200
Tel:    (317) 236-2100
Fax:    (317) 236-2219
henry.efroymson@icemiller.com
michelle.fisk@icemiller.com

DISTRIBUTION TO:

Henry A. Efroymson, Esq.
Michelle J. Fisk, Esq.
ICE MILLER LLP
One American Square, Suite 2900
Indianapolis, Indiana 46282-0200

James F. Wallack, Esq.
Christine D. Lynch, Esq.
GOULSTON & STORRS, P.C.
400 Atlantic Avenue
Boston, Massachusetts  02110-3333

Office of the United States Trustee
101 West Ohio Street, Suite 1000
Indianapolis, Indiana  46204

George W. Hopper
Hopper Blackwell
111 Monument Circle, Suite 452
Indianapolis, Indiana  46204-5170
ghopper@hopperblackwell.com

Brian I. Swett
Winston & Strawn LLP
35 West Wacker Drive
Chicago, Illinois  60601-9703
bswett@winston.com

BTI Crushed Stone Sales
7071 State Road 446
Norman, Indiana  47264

Fort Dearborn Life
36788 Eagle Way
Chicago, Illinois  60678-1367

Freeport Loan Fund LLC
c/o Freeport Financial LLC
500 West Madison, Suite 1710
Chicago, Illinois  60661

Hawkins Bailey Warehouse, Inc.
1101 12th Street
Bedford, Indiana  47421

Indiana Department of Revenue
100 North Senate Avenue
Room N203 -  Bankruptcy
Indianapolis, Indiana  46204

Indiana Department of
 Workforce Development
10 North Senate Avenue
SE105-Legal Support
Indianapolis, Indiana  46204-2277

Internal Revenue Service
P.O. Box 21126
Philadelphia, Pennsylvania  19114

Kirby Risk Supply Co.
1622 West Third Street
Bloomington, Indiana  47403

M&I Marshall & Ilsley Bank
As Administrative Agent
135 North Pennsylvania Street
Indianapolis, Indiana  46204-2400

McGladrey & Pullen, LLP
One South Wacker Drive, Suite 800
Chicago, Illinois  60606

Quill Corporation
P.O. Box 94081
Palatine, Illinois  60094-4081

RSM McGladrey, Inc.
One South Wacker Drive, Suite 800
Chicago, Illinois  60606

Stone Belt Freight Lines, Inc.
P.O. Box 1450
Bloomington, Indiana  47402-1450

United States Attorney's Office
10 West Market Street, Suite 100
Indianapolis, Indiana  46204-3048

Verizon Wireless
P.O. Box 25505
Lehigh Valley, Pennsylvania  18002-5505


Brad B. Erens, Esq.
Timothy W. Hoffman, Esq.
Jones Day
77 West Wacker Drive
Chicago, IL 60601

Industrial Service & Supply, Inc.
2129 Yost Avenue
Bloomington, Indiana  47403

John J. Barry
2063 Shadow Grove Way
Encinitas, California  92024

Landers Explosives, Inc.
16785 North State Road 66
Magnet, Indiana  47520

MacAllister Machinery
P.O. Box 1941
Indianapolis, Indiana  46206


The Parthenon Group
200 State Street
Boston, Massachusetts  02109

Ropes & Gray
One International Place
Boston, Massachusetts  02110

Stillions Sawmill
7208 South Rockport Road
Bloomington, Indiana  47403

United Parcel Service
P.O. Box 650580
Dallas, Texas  75265-0580

Valley Electric Supply Co.
1361 North State Road 67
Vincennes, Indiana  47591

David M. Powlen, Esq.
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN 46204
david.powlen@btlaw.com

**EXHIBIT A**

**ASSET PURCHASE AND SALE AGREEMENT**

**BY AND BETWEEN**

**VICTOR OOLITIC STONE COMPANY**

**AND**

**VICTOR ACQUISITION CORP.**

**AS OF NOVEMBER 17, 2009**

## ASSET PURCHASE AND SALE AGREEMENT

THIS ASSET PURCHASE AND SALE AGREEMENT (this "Agreement") is entered into as of this 17th day of November, 2009, by and between Victor Acquisition Corp., an Indiana corporation ("Buyer"), and Victor Oolitic Stone Company, an Indiana corporation ("Seller").

## RECITALS

WHEREAS, on April 28, 2009 (the "Petition Date"), Seller and its parent company, Victor Oolitic Holdings, Inc. ("Victor Holdings") each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Indiana (the "Bankruptcy Court"), commencing cases which are jointly administered under Case No. 09-05786 (the "Bankruptcy Cases");

WHEREAS, on September 16, 2009, the Seller filed its Motion of Debtors for Orders: (i) Authorizing the Sale of Substantially all of the Assets of the Debtors and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases to Limestone Acquisition Corp. Free and Clear of Liens, Claims, Interests and Encumbrances, and (ii) Approving (A) Auction and Overbid Procedures in Connection with the Proposed Sale to Obtain Higher and Better Offers, (B) an Expense Reimbursement, and (C) the Manner and Form of Notice of Sale with the Bankruptcy Court;

WHEREAS, on September 24, 2009 the Bankruptcy Court entered the Order (I) Scheduling Hearing on Proposed Sale of Substantially all of the Assets of Victor Oolitic Stone Company and Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Free and Clear of Liens, Claims, Interests and Encumbrances and (II) Approving (A) Auction and Overbid Procedures in Connection with the Proposed Sale, (B) An Expense Reimbursement, (C) The Manner and Form of Notice of Sale, and Granting Certain Related Relief (the "Sale Procedures Order"), which approved the Auction and Overbid Procedures, under which Buyer submits this Agreement;

WHEREAS, on November 17, 2009, Buyer participated in an auction conducted pursuant to the procedures set forth in the Sale Procedures Order and was selected as the successful bidder with respect to the transactions contemplated herein;

WHEREAS, on November 17, 2009, the Bankruptcy Court entered an order, in substantially the form attached hereto as Exhibit A approving Buyer as the successful bidder pursuant to the Sale Procedures Order and authorizing the Seller to enter into this Agreement (the "Sale Approval Order");

WHEREAS, subject to the approval of the Bankruptcy Court, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, the properties, assets, business operations and goodwill of Seller that are specified herein; and

WHEREAS, defined terms used in this Agreement have the meanings ascribed to them by definition in Section 13.1.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants and agreements hereinafter set forth, the parties hereto hereby agree as follows:

## 1. SALE AND PURCHASE OF ASSETS; ASSUMPTION OF CERTAIN LIABILITIES

### 1.1 Agreement to Sell and Purchase.

Subject to the terms and conditions hereof, at the Closing, Seller shall sell, assign, transfer, convey and deliver to and cause the same to be vested in Buyer, and Buyer shall purchase from Seller, the Purchased Assets free and clear of all Liens except for Permitted Liens.

### 1.2 Purchased Assets.

For purposes of this Agreement, "Purchased Assets" means the right, title, and interest of Seller in all of its assets, properties, and rights (wherever located and whether or not required to be reflected on a balance sheet prepared in accordance with GAAP, including any assets acquired by Seller after the date hereof but prior to the Closing), except for the Excluded Assets, including without limitation all right, title and interest in Seller in and to the following:

(a)     all bank accounts, cash, cash equivalents and marketable securities, including all rights to any amounts received by or on behalf of Seller in any lock-box or depository account;

(b)     all royalties, advances, prepaid assets, prepayments and other current assets of the Seller as of the Closing;

(c)     the furniture, fixtures, furnishings, vehicles, machinery, computers, equipment (mobile or otherwise), inventory, tools, office materials and other tangible property of Seller that are listed on Schedule 1.2(c);

(d)     those Contracts that are listed on Schedule 1.2(d) (the "Assumed Contracts");

(e)     subject to Section 6.3, all Accounts Receivable;

(f)     all real property used or usable in connection with the Business as set forth and described on Schedule 1.2(f), (the "Real Property");

(g)     all lists, records, information, files, data and plans (whether written, electronic or in any other medium), advertising and promotional materials and similar items of the Seller as of the Closing, including customer and supplier lists, mailing lists, sales and promotional literature, other sales related materials related to the Business;

(h)     all books, records, accounts, checks, payment records, personnel files, Tax records (including payroll, unemployment, real estate and other Tax records) and other similar books, records and information of Seller, or copies thereof, to the extent relating specifically to the Business (the "Records"); provided, however, if Seller is required by Applicable Law to

retain any Records, Seller shall retain such Records and provide Buyer with reasonable access to such Records for a period of three (3) years following the Closing, subject, however, to any requirements of Applicable Law regarding employee consent to disclosure of confidential employee records and to any other Applicable Law requiring the confidentiality of such Records;

(i)    all Seller Intellectual Property, including (A) all computer software, (B) all rights of Seller to the names "Victor Oolitic" and "Victor Oolitic Stone Company," including, without limitation, all related trade names, trademarks, identifying logos or service marks and (C) all right, title and interest of Seller in and to the internet domain name "www.victoroolitic.com";

(j)    all claims and causes of action (other than, in each case, to the extent related to Excluded Assets or Excluded Liabilities) of the Seller as of the Closing (regardless of whether or not such claims and causes of action have been asserted by the Seller) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery possessed by the Seller as of the Closing (regardless of whether such rights are currently exercisable) to the extent related to the Purchased Assets;

(k)    all goodwill associated with the Business or the Purchased Assets, including all goodwill associated with the Seller Intellectual Property and all rights under any confidentiality agreements executed by any third party for the benefit of any of the Seller to the extent relating to the Business;

(l)    all rights of the Seller under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with employees (current or former) or current or former directors, consultants, independent contractors and agents of any of the Seller or any of its Affiliates or with third parties to the extent primarily relating to the Business or the Purchased Assets (or any portion thereof);

(m)    any rights, demands, claims, credits, allowances, rebates (including any vendor or supplier rebates), or rights of setoff arising out of or relating to any of the Purchased Assets as of the Closing (but excluding all interests in the Excluded Assets);

(n)    all other assets that are related to or used in connection with the Business and that are owned by the Seller as of the Closing; and

(o)    the other items, if any, that are listed on Schedule 1.2(o).

**1.3    Excluded Assets**.

Notwithstanding Section 1.2 or anything to the contrary in this Agreement, the following assets, properties or rights of Seller (collectively, the "Excluded Assets") shall not constitute Purchased Assets:

(a)    all refunds of any Taxes relating to any and all periods or partial periods ending on or prior to the Closing Date;

(b)    the articles of incorporation, by-laws, minute books, corporate seal, stock transfer records and other corporate records of Seller;

(c)    any Records that Seller is required by Applicable Law to retain; provided, however, that the Buyer shall have the right, at its expense, to make copies of any portions of such books and records related to the Purchased Assets;

(d)    all Contracts that are not Assumed Contracts;

(e)    all Employee Benefit Plans;

(f)    any rights and claims of Seller, whether known or unknown, absolute or contingent, matured or unmatured, against third parties whether in tort, contract, or contingent or otherwise, (I) under the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act or, except to the extent arising from Assumed Contracts, the Bankruptcy Code and (II) against any directors, officers and/or employees of Seller relating to actions or failures to act at any time prior to the Closing Date;

(g)    all insurance policies and benefits thereunder, including all refunds, all proceeds and all claims against officers and directors acting in such capacity, and directors and officers insurance policies;

(h)    all intercompany claims and receivables of Seller against companies that own, are owned by or are under common ownership with Seller; and

(i)    the other items listed on Schedule 1.3(i).

**1.4    Assumption of Liabilities**.

On the Closing Date, Buyer shall assume and agree to discharge the following Liabilities of Seller (the "<u>Assumed Liabilities</u>"):

(a)    all amounts outstanding under the Swap Agreement;

(b)    subject to Section 1.5, all Liabilities pursuant to or arising under Assumed Contracts, including the Cure Costs;

(c)    solely the following post-petition administrative claims of Seller that arose during or relate to the period after the Petition Date: (1) real estate taxes, (2) income taxes relating to income recognized in a period prior to (x) the Closing Date and (y) the consummation of the transactions contemplated by the Purchase Agreement (not to exceed $150,000), (3) all payables to the vendors identified on Schedule 1.4(c), (4) payables not to exceed $50,000 in the aggregate to any vendors <u>not</u> identified on Schedule 1.4(c), and (5) the allowed fees and expenses of Seller's professionals in the Bankruptcy Case, whether allowed prior to or after the Closing, in each case to the extent unpaid.

(d)     all accrued payroll for base salaries, wages and commissions (excluding all Liabilities for annual or other incentive bonuses), and all related employment taxes and expenses;

(e)     all accrued vacation time and sick pay and related employment taxes; and

(f)     the employment-related liabilities, including those arising under the US Consolidated Omnibus Budget Reconciliation Act, as described on Schedule 1.4(f).

Notwithstanding anything to the contrary contained in this Agreement or the Schedules hereto, or any Other Document, except for the assumption of the Assumed Liabilities pursuant to this Section 1.4, Buyer does not and will not at Closing assume or agree to pay, satisfy, discharge or perform, and is not and shall not be deemed by virtue of the execution and delivery of this Agreement or any Other Document, or as a result of the consummation of the transactions contemplated by this Agreement or otherwise, to have assumed, or to have agreed to pay, satisfy, discharge or perform, any Liabilities of Seller, the Business or any Affiliates of Seller, including all Liabilities relating to Excluded Assets unless otherwise specifically identified as Assumed Liabilities (all such Liabilities that Buyer is not assuming being referred to collectively as **"Excluded Liabilities"**).  Without limiting the foregoing, the Buyer is not assuming any Liabilities for Taxes resulting from or related to the consummation of the transactions contemplated by this Agreement, including any income Taxes related to any income or gains recognized as a result of the consummation of the transactions contemplated by this Agreement, notwithstanding that the Company will have no unencumbered funds to pay any such Taxes.

**1.5     Assumed Contracts and Leases**

(a)     Buyer will be responsible for the payment of amounts necessary to cure defaults under the Assumed Contracts solely to the extent set forth on the Cure Cost Schedule (the "Cure Costs").

(b)     Seller has included in the Sale Motion the request to assume and assign to Buyer the Assumed Contracts and the request to establish the Cure Costs for the Assumed Contracts (scheduling the amount of such costs as determined in accordance with the Records; provided that where Seller is unable to determine the amount of such costs from the Records, the Sale Motion requested that the applicable cure cost be set at zero dollars (such schedule, the **"Cure Cost Schedule"**), and will use best efforts to obtain entry of a court order authorizing the assumption and assignment of such Assumed Contracts to Buyer.

(c)     If the actual cure cost associated with any Assumed Contract exceeds the amount of such cure cost as listed on the Cure Cost Schedule, Buyer, in its sole discretion, may elect not to accept assignment of such Assumed Contract.

**2.     CLOSING; DELIVERIES**

**2.1     Closing**.

The consummation of the transactions contemplated herein (the "Closing") shall take place at the offices of Ice Miller, One American Square, Suite 2900, Indianapolis, Indiana 46282, within two (2) Business Days following satisfaction (or waiver by the party entitled to such waiver) of the conditions set forth in Sections 7, 8 and 9, or at such other time and date as the parties hereafter agree in writing (the "Closing Date"). The Closing shall be effective as of 12:01 a.m. on the Closing Date.

**2.2    Deliveries at the Closing**.

At the Closing, (i) Seller will deliver to Buyer the various certificates, instruments, and documents referred to in Section 10.1, (ii) Buyer will deliver to Seller the various certificates, instruments, and documents referred to in Section 10.2, (iii) Buyer will deliver to Seller the consideration specified in Section 3.1 in accordance with Section 3.2, and (iv) each party shall fulfill such other obligations as are imposed upon it under this Agreement or the Other Documents that are to be fulfilled on or prior to the Closing.

**3.    PURCHASE PRICE**

**3.1    Purchase Price**.

For and in consideration of the conveyances and assignments described herein, and in addition to the other representations, warranties and covenants herein (including, without limitation, the Buyer's assumption of the Assumed Liabilities pursuant to Section 1.4 of this Agreement), Buyer shall pay the following (the "Purchase Price"):

(a)    to the Administrative Agent at the Closing all amounts outstanding under the First Lien Credit Agreement (other than default interest, which will be waived, and excepting the Senior Lenders' professional fees and expenses, which will be paid by Buyer in cash at the Closing) (the "Loan Payoff");

(b)    to Seller at the Closing, the cash deposit (the "Deposit") in an amount equal to one-hundred thousand dollars ($100,000), which such amount has been previously deposited by Buyer with the Seller pursuant to Section 5(f) of the Auction and Overbid Procedures set forth as Exhibit A to the Sale Procedures Order;

(c)    to Seller at the Closing, a cash payment equal to the amount payable by the Seller as the "Expense Reimbursement" pursuant to Section 6.1(c) of the Stalking Horse Agreement, which such amount shall not exceed two hundred thousand dollars ($200,000); and

(d)    To Seller, pursuant to Section 363(k) of the Bankruptcy Code, a credit bid in an amount equal to $19,449,877 of the amounts owed under the Second Lien Loan (the "Credit Bid").

**3.2    Payment of Purchase Price**.

At the Closing, (a) Buyer, Administrative Agent and the Senior Lenders shall execute all loan documents related to and as required by the New Credit Agreement and the Senior Lenders shall provide the financing contemplated thereunder to Buyer, as contemplated in

Section 6.7 of this Agreement, (b) Buyer shall pay to Seller or the Administrative Agent, as the case may be, the Purchase Price set forth in Sections 3.1(a) and (c) of this Agreement by wire transfer of immediately available U.S. funds, and (b) Seller shall apply a credit in an amount equal to the Deposit toward the Purchase Price paid by Buyer, and (c) Buyer shall deliver to Seller or the Administrative Agent, as the case may be, documentation evidencing the Credit Bid in favor of the Company.

### 3.3    Purchase Price Allocation.

The Purchase Price shall be allocated among the Purchased Assets pursuant to the allocation schedule set forth on Schedule 3.3. Each of Buyer and Seller agrees to file Form 8594 as required by Section 1060 of the Code, and all federal, state, local and foreign Tax Returns, in accordance with such agreed allocation. Each of Buyer and Seller shall report the transactions contemplated by this Agreement for federal Tax and all other Tax purposes in a manner consistent with the allocation determined pursuant to this Section 3.3. Each of Buyer and Seller agrees to provide the other promptly with any information required to complete the Form 8594. Buyer and Seller shall notify and provide the other with reasonable assistance in the event of an examination, audit or other proceeding regarding any allocation of the Purchase Price determined pursuant to this Section 3.3. Buyer and Seller shall not take any position in any Tax Return, Tax proceeding or audit that is inconsistent with such allocation.

## 4.    REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth or described on the Disclosure Schedule attached hereto (the "Disclosure Schedule"), Seller represents and warrants to Buyer that:

### 4.1    Organization and Qualification.

Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Indiana. Seller has all necessary corporate power and authority to own its properties and to carry on the Business and to enter into and perform its obligations under this Agreement, the Other Documents to which it is a party and the transactions contemplated hereby and thereby.

### 4.2    Corporate Authority.

The execution, delivery and performance by Seller of this Agreement and the Other Documents and the consummation by Seller of the transactions contemplated hereby and thereby have been or, upon entry of the Sale Approval Order, will be duly authorized by all requisite corporate action on the part of Seller. This Agreement has been duly executed and delivered by Seller and constitutes, and upon execution and delivery of each of the Other Documents, such Other Documents will constitute, the legal, valid and binding obligation of Seller, enforceable in accordance with its terms (assuming approval of this Agreement by the Bankruptcy Court).

### 4.3    Litigation; Disputes.

Other than the proceedings to be commenced before the Bankruptcy Court, to the Knowledge of Seller, there is no material action, claim, demand, suit, proceeding, arbitration, grievance, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, pending or threatened against or relating to Seller which seeks to enjoin or rescind the transactions contemplated by this Agreement or otherwise prevent Seller from complying with the terms and provisions of this Agreement..  To the Knowledge of Seller, the Business is not operating under, subject to or in default with respect to any order, award, writ, injunction, decree or judgment of any Governmental Authority.

**4.4     Contracts**.

(a)     Each Assumed Contract is a valid and binding obligation of Seller, and to the Knowledge of the Seller, the other parties thereto, enforceable against each of them in accordance with its terms, except, in each case, (i) as such enforceability may be limited by applicable bankruptcy, insolvency, moratorium or other similar laws affecting or relating to enforcement of creditors' rights generally or general principles of equity, or (ii) as set forth in Schedule 4.4(a).

(b)     None of Seller or, to the Seller's Knowledge, the other parties thereto, are in breach in any material respect of any Assumed Contract and Seller has not received any notice of any such breach, except, in each case, (i) as a result of the Bankruptcy Case, (ii) as set forth in Schedule 4.4(b), or (iii) as has been previously cured or will be cured upon entry of the Sale Order and payment of the Cure Costs.

**4.5     Consents**.

Other than the Sale Approval Order and other than as set forth on Schedule 4.5, no consent, approval or authorization of, or declaration or filing with, any Governmental Authority is required in connection with the execution, delivery or performance by Seller of this Agreement or the Other Documents, except to the extent that any of the foregoing: (a) have previously been obtained or made, as applicable or (b) if not obtained or made, as applicable, are not reasonably expected to materially affect the execution, delivery or performance by Seller of this Agreement or the Other Documents.  No approval, consent or authorization of any lender, lessor or other third party is required in order for Seller to consummate the transactions contemplated hereby or thereby.

**4.6     Brokers**.

No broker or finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller for which Buyer could become liable or obligated.

**4.7     Assets**.

Seller has good and transferable title to the Purchased Assets, free and clear of all Liens other than Permitted Liens.

**4.8    Legal Compliance**.

To the Knowledge of Seller, Seller is not currently in material violation of any Applicable Law, other than bulk sales or similar laws, nor has Seller received within the past two (2) years any notice alleging any material conflict with, violation of, breach of or default under any such Applicable Law.

**5.    REPRESENTATIONS AND WARRANTIES OF BUYER**

Buyer hereby represents and warrants to Seller, on the date hereof and on the Closing Date, as follows:

**5.1    Organization**.

Subject to Section 6.9 of this Agreement, Buyer is a corporation duly formed, validly existing and in good standing under the law of the State of Indiana.  Buyer has all necessary power, authority, and capacity to own its property, to carry on its business, and to enter into and perform its obligations under this Agreement and the Other Documents to which it is a party and to carry out the transactions contemplated hereby and thereby.

**5.2    Authority**.

The execution, delivery and performance by Buyer of this Agreement and the Other Documents to which it is a party and the consummation by Buyer of the transactions contemplated hereby or thereby have been duly authorized by all requisite limited liability company action on the part of Buyer.  This Agreement has been duly executed and delivered by Buyer and constitutes, and upon execution and delivery by Buyer of each of the Other Documents to which it is a party, such Other Documents will constitute, the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms, except to the extent that enforceability may be limited by applicable bankruptcy, insolvency or similar laws affecting the enforcement of creditors' rights generally and subject to general principles of equity.

**5.3    No Conflict**.

Neither the execution or delivery by Buyer of this Agreement or the Other Documents to which it is a party, nor the consummation of the transactions contemplated hereby or thereby will (a) conflict with or result in a breach of any of the provisions of, or constitute a default under, the charter, by-laws, or other organizational document of Buyer, as amended to date, (b) result in a breach of any of the provisions of, or constitute a default under any material contract to which Buyer is bound, or (c) result in a violation of any Applicable Law to which Buyer or its property is subject.

**5.4    Consents**.

Other than the Sale Approval Order, no consent, approval or authorization of, or declaration or filing with, any Governmental Authority is required in connection with the execution, delivery or performance by Buyer of this Agreement or the Other Documents.  No

approval, consent or authorization of any lender, lessor or other person is required in order for Buyer to consummate the transactions contemplated hereby or thereby.

**5.5    Litigation**.

There is no action, claim, demand, suit, proceeding, arbitration, grievance, citation, summons, subpoena, inquiry or investigation of any nature, civil, criminal, regulatory or otherwise, in law or in equity, pending or, to the knowledge of Buyer, threatened against or relating to Buyer which seeks to enjoin or rescind the transactions contemplated by this Agreement or otherwise prevent Buyer from complying with the terms and provisions of this Agreement.

**5.6    Brokers**.

No broker or finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer for which Seller could become liable or obligated.

**5.7    Financing; Due Diligence**.

Other than the conditions in Sections 8.2 and 8.3 of this Agreement, Buyer's obligations under this Agreement are not subject to the satisfaction of any financing or further due diligence contingencies.  Subject to the receipt of financing pursuant to the New Credit Agreement, Buyer either has sufficient funds available to consummate the transactions contemplated by this Agreement or has binding commitments from lenders or investors to provide such funds.

**6.    ADDITIONAL COVENANTS AND AGREEMENTS**

**6.1    Bankruptcy Covenants; Bankruptcy Scheduling; Expense Reimbursement**.

(a)    <u>Operation as Debtor in Possession</u>.  Seller has and shall continue to operate its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Without limiting or modifying the foregoing, Seller shall use its commercially reasonable efforts to: (i) operate the Business in the ordinary course of business consistent with past practices, (ii) preserve in all material respects the Purchased Assets (excluding sales of inventory in the ordinary course of business), and (iii) preserve its current relationships with the suppliers, vendors, customers, clients, contractors and others having business dealings with the Business, but taking into account, in each case, the fact that the Bankruptcy Case  have commenced, and the fact that the Business will be operated while in bankruptcy.

(b)    <u>Entry of Sale Approval Order</u>.  Seller shall obtain the entry of the Sale Approval Order which is mutually satisfactory to Buyer and Seller.

**6.2    Consents; Satisfaction of Closing Conditions**.

Seller and Buyer shall use all reasonable efforts to obtain all consents, waivers and other approvals which shall be required in order to effectuate the transactions contemplated hereby, and to satisfy promptly the conditions to the Closing specified in this Agreement. Seller and Buyer shall furnish to each other and to each other's counsel all such information as may be reasonably required in order to effectuate the foregoing actions.

**6.3     Collection of Accounts Receivable**.

The parties acknowledge that the Purchased Assets include Accounts Receivable. To the extent that Seller receives after the Closing any funds from customers of the Business which are paid in satisfaction of such Accounts Receivable, Seller shall hold such funds in trust for the benefit of Buyer and, within seven (7) business days, remit such funds to Buyer.

**6.4     Transfer Taxes**.

Buyer shall pay all Indiana state and local transfer taxes levied as a result of the transfer of the Purchased Assets pursuant to this Agreement and the Other Documents.

**6.5     Supplemental Information**.

From time to time after the date hereof until the Closing Date, Seller shall promptly disclose in writing to Buyer any material matter hereafter arising that, if existing, occurring or known as of the date hereof or at or prior to the Closing Date would have been required to be disclosed to Buyer or that would render materially inaccurate any of the representations, warranties or statements of such party set forth in Section 4 of this Agreement, and any such disclosure shall constitute an amendment to the Disclosure Schedule, effective as of the date of this Agreement.

**6.6     Employees**.

Buyer shall extend offers of employment to all Seller Employees and the terms of such offers shall assure that Seller shall incur no Liabilities under the Workers Adjustment and Retraining Notification Act, as amended; provided, however, such offers shall not prohibit Buyer from terminating the employment of any Seller Employees following the Closing, subject to the terms of such employment and any Applicable Laws, and Buyer shall be solely responsible for any Liabilities relating to such termination. Immediately prior to Closing, Seller will terminate the employment of all employees at each Business location who have accepted Buyer's offer of employment, and Buyer shall assume the obligations with respect thereto that are specified in Section 1.4 hereof.

**6.7     New Credit Agreement**.

Buyer shall obtain, and at the Closing the Senior Lenders have agreed to provide, the funds for the Loan Payoff from a new loan to be extended by the Senior Lenders to Buyer pursuant to that certain credit agreement, by and among, Buyer, the Senior Lenders and the other parties thereto, executed on November 13, 2009 (the "New Credit Agreement").

**6.8     Payment and Performance of Assumed Liabilities**.

From and after the Closing, Buyer shall pay, perform and discharge the Assumed Liabilities in accordance with their respective terms.

**6.9**    **[INTENTIONALLY OMITTED.]**

**6.10**    **"AS IS" TRANSACTION**.

BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR AND SUBJECT TO THE EXPRESS REPRESENTATIONS AND WARRANTIES IN SECTION 4 OF THIS AGREEMENT, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS" AND SELLER MAKES NO OTHER REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO THE PURCHASED ASSETS.

**7.    MUTUAL CONDITIONS PRECEDENT TO OBLIGATIONS TO CLOSE**

The obligations of each of Buyer and Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, unless otherwise waived in writing by Buyer and Seller:

**7.1    Absence of Litigation**.

There shall be no claim, action, suit, investigation, litigation or proceeding, pending in or before any Governmental Authority that enjoins, restrains or prohibits, or seeks to effect the injunction, restraint of, or prohibition of, the consummation of the transactions contemplated by this Agreement.

**7.2    Bankruptcy Court Order; Other Approvals**.

(a)    The Cash Collateral Order shall be in full force and effect; and

(b)    The Bankruptcy Court shall have entered the Sale Approval Order and any other required material governmental, regulatory and third-party approvals, waivers, and/or consents in connection with the sale transaction will have been obtained.

**8.    CONDITIONS TO BUYER'S OBLIGATION TO CLOSE**

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, unless otherwise waived in writing by Buyer:

**8.1    Representations and Warranties**.

The representations and warranties of Seller contained herein (taking into account the Disclosure Schedule, as amended through the Closing) shall be true and correct as of the date hereof and on and as of the Closing Date in all material respects, except to the extent that such failure to be materially true and correct results from Buyer's determination not to (i) assume any Contract or (ii) breach by Buyer of its obligations or representations hereunder.

**8.2    Performance**.

Seller shall have duly performed or complied with all of the covenants, acts and obligations to be performed or complied with by each of them as provided hereunder at or prior to the Closing, except to the extent that any such failure to so perform or comply does not materially impair the ability of the Seller to perform its obligations under this Agreement.

**8.3    New Credit Agreement**.

The Senior Lenders shall have provided the financing contemplated under the New Credit Agreement.

**9.    CONDITIONS TO SELLER'S OBLIGATIONS TO CLOSE**

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions unless otherwise waived in writing by Seller:

**9.1    Representations and Warranties**.

The representations and warranties of Buyer contained herein or in any document delivered pursuant hereto shall be true and correct as of the date hereof and on and as of the Closing Date in all material respects.

**9.2    Performance**.

Buyer shall have performed or complied in all material respects with all covenants, acts and obligations to be performed or complied with by Buyer hereunder at or prior to the Closing.

**9.3    Capitalization of Buyer; Other Assets**

Buyer shall be capitalized, immediately prior to the Closing, with and have cash on hand of no less than $3,500,000 million and, immediately after the Closing, with and have cash on hand of no less than $3,000,000 million, exclusive of the Purchased Assets. Buyer shall also hold a portion of the rights held by Freeport Onshore Holding LLC and Freeport Offshore Holding LLC with respect to the Second Lien Credit Agreement in order that Buyer be able to perform its obligations under Section 3.1(c) herein (the "Credit Bid Contribution"). The commitment to provide such equity and contribute the Credit Bid Contribution is evidenced by

the contribution agreement which has been executed by the parties thereto in substantially the same form as attached hereto as <u>Exhibit B</u>.

## 10.    ACTION TO BE TAKEN AT CLOSING

### 10.1    Action to be Taken by Seller.

At the Closing, Seller shall deliver to Buyer the following:

(a)    an executed Bill of Sale, dated as of the Closing Date;

(b)    an executed Assignment and Assumption, dated as of the Closing Date;

(c)    a copy of the Sale Approval Order; and

(d)    wire instructions of Seller.

### 10.2    Action to be Taken by Buyer.

At the Closing, Buyer shall deliver the following:

(a)    to Seller a certified copy of the resolutions duly adopted by the Board of Directors of Buyer authorizing or ratifying this Agreement and authorizing the consummation by Buyer of the transactions contemplated hereby and by the Other Documents;

(b)    to the Administrative Agent, the fully executed New Credit Agreement together with all loan documents and other supporting materials required therein; and

(c)    to Seller or the Administrative Agent, as the case may be, the Purchase Price set forth in Section 3.1 of this Agreement.

## 11.    TERMINATION

### 11.1    Termination.

Subject to the provisions of Section 11.2, this Agreement may be terminated at any time before the Closing under any one or more of the following circumstances:

(a)    by mutual written consent of Seller and Buyer;

(b)    by Seller or Buyer if the Closing shall not have been consummated on or before December 16, 2009; or

(c)    (i) by Buyer, if any of the conditions in Section 7 or Section 8 has not been satisfied as of the Closing or if satisfaction of any such condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition at or before the Closing; or (ii) by Seller, if any of the conditions in Section 7 or Section 9 has not been satisfied as of the Closing or if satisfaction of any such condition is or becomes impossible (other than through the failure of Seller to comply

with its obligations under this Agreement) and Seller has not waived such condition at or before the Closing.

> **11.2    Effect of Termination**.

In the event of termination of this Agreement, as provided above, this Agreement shall forthwith become void and there shall be no liability or obligation hereunder on the part of Seller or Buyer except that the following shall survive the termination hereof: (a) Buyer's liability resulting from Buyer's breach of any representation, warranty, covenant or agreement in this Agreement, and (b) the agreement respecting expenses contained in Section 13.13.

## 12.    SURVIVAL.

None of the representations or warranties of Seller and Buyer herein, or in any Other Document delivered prior to or at the Closing, will survive the Closing, and except for the covenants and agreements by their terms to be performed after the Closing Date, none of the respective covenants and agreements of Seller and Buyer herein, or in any Other Document delivered prior to or at the Closing, will survive the Closing. In addition to the foregoing, in the event of breach of a representation or warranty of Seller, Buyer's sole remedy shall be to terminate this Agreement pursuant to Section 11.1(c) on account of such breach (if such remedy is otherwise in all respects applicable and available to Buyer).

## 13.    MISCELLANEOUS.

> **13.1    Certain Definitions**.

As used herein, the following terms have the meanings set forth below:

**"Accounts Receivable"** means all trade accounts receivable and other rights to payment from customers of Seller, billed or unbilled, and the full benefit of all security for such accounts or rights to payment that have accrued on the records of Seller as of the Closing Date as determined in accordance with United States generally accepted accounting principles consistent with past practices of Seller.

**"Administrative Agent"** means M&I Marshall & Ilsley Bank as administrative agent under the First Lien Credit Agreement.

**"Affiliate"** means a Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, the first Person. "Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a person, whether through the ownership of voting securities, by contract or credit arrangement, as trustee or executor or otherwise.

**"Applicable Law"** means all applicable provisions of all (i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, ordinances, codes or orders of any Governmental Authority, (ii) Governmental Approvals and (iii) orders, decisions, injunctions, judgments, awards and decrees of or agreements with any Governmental Authority.

"**Assignment and Assumption**" means the Instrument of Assignment and Assumption for Seller, substantially in the form attached hereto as <u>Exhibit C</u>.

"**Assumed Contracts**" has the meaning given to it in Section 1.2(d).

"**Assumed Liabilities**" has the meaning given to it in Section 1.4.

"**Auction**" has the meaning given to it in the Sale Procedure Order.

"**Bankruptcy Case**" has the meaning given to it in the Recitals.

"**Bankruptcy Code**" has the meaning given to it in the Recitals.

"**Bankruptcy Court**" has the meaning given to it in the Recitals.

"**Bill of Sale**" means the Bill of Sale for Seller substantially in the form attached hereto as <u>Exhibit D</u>.

"**Business**" means the Seller's business of quarrying of limestone and the sale of limestone in the form of quarry blocks, slabs and ready-to-use sills, hearths, mantels and coping material.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized by law to close.

"**Cash Collateral Order**" means the *Final Order Authorizing Use of Cash Collateral, Granting Adequate Protection, and Other Related Relief* entered in the Bankruptcy Case on May 27, 2009 (Docket No. 85), as the same may be amended or extended with the Buyer's consent.

"**Closing**" has the meaning given to it in Section 2.1.

"**Closing Date**" has the meaning given to it in Section 2.1.

"**Code**" means the Internal Revenue Code of 1986, as amended, and all laws and regulations promulgated pursuant thereto or in connection therewith.

"**Contracts**" means all agreements, contracts, leases, commitments, purchase orders, understandings and other instruments and arrangements by which any of the Purchased Assets are bound or to which Seller is a party or by which Seller is bound in connection with the Business of Seller or the Purchased Assets.

"**Credit Bid**" has the meaning given to it in Section 3.1(c).

"**Credit Bid Contribution**" has the meaning given to it in Section 9.3.

"**Cure Costs**" has the meaning given to it in Section 1.5(a).

"**Deposit**" has the meaning given to it in Section 3.1(b).

**"Employee Benefit Plans"** means an employee benefit plan within the meaning of Section 3(3) of ERISA.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"Excluded Assets"** has the meaning given to it in Section 1.3.

**"First Lien Credit Agreement"** means that certain Credit Agreement dated as of August 25, 2005 (as amended) among Seller, M&I Marshall & Ilsley Bank (successor by merger to First Indiana Bank, N.A.), as administrative agent, and the other lenders party thereto.

**"Governmental Approvals"** means permits, approvals, orders, authorizations, consents, security clearances, franchises, exemptions of, or filings or registrations with, any Governmental Authority in any jurisdiction, which have been issued or granted to or are owned or used by Seller in connection with the Business and all pending applications therefor.

**"Governmental Authority"** means any court, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign.

**"Intellectual Property"** means all rights, title and interest in or relating to intellectual property of the following types, which may exist or be created under the laws of any jurisdiction in the world:  (a) rights associated with works of authorship, including exclusive exploitation rights, mask work rights, copyrights, database and design rights, whether or not registered or published, all registrations and recordations thereof and applications in connection therewith, along with all extensions and renewals thereof, (b) trademarks, service marks, trade names, service names, brand names, trade dress rights, logos, corporate names, trade styles, logos and other source or business identifiers and general intangibles of a like nature, along with applications, registrations, renewals and extensions thereof, (c) trade secrets, (d) patents and applications therefore, including all continuations, divisionals, and continuations-in-part thereof and patents issuing thereon, along with all reissues, reexaminations and extensions thereof, (e) all Internet domain names, and (f) all other intellectual property rights.

**"Knowledge"** means the actual and conscious (and not constructive) knowledge of Terry Reutell.

**"Liabilities"** means all liabilities and obligations, secured or unsecured, whether absolute, accrued, contingent or otherwise, and whether or not due.

**"Lien"** means any mortgage, pledge, hypothecation, right of others, claim, security interest, encumbrance, lease, sublease, license, occupancy agreement, adverse claim or interest, easement, covenant, encroachment, burden, title defect, title retention agreement, voting trust agreement, interest, equity, option, lien, right of first refusal, charge or other restrictions or limitations of any nature whatsoever, including but not limited to such as may arise under any Contracts, and any "claim," "lien," or "security interest," as those terms are defined in the Bankruptcy Code.

**"New Credit Agreement"** has the meaning given to it in Section 6.7.

"**Other Document**" means the Bill of Sale and the Assignment and Assumption and any other document or instrument executed in connection with the transactions contemplated hereby or thereby.

"**Permitted Liens**" means (a) zoning, entitlement, building and other land use regulations imposed by Governmental Authorities having jurisdiction over the Real Property used in the Business; (b) Liens upon assets subject to capital lease obligations arising under capital leases included in the Purchased Assets, provided that such Liens only serve to secure payments arising under such capital lease obligations and that Seller identified such Purchased Assets as being subject to lease; (c) Liens arising under precautionary UCC financing statement filings regarding operating leases included in the Purchased Assets (provided that each Seller identified such Purchased Assets as being subject to lease); (d) Liens upon vehicles arising under financing agreements (including, without limitation, installment sales contracts); ; and (e) Liens upon any Real Property that arise in favor of any Governmental Authority with respect to unpaid Taxes.

"**Person**" means an individual, partnership, corporation, limited liability company, association, joint stock company, trust, joint venture, unincorporated organization or Governmental Authority (or any department, agency or political subdivision thereof), or any other entity.

"**Petition Date**" has the meaning given to it in the Recitals.

"**Purchase Price**" has the meaning given to it in Section 3.1.

"**Purchased Assets**" has the meaning given to it in Section 1.2, as modified by Section 1.3.

"**Real Property**" has the meaning given to it in Section 1.2(f).

"**Records**" has the meaning given to it in Section 1.2(h).

"**Sale Motion**" has the meaning given to it in Section 6.1(b).

"**Sale Approval Order**" has the meaning given to it in the recitals.

"**Sale Procedures Order**" has the meaning given to it in the recitals.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of August 25, 2005 among Seller, Freeport Financial LLC and Freeport Loan Fund LLC.

"**Second Lien Lender**" means Freeport Loan Fund LLC.

"**Second Lien Loan**" means the outstanding obligation in an amount equal to $19,449,877 owed by Seller to the Second Lien Lender pursuant to the Second Lien Credit Agreement.

"**Seller Employees**" means the employees of Seller as of the date hereof.

"**Seller Intellectual Property**" means all rights, title and interest in and to Intellectual Property owned by Seller as of the Closing.

"**Senior Lenders**" means collectively M&I Marshall & Ilsley Bank, Fifth Third Bank (Central Indiana), RBS Citizens Bank and Huntington National Bank.

"**Stalking Horse Agreement**" means that certain Asset Purchase Agreement, by and between seller and Limestone Acquisition Corp., dated as of September 16, 2009.

"**Swap Agreement**" means that certain ISDA Master Agreement between Charter One Bank, N.A. and the Company, dated as of September 14, 2005.

"**Tax Return**" means any return, report declaration, form, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Taxes**" means all federal, state, local and foreign taxes and other assessments of a similar nature (whether imposed directly or through withholding), including any interest, additions to tax or penalties applicable thereto.

"**Victor Holdings**" has the meaning given to it in the recitals.

**13.2   Buyer not Successor**.

It is expressly understood by Buyer and Seller that in no respect is Buyer intended to be deemed the successor in interest to Seller under any theory of law or equity.

**13.3   Written Agreement to Govern**.

This Agreement (together with the Schedules and Exhibits hereto, and the other instruments and documents delivered pursuant hereto) sets forth the entire understanding and supersedes all prior oral and written agreement among the parties relating to the subject matter contained herein, and merges all prior discussions among them.

**13.4   Severability**.

The parties expressly agree that it is not their intention to violate any public policy or Applicable Law.  If any provision of this Agreement is judicially or administratively interpreted or construed as being so in violation, such provision shall be inoperative and the remainder this Agreement shall remain binding upon the parties hereto.

**13.5   Notices and Other Communications**.

Any notice or other communication required, contemplated or permitted by this Agreement by any party shall be in writing and shall be deemed served (a) when personally delivered, (b) when transmitted via facsimile machine to the party for whom it is intended at the

number shown below, (c) on the next business day after delivery to a reputable overnight courier for next business day delivery, or (d) five (5) business days after deposit in the mail, registered or certified mail, return receipt requested, postage prepaid, addressed, in the case of deliveries made pursuant to clause (c) or (d), as follows:

> If to Buyer:
>
>> Victor Acquisition Corp.
>> c/o Resilience Capital Partners LLC
>> 25101 Chagrin Blvd.
>> Suite 350
>> Cleveland, Ohio 44122
>> Attention:  Bassem A. Mansour
>> Facsimile number: (216) 292-4750
>>
>> and
>> Freeport Financial
>> 500 West Madison, 17th Floor
>> Chicago, IL 60661
>> (312) 281-4646
>> Attention: Joe Walker
>>
>> and
>>
>> Stark Investments
>> 3600 South Lake Drive
>> St. Francis, WI 53235
>> (414) 294-7000
>> Attention: Joseph P. Lukas
>
> With a copy (which shall not constitute notice) to:
>
>> Jones Day
>> 77 West Wacker Drive
>> Suite 3500
>> Chicago, Illinois 60601
>> Attention: Walter S. Holzer, Esq.
>> Brad B Erens, Esq.
>> Facsimile number: (312) 782-8585

and

Winston & Strawn LLP
35 West Wacker Drive
Chicago, Illinois 60601-9703
Attention:  Brian Swett, Esq.
Facsimile number: (312) 558-5700

and

Barnes and Thornberg LLP
1000 North West Street
Suite 1200
Wilmington, Illinois 19801
Attention:  David Powlen, Esq.
Facsimile number:

If to Seller:

Victor Oolitic Stone Company
7850 South Victor Pike
P.O. Box 668
Bloomington, Indiana 47402
Attention: Marjorie Shymske

With a copy (which shall not constitute notice) to:

Goulston & Storrs, P.C.
400 Atlantic Avenue
Boston, MA 02110-3333
Attention: James F. Wallack, Esq.
Christine D. Lynch, Esq.
Facsimile number: (617) 574-7646

or to such other address or addresses as any addressee may designate for itself by written notice
served in accordance herewith.

**13.6    Counterparts**.

This Agreement may be executed in any number of counterparts, and each
counterpart shall constitute an original instrument, but all such separate counterparts shall
constitute one and the same agreement.

**13.7    Law to Govern; Bankruptcy Court Jurisdiction**.

(a)    THE VALIDITY, CONSTRUCTION AND ENFORCEABILITY OF THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ITS CONFLICT OF LAWS RULES.

(b)    THE PARTIES AGREE THAT THE BANKRUPTCY COURT LOCATED IN THE SOUTHERN DISTRICT OF INDIANA SHALL HAVE EXCLUSIVE JURISDICTION OVER ALL DISPUTES AND OTHER MATTERS RELATING TO (i) THE INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT OR ANY OTHER DOCUMENT EXECUTED PURSUANT HERETO; AND/OR (ii) THE PURCHASED ASSETS AND/OR ASSUMED LIABILITIES AND/OR ASSUMED CONTRACTS; AND (iii) ANY OTHER MATTER IN DISPUTE HEREUNDER.  BUYER EXPRESSLY CONSENTS TO AND AGREES NOT TO CONTEST SUCH EXCLUSIVE JURISDICTION AND, ACCORDINGLY, WAIVES ITS RIGHTS TO A JURY TRIAL.

**13.8    Successors and Assigns**.

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, provided, however, that no party may assign its rights and obligations hereunder without the prior written consent of the other party hereto; provided that prior to Closing Buyer may assign all or any portion of its rights and obligations to an Affiliate provided that (a) such Affiliate shall have cash, immediately prior to Closing of at least $3,500,000 and, immediately after the Closing, exclusive of the Purchased Assets, of at least $3,000,000, and (b) no such assignment shall relieve Buyer of any of its obligations hereunder.

**13.9    Interpretation**.

The masculine, feminine or neuter pronouns used herein shall be interpreted without regard to gender, and the use of the singular or plural shall be deemed to include the other whenever the context so requires.  The headings in this Agreement are inserted for convenience of reference only and shall not be a part of or control or affect the meaning of this Agreement.  Unless otherwise expressly stated herein, all references herein to Articles, Sections and paragraphs are to Articles, Sections and paragraphs in this Agreement and all references herein to Schedules and Exhibits are to Schedules and Exhibits to this Agreement.  The phrase "including" means "including, without limiting the generality of the foregoing."  The parties have each been represented by counsel in connection with the negotiation of this Agreement.  The fact that any provision hereof may have been drafted by counsel for a given party shall not be taken into consideration in interpreting such provision.

**13.10   Schedules and Exhibits**.

The Schedules and Exhibits referred to herein and attached to this Agreement are incorporated herein by such reference as if fully set forth in the text hereof.  The inclusion of information in the Schedules hereto shall not be construed as an admission that such information is material to the Purchased Assets or the Business.  Terms used in the Schedules and not specifically defined shall have the same meanings as ascribed to them in this Agreement.  An item disclosed in a Schedule which is relevant to another Schedule shall be deemed disclosed in such other Schedule, but only if a person reading such Schedule would reasonably conclude that such item is relevant to the other Schedule.

**13.11   Modification**.

The parties to this Agreement may, by mutual written consent, executed by an authorized officer of each the Buyer and Seller, modify or supplement this Agreement in such manner as may be mutually agreed upon by them in writing.

**13.12   Waiver of Provisions**.

The terms, covenants, representations, warranties and conditions of this Agreement may be waived only by a written instrument executed by each the Buyer and Seller waiving compliance.  The failure of any party at any time to require performance of any provisions hereof shall, in no manner, affect the right at a later date to enforce the same.  No waiver by any party of any condition, or breach of any provision, term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

**13.13   Expenses**.

Except as otherwise provided in Section 3.1(a) of this Agreement, each party shall bear its own expenses incident to this Agreement and the transactions contemplated hereby, including without limitation, all fees of counsel, accountants and consultants provided that, if any party breaches this Agreement any non-breaching party shall be entitled to reimbursement from the breaching party of its reasonable attorneys fees incurred in connection with the enforcement of its rights hereunder (whether or not judicial proceedings are instituted).

**13.14   Further Assurances**.

At any time on or after the Closing, the parties hereto shall each perform such acts, execute and deliver such instruments, assignments, endorsements and other documents and do all such other things consistent with the terms of this Agreement as may be reasonably necessary to accomplish the transactions contemplated in this Agreement or otherwise carry out the purpose of this Agreement and the Other Documents.

**13.15   Name Change Filings**.

Each of the Seller and Victor Holdings shall, within 5 Business Days following the Closing, deliver to the Buyer evidence of filings with the Secretary of State of Indiana of amendments to each Person's certificate of incorporation to change its respective name to a name that does not include the words "Victor Oolitic" or any such words that are confusingly similar thereto.

**13.16   Irrevocability**

As required in the Sale Procedures Order, Buyer shall not be permitted to revoke this Agreement until the earlier to occur of (i) the Closing, or (ii) for thirty (30) days following the conclusion of the Auction.

**(Signature Page Follows)**

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be executed on its behalf by its officer thereunto duly authorized, all on or as of the day and year first above written.

**VICTOR OOLITIC STONE COMPANY**

By: _____
Name:
Title:

**VICTOR ACQUISITION CORP.**

By: _____
Name:
Title:

Acknowledged and Agreed (with respect to Section 13.15):

**VICTOR OOLITIC HOLDINGS, INC.**

By: _____
Name:
Title:

CHI-1727944

Asset and Other Schedules

**Schedule 1.2(c)**
**Furniture, Fixtures, Equipment**

Automobiles used in the ordinary course of business

Various office equipment used in the ordinary
course of business

All machinery, fixtures and equipment used in
the ordinary course of business

All quarry blocks, slabs and finished sills

Mineral reserves

**Schedule 1.2(d)**
**Assumed Contracts**

Pitney Bowes Global Financial Services LLC          Mailing System Lease
PO Box 856460
Louisville, KY  40285-6460

Pegasus Property Management Corporation          Property Management Agreement

Any and all confidentiality agreement or similar agreements entered into by the Seller in connection with the Bankruptcy Cases.

Various Farm-Lease Arrangements, including:

> Danny & Carmon Butcher
> 8570 S. Rockport Road
> Bloomington, IN 47403

> Gerald W. & Tammy E. Prince
> 3537 State Rd. 158
> Bedford, IN 47421

> Phillip Vance Smith
> 3699 W. Milton Road
> Bloomington, IN 47403

Rental Arrangements with respect to the following properties:

7070 South Victor Pike
Bloomington, IN  47403

7080 South Victor Pike
Bloomington, IN  47403

7255 South Victor Pike
Bloomington, IN  47403

7749 South Victor Pike
Bloomington, IN  47403

7750 South Victor Pike
Bloomington, IN  47403

7885 South Victor Pike
Bloomington, IN  47403

**Schedule 1.2(f)**
**Real Property**

7850 South Victor Pike, Bloomington, IN

Approx. 280 Acres Near Stinesville, IN

Approx. 260 Acres Near Peerless, IN

All production and maintenance buildings and real estate improvements (fences, parking lots, paved roads, etc.) on the foregoing properties.

7070 South Victor Pike, Bloomington, IN

7080 South Victor Pike, Bloomington, IN

7255 South Victor Pike, Bloomington, IN

7749 South Victor Pike, Bloomington, IN

7750 South Victor Pike, Bloomington, IN

7885 South Victor Pike, Bloomington, IN

CHI-1727944v5

**Schedule 1.2(o)**
**Other Purchased Assets**

Refunds in connection with any workers' compensation policies.

**Schedule 1.3(i)**
**Other Excluded Assets**

Employment Agreement, dated February 12, 2007, by and between Seller and Richard M. Gold.

Aggregate Production and Lease Agreement dated as of December 10, 2003 between Seller and Justin Blackwell Trucking and Conveying, Incorporated.

Letter Agreement dated June 10, 2008 [sic] and executed June 15, 2009 between Seller and BTI Crushed Stone Sales, LLC.

**Schedule 1.4(c)**
**Vendors**

Bank of America MasterCard
Brandeis, Inc.
Chase, Indiana NA
Cintas Corporation LOC 529
City of Bloomington Utilities
Community Hardware, Inc.
Cornwell Communications
Diamond Stone Technologies
Farmers & Mechanics Federal Savings
FedEx
Indylift, Inc.
interrupt
Lawson Products, Inc.
Napa Auto Parts
Northern Safety Co., Inc.
Office Depot
REMC
Smith Western Wear & Tack
White River Co-op

**Schedule 1.4(f)**
**Employment Liabilities**

Health insurance for YJ Zhang through December 31, 2009

Potential COBRA obligations for Richard Gold and YJ Zhang

Employee Travel and Related Expenses

**Schedule 3.3**
**Purchase Price Allocation**

**To be provided.**

# DISCLOSURE SCHEDULE

## to

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**
**DISCLOSURE SCHEDULE**
**NOVEMBER 17, 2009**

This is the Disclosure Schedule referred to in the Asset Purchase Agreement dated as of the 17th day of November, 2009 (the "Agreement"), by and between Victor Acquisition Corp., an Indiana corporation ("Buyer"), and Victor Oolitic Stone Company, an Indiana corporation ("Seller")

Unless otherwise defined herein, all capitalized terms used herein shall have the meanings given to them in the Agreement.

The information contained in this Disclosure Schedule is subject to the following general qualifications:

(i)     such information is not limited to matters required by the Agreement to be reflected or disclosed in this Disclosure Schedule;

(ii)     a section of this Disclosure Schedule relating to one Section of the Agreement may cross-reference matter(s) disclosed on a section of this Disclosure Schedule relating to any other Section of the Agreement;

(iii)     to the extent that a certain section of this Disclosure Schedule describes with particularity a matter relating to the subject matter of any other section of this Disclosure Schedule such that the relevance of such matter to such section of this Disclosure Schedule is reasonably apparent, the matter shall be deemed disclosed for purposes of each such section of this Disclosure Schedule;

(iv)     the headings used herein are for convenience purposes only and in no way expand or otherwise modify the information requests in the Agreement; and

(v)     no reference to or disclosure of any item or other matter in this Disclosure Schedule shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in this Disclosure Schedule.

Any and all documents, agreements or other materials referred to in this Disclosure Schedule, and any annexes hereto, are hereby incorporated herein by reference as if set forth herein in their entirety.  References to "undated" documents are to those documents in the forms provided or made available to the Buyer.

In addition to the foregoing, the following documents, agreements or materials are hereby deemed disclosed for all purposes of the Agreement and are hereby incorporated into this Disclosure Schedule by reference as if set forth herein in their entirety:

1.     All organizational and formation documents of the Seller which are of public record and generally available for public review or procurement;

2.      All Liens which are reflected within any public filings or public records generally available for public review; any title, survey and other real estate-related encumbrances which are of public record and generally available for public review or procurement; any zoning or land use laws generally applicable to the relevant properties;

3.      The Agreement and all exhibits, schedules and other attachments thereto.

4.      All pleadings and filings in the Bankruptcy Case, and all other documents, transcripts, and other information made available pursuant to or a part of the Bankruptcy Case.

The following Schedules to the Agreement are set forth elsewhere and not included in this Disclosure Schedule:

| Schedule | |
|---|---|
| 1.2(c) | Equipment |
| 1.2(d) | Assumed Contracts |
| 1.2(f) | Real Property |
| 1.2(o) | Other Purchased Assets |
| 1.3(i) | Other Excluded Assets |
| 1.4(c) | Vendors |
| 1.4(f) | Employment Liabilities |
| 3.3 | Purchase Price Allocation |

**Schedule 4.4(a)**
**Limitations on Assumed Contracts**

**None.**

**Schedule 4.4(b)**
**Breaches of Assumed Contracts**

**None.**

**Schedule 4.5**
**Consents**

**None.**

**EXHIBIT A**

**SALE APPROVAL ORDER**

**EXHIBIT B**

**CONTRIBUTION AGREEMENT**

## CONTRIBUTION AGREEMENT

THIS CONTRIBUTION AGREEMENT (this "***Agreement***"), made as of the 13th day of November, 2009, by and among Victor Oolitic Holdings, Inc., a Delaware corporation (the "***Company***"), Victor Acquisition Corp., an Indiana corporation ( "***Acquisition***"), North Coast Materials LLC, a Delaware limited liability company ("***North Coast***"), Freeport Financial LLC, a Delaware limited liability company ("***Freeport Financial***"), Freeport Onshore Holding LLC, a Delaware limited liability company ("***Freeport Onshore***"), Freeport Offshore Holding LLC, a Delaware limited liability company ("***Freeport Offshore,***" and together with Freeport Onshore, the "***Freeport Parties***"). Capitalized terms used and not otherwise defined herein have the meaning ascribed to them in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, the Company is the sole shareholder of Acquisition;

WHEREAS, pursuant to that Letter Agreement dated November 3, 2009, Freeport Onshore, on behalf of itself and its affiliates, agreed exclusively in support of the transaction contemplated herein to make the Freeport Contribution in exchange for the benefits provided to Freeport herein;

WHEREAS, Acquisition has executed that certain Asset Purchase Agreement by and between Victor Oolitic Stone Company and Acquisition, dated as of November 17, 2009 (the "***Purchase Agreement***");

WHEREAS, Acquisition has submitted the Purchase Agreement and taken other actions (collectively, the "***Bid***") in connection with its participation in an auction conducted by the Bankruptcy Court pursuant to procedures set forth in the Sale Procedures Order all of which are related to the Bankruptcy Cases;

WHEREAS, in the event that Acquisition is declared the "Successful Bidder" pursuant to the Sale Approval Order, Acquisition will (i) make a cash payment as part of the Purchase Price, and (ii) be capitalized, immediately prior to the Closing, with and have cash on hand of no less than $3,500,000, and immediately after the Closing, with and have cash on hand of no less than $3,000,000 (collectively, the "***Cash Matters***") in accordance with Section 9.3 of the Purchase Agreement;

WHEREAS, in connection with the Bid, Acquisition will make a "*credit bid*" pursuant to Section 3.1(d) of the Purchase Agreement (the "***Credit Bid***");

WHEREAS, the Seller owes approximately $19,449,877.52 to the Freeport Parties pursuant to that certain Second Lien Credit Agreement, by and among Seller, Freeport Financial LLC and the lenders party thereto (collectively, the "***Obligations***");

WHEREAS, in order to enable Acquisition to perform its obligations with respect to Cash Matters (after contribution of such by the Company), North Coast desires to contribute cash in amount equal to $3,400,000 (the "***Cash Contribution***") to the Company and the

Company desires to accept the Cash Contribution, at the time and on the terms and conditions set forth herein;

WHEREAS, in order to enable Acquisition to perform its obligations with respect to the Credit Bid (after contribution of such by the Company), the Freeport Parties desire to contribute all of their rights, interests and claims with respect to the Obligations to the Company and the Company desires to accept such contribution, at the time and on the terms and conditions set forth herein;

WHEREAS, in order to enable Acquisition to perform its obligations with respect to the Cash Matters and the Credit Bid under the Purchase Agreement, the Company desires to contribute all of its rights and interests with respect to the Cash Contribution and the Obligations to Acquisition and Acquisition desires to accept such contribution, at the time and on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and mutual covenants hereinafter set forth, and other good and valuable consideration had and received, the parties agree as follows:

## ARTICLE 1  CONTRIBUTION

1.1     <u>Contribution by North Coast</u>.  Within one (1) Business Day following the satisfaction (or waiver by Acquisition, as applicable) of the conditions (the "***Closing Conditions***") set forth in Sections 7.1, 7.2, 8.1, 8.2 and 8.3 of the Purchase Agreement, North Coast shall contribute the Cash Contribution to the capital of the Company, and the Company, in exchange for such contribution, shall issue and deliver to North Coast (i) 680 shares of the common stock, par value $0.01, of the Company (the "***Common Stock***"), and (b) 2720 shares of the preferred stock, par value $0.01, of the Company (the "***Preferred Stock***" and together with the Common Stock, the "***Shares***"), subject to the terms of that certain stockholders agreement of the Company, entered into as of November 13, 2009, by and among, the Company, North Coast and the Freeport Parties (the "***Stockholders Agreement***").

1.2     <u>Contribution by the Freeport Parties</u>.  Within one (1) Business Day of the satisfaction of the Closing Conditions, the Freeport Parties shall each contribute, transfer, assign and convey all rights, interests and claims with respect to the Obligations (the "***Claim Contribution***"), and Company, in exchange for such contribution, shall issue and deliver the following: (A) to Freeport Onshore or its designee (i) 212.8496251 shares of Common Stock, and (ii) 851.3985003 shares of Preferred Stock, (B) to Freeport Offshore or its designee (i) 164.0733750 shares of Common Stock, and (ii) 656.2935000 shares of Preferred Stock,.

1.3     <u>Contribution by the Company</u>.  Immediately after the contribution of the Cash Contribution and the Obligations by North Coast and the Freeport Parties, respectively, the Company, in its capacity as the sole shareholder of Acquisition, shall contribute the Cash Contribution and the Obligations to the capital of Acquisition, and Acquisition hereby agrees to accept such contribution.

1.4     <u>Additional Conditions to Contributions</u>: In addition to the Closing Conditions, each of the Cash Contribution and the Claim Contribution are conditioned on (A) the entry of the

2

Sale Approval Order by the Bankruptcy Court and (B) the execution and delivery of the documents prepared in contemplation of the Acquisition, in each case by the respective parties thereto.

## ARTICLE 2   REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants as of the date first set forth above to Acquisition, North Coast and the Freeport Parties as follows:

2.1    Existence and Good Standing.  The Company is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Delaware.

2.2    Power.  The Company has the corporate power and authority to execute, deliver and perform fully its obligations under this Agreement.

2.3    Validity and Enforceability.  This Agreement has been duly executed and delivered by the Company and, assuming due authorization, execution and delivery by Acquisition, North Coast and the Freeport Parties represents the legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation, fraudulent conveyance and other similar laws and principles of equity affecting creditors' rights and remedies generally.  No further action on the part of the Company is or will be required in connection with the transactions contemplated hereby.

2.4    Capitalization of the Company.  As of the date of this Agreement, other than (i) twenty (20) shares of Common Stock issued to North Coast, (ii) eighty (80) shares of Preferred Stock issued to North Coast and (iii) the Shares to be issued pursuant hereto, there are no other issued and outstanding shares of capital stock of the Company, and there are no outstanding options, warrants, rights, calls, subscriptions, claims of any character, agreements, obligations, convertible or exchangeable securities or other commitments, contingent or otherwise of any kind obligating the Company to issue, directly or indirectly, any additional shares of its capital stock or other equity securities.

2.5    No Conflict.  Neither the execution of this Agreement nor the performance by the Company of its obligations hereunder will (a) violate or conflict with the Company's Certificate of Incorporation or Bylaws, (b) violate, conflict with or result in a breach or termination of, or otherwise give any person additional rights or compensation under, or the right to terminate or accelerate, or constitute (with notice or lapse of time, or both) a default under the terms of any note, deed, lease, instrument, security agreement, mortgage, commitment, contract, agreement, license or other instrument or oral understanding to which the Company is a party or (c) result in the creation or imposition of any lien with respect to, or otherwise have an adverse effect upon, any of the assets or properties of the Company.

2.6    Consents.  No consent, approval or authorization of any person or is required in connection with the execution and delivery by the Company of this Agreement or the consummation of the transactions contemplated by this Agreement.

3

## ARTICLE 3  REPRESENTATIONS AND WARRANTIES OF ACQUISITION

Acquisition hereby represents and warrants as of the date first set forth above to the Company, North Coast and the Freeport Parties as follows:

3.1    <u>Existence and Good Standing</u>.  Acquisition is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Indiana.

3.2    <u>Power</u>.  Acquisition has the corporate power and authority to execute, deliver and perform fully its obligations under this Agreement.

3.3    <u>Validity and Enforceability</u>.  This Agreement has been duly executed and delivered by Acquisition and, assuming due authorization, execution and delivery by North Coast and Freeport represents the legal, valid and binding obligation of Acquisition, enforceable against Acquisition in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation, fraudulent conveyance and other similar laws and principles of equity affecting creditors' rights and remedies generally.  No further action on the part of Acquisition is or will be required in connection with the transactions contemplated hereby.

3.4    <u>No Conflict</u>.  Neither the execution of this Agreement nor the performance by Acquisition of its obligations hereunder will (a) violate or conflict with Acquisition's Certificate of Incorporation or Bylaws, (b) violate, conflict with or result in a breach or termination of, or otherwise give any person additional rights or compensation under, or the right to terminate or accelerate, or constitute (with notice or lapse of time, or both) a default under the terms of any note, deed, lease, instrument, security agreement, mortgage, commitment, contract, agreement, license or other instrument or oral understanding to which Acquisition is a party or (c) result in the creation or imposition of any lien with respect to, or otherwise have an adverse effect upon, any of the assets or properties of Acquisition.

3.5    <u>Consents</u>.  No consent, approval or authorization of any person is required in connection with the execution and delivery by Acquisition of this Agreement or the consummation of the transactions contemplated by this Agreement.

## ARTICLE 4  REPRESENTATIONS AND WARRANTIES OF NORTH COAST

North Coast represents and warrants as of the date first set forth above to the Company, Acquisition and the Freeport Parties as follows:

4.1    <u>Existence and Good Standing</u>.  North Coast is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware.

4.2    <u>Power</u>.  North Coast has the limited liability company power and authority to execute, deliver and perform fully its obligations under this Agreement.

4.3    <u>Validity and Enforceability</u>.  This Agreement has been duly executed and delivered by North Coast and, assuming due authorization, execution and delivery by each of the Company, Acquisition and the Freeport Parties, represents the legal, valid and binding obligation

4

of each person enforceable against such person in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation, fraudulent conveyance and other similar laws and principles of equity affecting creditors' rights and remedies generally.  No further action on the part of North Coast is or will be required in connection with the transactions contemplated hereby.

4.4    No Conflict.  Neither the execution of this Agreement nor the performance by North Coast of its obligations hereunder will (a) violate or conflict with North Coast's Certificate of Formation or Operating Agreement, (b) after entry of the Sale Approval Order by the Bankruptcy Court violate, conflict with or result in a breach or termination of, or otherwise give any person additional rights or compensation under, or the right to terminate or accelerate, or constitute (with notice or lapse of time, or both) a default under the terms of any note, deed, lease, instrument, security agreement, mortgage, commitment, contract, agreement, license or other instrument or oral understanding to which the Company is a party or (c) result in the creation or imposition of any lien with respect to, or otherwise have an adverse effect upon, any of the assets or properties of North Coast.

4.5    Consents.  No consent, approval or authorization of, or notice to, any person is required in connection with the execution and delivery by North Coast of this Agreement or the consummation of the transactions contemplated by this Agreement.

4.6    Investment and Representations.

(a)    North Coast has such knowledge and experience in financial and business matters that North Coast is capable of protecting North Coast's own interests in connection with the purchase of the Shares and evaluating the merits and risks of North Coast's investment in the Company.

(b)    North Coast and North Coast's advisors have such knowledge and experience in financial, tax and business matters so as to enable North Coast to utilize the information made available to North Coast in connection with the investment contemplated hereby to evaluate the merits and risks of an investment in the Company and to make an informed investment decision with respect thereto.  North Coast is familiar with the type of investment that the Shares constitute and recognizes that an investment in the Company involves substantial risks, including risk of loss of the entire amount of such investment.

(c)    North Coast is aware that there are limitations and restrictions on the circumstances under which North Coast may offer to sell, transfer or otherwise dispose of the Shares.  North Coast acknowledges that as a result of such limitations and restrictions, it might not be possible to liquidate this investment readily and that it may be necessary to hold the investment for an indefinite period.

(d)    In evaluating the suitability of an investment in the Company, North Coast has not relied upon any oral or written representations or other information from the Company or any agent or representative of the Company except as set forth herein.

(e)    No person, including, without limitation, the Company, its managers, employees, directors or officers, or their agents or employees, has warranted to North Coast,

5

CHI-1729227v9                                                    Contribution Agreement

either expressly or by implication, the amount of profits and/or amount of or type of consideration, profit or loss (including tax write-offs and/or tax benefits) to be realized, if any, as a result of North Coast's investment in the Company

(f)     North Coast is effecting the purchase of the Shares contemplated hereby for North Coast's own account, for investment and not with a view to resale or distribution except in compliance with the Securities Act of 1933, as amended (the "***Securities Act***").  North Coast agrees not to sell or otherwise transfer the Shares without registration under the Securities Act or applicable state securities laws or an exemption therefrom.  North Coast acknowledges that the Shares have not been and will not be registered under the Securities Act or the securities laws of any state.

(g)     North Coast understands that there is no established market for the Shares and it is not anticipated that there will be any public market for the Shares in the foreseeable future, and, accordingly, that it may not be possible for North Coast to liquidate their investment in case of an emergency, if at all.

(h)     North Coast has been provided to their satisfaction with the opportunity to ask questions concerning the terms and conditions of the offering of the Shares, has had all such questions answered to their satisfaction, and has had access to, and been supplied with, all additional information deemed necessary by North Coast to verify the accuracy of such information.

(i)     North Coast's principal residence for tax purposes is 25101 Chagrin Blvd., Suite 350, Cleveland, Ohio  44122, c/o Resilience Capital Partners LLC.

(j)     North Coast can bear the economic risk of the purchase of the Shares and of the loss of the entire amount of the investment.

(k)     North Coast has read, is familiar with, and understands the Stockholders Agreement.

(l)     Accredited Investor Determination.  North Coast is qualified as an accredited investor within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act.

## ARTICLE 5  REPRESENTATIONS AND WARRANTIES OF THE FREEPORT PARTIES

Each of the Freeport Parties hereby represents and warrants as of the date first set forth above to the Company and North Coast as follows:

5.1     Existence and Good Standing.  Freeport Onshore and Freeport Offshore are limited liability companies duly formed, validly existing and in good standing under the laws of the State of Delaware..

6

5.2     Power.  Each of Freeport Onshore and Freeport Offshore have the limited liability company power and authority to execute, deliver and perform fully its obligations under this Agreement.

5.3     Validity and Enforceability.  This Agreement has been duly executed and delivered jointly and severally by the Freeport Parties and, assuming due authorization, execution and delivery by each of the Company, Acquisition, and North Coast, represents the legal, valid and binding obligation of each of the Freeport Parties enforceable against each of the Freeport Parties in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium, liquidation, fraudulent conveyance and other similar laws and principles of equity affecting creditors' rights and remedies generally.  No further action on the part of any of the Freeport Parties is or will be required in connection with the transactions contemplated hereby.

5.4     No Conflict.  Neither the execution of this Agreement nor the performance by the Freeport Parties of their obligations hereunder will (a) violate or conflict with either Freeport Parties' Certificate of Formation or Operating Agreement, (b) after entry of the Sale Approval Order by the Bankruptcy Court, violate, conflict with or result in a breach or termination of, or otherwise give any person additional rights or compensation under, or the right to terminate or accelerate, or constitute (with notice or lapse of time, or both) a default under the terms of any note, deed, lease, instrument, security agreement, mortgage, commitment, contract, agreement, license or other instrument or oral understanding to which any Freeport Party is a party or (c) result in the creation or imposition of any lien with respect to, or otherwise have an adverse effect upon, any of the assets or properties the Freeport Parties.

5.5     Consents.  No consent, approval or authorization of, or notice to, any person is required in connection with the execution and delivery by the Freeport Parties of this Agreement or the consummation of the transactions contemplated by this Agreement.

5.6     Investment and Representations.

(a)     Each of the Freeport Parties has such knowledge and experience in financial and business matters that each of the Freeport Parties is capable of protecting their respective interests in connection with the purchase of the Shares and evaluating the merits and risks of the Freeport Parties' investment in the Company.

(b)     Each of the Freeport Parties and their respective advisors have such knowledge and experience in financial, tax and business matters so as to enable each of the Freeport Parties to utilize the information made available to each of the Freeport Parties in connection with the investment contemplated hereby to evaluate the merits and risks of an investment in the Company and to make an informed investment decision with respect thereto. Each of the Freeport Parties is familiar with the type of investment that the Shares constitute and recognizes that an investment in the Company involves substantial risks, including risk of loss of the entire amount of such investment.

(c)     Each of the Freeport Parties is aware that there are limitations and restrictions on the circumstances under which the Freeport Parties may offer to sell, transfer or

7

otherwise dispose of the Shares.  Each of the Freeport Parties acknowledges that as a result of such limitations and restrictions, it might not be possible to liquidate this investment readily and that it may be necessary to hold the investment for an indefinite period.

(d)    In evaluating the suitability of an investment in the Company, neither of the Freeport Parties has relied upon any oral or written representations or other information from the Company or any agent or representative of the Company except as set forth herein.

(e)    No person, including, without limitation, the Company, its managers, employees, directors or officers, or their agents or employees, has warranted to the Freeport Parties, either expressly or by implication, the amount of profits and/or amount of or type of consideration, profit or loss (including tax write-offs and/or tax benefits) to be realized, if any, as a result of the Freeport Parties' investment in the Company

(f)    Each of the Freeport Parties is effecting the purchase of the Shares contemplated hereby for its own account, for investment and not with a view to resale or distribution except in compliance with the Securities Act.  Each of the Freeport Parties agrees not to sell or otherwise transfer the Shares without registration under the Securities Act or applicable state securities laws or an exemption therefrom.  The Subscriber acknowledges that the Shares have not been and will not be registered under the Securities Act or the securities laws of any state.

(g)    Each of the Freeport Parties understands that there is no established market for the Shares and it is not anticipated that there will be any public market for the Shares in the foreseeable future, and, accordingly, that it may not be possible for the Subscriber to liquidate the Subscriber's investment in case of an emergency, if at all.

(h)    Each of the Freeport Parties has been provided to the other's satisfaction with the opportunity to ask questions concerning the terms and conditions of the offering of the Shares, has had all such questions answered to each of the Freeport Parties' satisfaction, and has had access to, and been supplied with, all additional information deemed necessary by each of the Freeport Parties to verify the accuracy of such information.

(i)    Freeport Parties principal residence for tax purposes is the Cayman Islands.

(j)    Each of the Freeport Parties can bear the economic risk of the purchase of the Shares and of the loss of the entire amount of the investment.

(k)    Each of the Freeport Parties has read, is familiar with, and understands the Stockholders Agreement.

(l)    Each of the Freeport Parties is qualified as an "***accredited investor***" within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act.

8

## ARTICLE 6  MISCELLANEOUS

6.1    <u>Amendment and Modification</u>.  This Agreement may be amended or modified, provided that such amendment, modification or waiver is set forth in writing and executed by the Company, North Coast, Freeport Financial and the Freeport Parties.

6.2    <u>Matter Related to the Bankruptcy Cases</u>.

(a)    In the event and upon the termination of the Purchase Agreement pursuant to Section 11 thereof, (i) Acquisition shall immediately distribute the Cash Contribution and Obligations to the Company, (ii) upon receipt of such distribution from Acquisition, the Company shall immediately distribute the Cash Contribution to North Coast and shall immediately distribute the Obligations to the Freeport Parties, in each case in such a manner that the parties hereto shall be in substantially the same position with respect to the contributions made hereunder after completion of the actions set forth in this Section 6.2 as they were immediately prior to the execution of this Agreement.

(b)    In the event Acquisition is not determined to be the "Successful Bidder" pursuant to the Sale Approval Order, then (i) Acquisition shall (i) distribute all cash held, and any cash received in the future, to the Company, and (ii) upon receipt of such cash from Acquisition, the Company shall distribute such cash so received to North Coast.

6.3    <u>Survival of Representations and Warranties</u>.  All representations, warranties, covenants and agreements set forth in this Agreement will survive the execution and delivery of this Agreement and the closing and consummation of the transactions contemplated by this Agreement, <u>provided</u> that survival of all such representations, warranties, covenants and agreements are conditioned upon the closing and consummation of the transactions contemplated by this Agreement.

6.4    <u>Entire Agreement</u>.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties to this Agreement and, except as provided in this Agreement, their respective successors and assigns.  This Agreement sets forth the entire agreement and understanding between the parties as to the subject matter hereof and merges and supersedes all prior discussions, agreements and understandings of any and every nature among them.  There are no representations, agreements or understandings, oral or written, between or among the parties to this Agreement relating to the subject matter of this Agreement that are not fully expressed in this Agreement.

6.5    <u>No Assignment</u>.  The rights and obligations of the parties under this Agreement may not be assigned, other than to an affiliate, without the prior written consent of the other parties.

6.6    <u>Governing Law</u>.  The validity, performance, construction and effect of this Agreement shall be governed by and construed in accordance with the internal law of the State of Delaware, without giving effect to principles of conflicts of law and all parties, including their successors and assigns, consent to the jurisdiction of the state and federal courts of Delaware.

9

Contribution Agreement

6.7    <u>Headings and Counterparts</u>.  The headings in this Agreement are for convenience of reference only and shall not constitute a part of this Agreement, nor shall they affect the meaning, construction or effect of this Agreement.  This Agreement may be executed in two or more counterparts and by the parties in separate counterparts, each of which when so executed shall be deemed to be an original, and all of which taken together shall constitute one and the same instrument.

6.8    <u>Notices</u>.  All notices and other communications required or permitted hereunder shall be in writing and shall be deemed to have been duly given when delivered in person or five business days after being sent by registered or certified mail, return receipt requested, postage prepaid or when dispatched by electronic facsimile transfer (if confirmed in writing by mail simultaneously dispatched) or one business day after having been dispatched by a nationally recognized overnight courier service, to the appropriate party at the address or facsimile number specified below:

Contribution Agreement

(a)     If to the Company:

Victor Oolitic Holdings Inc.
c/o Resilience Capital Partners LLC
25101 Chagrin Blvd.
Suite 350
Cleveland, Ohio 44122
Fax: (216) 292-4750
Attention:  President

and

Jones Day
77 West Wacker Drive
Suite 3500
Chicago, Illinois 60601-1692
Attention:  Walter S. Holzer
Facsimile No.:  (312) 782-8585

(b)     If to Acquisition North Coast, Freeport Financial or the Freeport Parties:  To the applicable address indicated on Exhibit A hereto.

Any party to this Agreement may change its address or facsimile number for the purposes of this Section 6.8 by giving notice as provided herein.

6.9     Severability.  In the event that any provision of this Agreement or the application of any provision hereof is declared to be illegal, invalid or otherwise unenforceable by a court or other judicial or administrative body of competent jurisdiction, the remainder of this Agreement shall remain in full force and effect.

6.10     Third Party Beneficiaries.  Nothing in this Agreement is intended or will be construed to confer on any person other than the parties or their successors and assigns any rights or benefits under this Agreement.

**[Signatures on Following Page]**

11

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first written above.

**VICTOR OOLITIC HOLDINGS, INC.**

By: _____
Name:
Title:

**VICTOR ACQUISITION CORP.**

By: _____
Name:
Title:

**NORTH COAST MATERIALS LLC**

By: _____
Name:
Title:

**FREEPORT ONSHORE HOLDING LLC**

By: _____
Name:
Title:

CHI-1729227

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first written above.

**VICTOR OOLITIC HOLDINGS, INC.**

By: _____
      Name:
      Title:

**VICTOR ACQUISITION CORP.**

By: _____
      Name:
      Title:

**NORTH COAST MATERIALS LLC**

By: _____
      Name:
      Title:

**FREEPORT ONSHORE HOLDING LLC**

By: _____
      Name: Joseph J Walker
      Title: MD

CHI-1729227

**FREEPORT OFFSHORE HOLDING LLC**

By: _____
Name:  Joseph V Walker
Title:  MD


**FREEPORT FINANCIAL LLC, as agent**

By: _____
Name:  Joseph V Walker
Title:  MD


**[Signature Page to Contribution Agreement]**

CHI-1729227

## Exhibit A

| Name | Address |
| --- | --- |
| Victor Acquisition Corp | c/o Resilience Capital Partners LLC<br>25101 Chagrin Blvd.<br>Cleveland, Ohio 44122<br>(216) 292-4750<br>Attention: President |
| North Coast Materials LLC | c/o Resilience Capital Partners LLC<br>25101 Chagrin Blvd.<br>Cleveland, Ohio 44122<br>(216) 292-4750<br>Attention: President |
| Freeport Parties | c/o Freeport Financial<br>500 West Madison, 17th Floor<br>Chicago, IL 60661<br>(312) 281-4646<br>Attention: Joe Walker<br><br>With a copy to:<br><br>Winston & Strawn LLP<br>35 West Wacker Drive<br>Chicago, IL 60601<br>(312) 558-5700<br>Attention: Brian I. Swett<br><br>and<br><br>Stark Investments<br>3600 South Lake Drive<br>St. Francis, WI 53235<br>(414) 294-7700<br>Attention: Joseph P. Lukas |

**EXHIBIT C**

**INSTRUMENT OF ASSIGNMENT AND ASSUMPTION**

Instrument of Assignment and Assumption (this "Assignment and Assumption"), dated _____ __, 2009, by and between Victor Oolitic Stone Company, an Indiana corporation ("Seller"), and [Buyer], an _____ ("Buyer").

WHEREAS, Seller has, pursuant to an Asset Purchase Agreement, dated August ___, 2009, between Seller and Buyer (the "Asset Purchase Agreement"), agreed to sell, convey, assign, transfer and deliver to Buyer all of Seller's right, title and interest in and to all of the Purchased Assets; and

WHEREAS, Buyer has pursuant to the Asset Purchase Agreement, agreed to assume the Assumed Liabilities.

NOW, THEREFORE, the parties hereto agree as follows, intending said agreements to become effective as of the Closing Date, and intending to be legally bound hereby:

1.    For good and valuable consideration to Seller in hand (receipt of which is hereby acknowledged), pursuant to and in accordance with the terms of the Asset Purchase Agreement, Seller hereby sells, conveys, transfers and delivers over unto Buyer, its successors and assigns, all of the right, title and interest of Seller in, to and under all Assumed Contracts.

2.    For good and valuable consideration to Buyer in hand (receipt of which is hereby acknowledged), pursuant to and in accordance with the terms of the Asset Purchase Agreement, Buyer hereby assumes (a) all of the right, title and interest of Seller in, to and under all Assumed Contracts and (b) the Assumed Liabilities (as set forth in Annex A).

3.    Buyer covenants and agrees to pay, perform, discharge, fulfill and observe the Assumed Liabilities in accordance with their respective terms, as required under Applicable Laws.

4.    This Assignment and Assumption and the covenants and agreements set forth herein shall be binding upon and inure to the benefit of Buyer and Seller and their respective successors and assigns.

5.    This Assignment and Assumption shall be governed by the laws of the State of Indiana (regardless of the laws that might be applicable under principles of conflicts of law) as to all matters, including, but not limited to, matters of validity, construction, effect and performance.

6.    Buyer and Seller will execute and deliver such instruments, certificates and other documents and take such other actions reasonably as may be required to effect the transfers contemplated by the Asset Purchase Agreement and this Assignment and Assumption.

7.      Each capitalized term used herein and not otherwise defined shall have the meaning assigned to such term in the Asset Purchase Agreement.

IN WITNESS WHEREOF, each of the parties hereto has caused this Instrument of Assignment and Assumption to be signed on the date first written above.

**VICTOR OOLITIC STONE COMPANY**

By:_____
Name:
Title:

**[BUYER]**

By:_____
Name:
Title:

**EXHIBIT D**

**BILL OF SALE**


       Victor Oolitic Stone Company, an Indiana corporation ("Seller"), for good and valuable consideration to Seller in hand paid (receipt of which is hereby acknowledged), pursuant to the Asset Purchase and Sale Agreement, dated August ___, 2009 (the "Asset Purchase Agreement"), by and among Seller and [Buyer], a _____ ("Buyer"), does hereby sell, convey, assign, transfer and deliver unto Buyer, its successors and assigns, all of Seller's right, title and interest, as of the Closing Date (as defined in the Asset Purchase Agreement), in and to all of the Purchased Assets (as defined in the Asset Purchase Agreement), including without limitation those listed on Annex A attached hereto.

       This Bill of Sale shall not in any manner affect, modify, expand upon or derogate from the representations, warranties, covenants or other agreements expressly set forth in the Asset Purchase Agreement.

       IN WITNESS WHEREOF, this Bill of Sale has been duly executed and delivered by the duly authorized officers of Seller and Buyer on this __ day of _____, 2009.

**VICTOR OOLITIC STONE COMPANY**

By:_____
Name:
Title:

ACCEPTED AND AGREED TO:

**[BUYER]**

By:_____
Name:
Title:

CHI-1727944v6